IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF TENNESSEE
EASTERN DIVISION

| | | |
|---|---|---|
| STEPHEN HUGUELEY, | ) | |
| | ) | |
| Petitioner, | ) | |
| | ) | |
| v. | ) | No. 09-1181-JDB-egb |
| | ) | |
| WAYNE CARPENTER, Warden, | ) | |
| Riverbend Maximum Security | ) | |
| Institution, | ) | |
| | ) | |
| Respondent. | ) | |
| | ) | |

## ORDER DENYING MOTION TO STAY AND ABATE PROCEEDINGS

On October 3, 2014, Petitioner, Stephen Hugueley, through counsel, filed a motion to stay

and abate proceedings. (Electronic Case Filing ("ECF") No. 101.) October 15, 2014, Respondent,

Warden Wayne Carpenter, answered in opposition to the motion. (ECF No. 102.) On October 16,

2014, Petitioner filed a reply (ECF No. 104-1) and, five days later, submitted a notice of

supplemental authority. (ECF No. 106.) On October 24, 2014, the Court directed Hugueley to file

a copy of the file-stamped Petition for Writ of *Error Coram Nobis* by Next Friend on Behalf of

Stephen L. Hugueley in the Circuit Court for Hardeman County, Tennessee. (ECF No. 107.) On

October 27, 2014, he filed a copy of the state court petition. (ECF No. 108.)

## I.     THE WRIT OF ERROR CORAM NOBIS

Petitioner's maternal aunt Lucille Parmenter filed the petition for writ of error coram nobis

by next friend on behalf of Petitioner. (*See* ECF No. 108.) She raises the following claims:

1. Mr. Hugueley was incompetent at the time of his trial in the above listed
case; newly discovered scientific evidence, previously unavailable to Mr.
Hugueley which was not presented to the jury (and is therefore *dehors* the
record) now shows that his irrational and self-defeating behavior, well
known to this Court, is the result of organic brain defects which rendered

him incompetent to stand trial. Because the result of the proceeding would have been different had this evidence been presented at the time of trial, Mr. Hugueley is entitled to *coram nobis* relief;

2.      Mr. Hugueley was also incompetent to waive presentation of mitigation evidence at trial, for the reasons stated above. Because the result of the proceeding would have been different had this evidence been presented at the time of trial, Mr. Hugueley is entitled to *coram nobis* relief;

3.      Mr. Hugueley was also incompetent to waive post-conviction, for the reasons stated above. Because the result of the proceeding would have been different had this evidence been presented at the time of trial, Mr. Hugueley is entitled to *coram nobis* relief.

(*Id.* at 2.)

Parmenter relies on submissions from neuropsychiatrist George Woods, neuropsychologist Erin Bigler, and Siddhartha Nadkarni[1], as well as her own affidavit and a declaration from Warden Roland Colson to support her petition and assertions about Petitioner's "current incompetence." (*Id.* at 5; *see* ECF Nos. 108-4, 108-5, 108-7.) She presents this evidence as "newly discovered scientific evidence" of Petitioner's mental incompetence. (ECF No. 108 at 9–10.) She further argues that the "newly discovered brain scans and expert interpretation support a . . . judgment" that Petitioner "was incompetent to stand trial, to waive mitigation evidence, and to waive post-conviction." (*Id.* at 15.)

Woods interviewed Petitioner in 2001, 2011, 2013, and 2014. (ECF No. 108-4 at PageID 5255.) In 2014, Woods concluded:

Stephen has multiple neurological and neuropsychiatric symptoms, including affective dysregulation, impaired registration, defective problem initiation, impaired judgment, clinical perseveration, poor problem sequencing, grandiosity, irritability, agitation, flight of ideas, and circumstantiality. These

---

[1] Nadkarni is a medical doctor who is board-certified in neurology, psychiatry, neurophysiology, neuropsychiatry, and behavioral neurology. (*See* ECF No. 108-7 at PageID 5296–97.) "PageID" is used for ease of reference to documents in the state court record and exhibits.

symptoms are associated with neurological disorders. The etiology of these disorders is complex and interconnected, creating a depth of impaired functioning and disruptive behavior greater than would be predicted from any one disorder independently. The multiplicity of symptoms explains Stephen's atypical presentation and behavioral dysfunction.

Moreover, Stephen's symptoms are interrelated in a cognitive synergy that rendered him unable to function effectively as both an adolescent and an adult. Mr. Hugueley is irrational, impulsive, and seemingly unable to effectively and consistently control his behavior. Mr. Hugueley's irrational behavior is long-standing, long pre-dating his trial on the instant case. His limitations rendered him incompetent to stand trial: his "impaired sense of reality substantially undermine[d] his judgment and prevent[[e]d] him from cooperating rationally with his lawyer." Stephen was also incompetent to waive post-conviction as his brain defect substantially affected his capacity to "appreciate his position and make a rational choice with respect to continuing or abandoning further litigation."

(*Id.* at PageID 5272 (first and third alterations in original) (citations omitted).)

Bigler provided NeuroQuant findings that Petitioner "show[ed] reduced hippocampal volume and increased size of the temporal horn" that "suggest that these temporal lobe regions . . . deviate from typical size." (ECF No. 108-5 at PageID 5291.) Bigler stated:

There are a variety of potential clinical correlations that could be made with such findings. However, in the absence of any indication for a progressive neurologic condition, this would suggest a static abnormality, most likely associated with developmental etiology. If there is history for longstanding developmental deficits in this individual, including intellectual and cognitive impairment, and/or longstanding emotional difficulty[,] this finding is likely of longstanding duration.

(*Id.*)

Although Parmenter asserts that she is relying on Nadkarni's findings, only his curriculum vitae was included with the petition, not the report. (*See* ECF No. 108 at 5 n.1; ECF No. 108-7 at PageID 5296–98.) Petitioner contends that Nadkarni's "nearly fatal illness over the summer and fall" prevented him from finalizing his report. (ECF No. 104-1 at 2.) Additionally, Parmenter provides documents relevant to Petitioner's social and medical history. (ECF Nos. 108-9; 108-10; 108-11; 108-12; 108-13; 108-14.)

Hugueley asserts that he is entitled to coram nobis relief under Tenn. Code. Ann. § 27-7-101, *et seq.* and § 40-26-105 because (1) "newly discovered . . . evidence demonstrates that he was incompetent at . . . trial and at the . . . waiver of his post-conviction proceedings"; (2) evidence of his incompetence was "*dehors* the record"; and (3) Petitioner is not at "fault for failing to present the brain scans at the proper time." (ECF No. 108 at 9–15.)

## II.    PRIOR EVALUATION AND ADJUDICATION RELATED TO COMPETENCY

Petitioner's competency has been addressed at various times in the state court. In 2003, prior to trial, neuropsychologist Pamela Auble conducted a records review and forensic neuropsychological evaluation of Petitioner at the request of counsel. (*See* ECF No. 43-2 at PageID 3433, 3447.) Auble concluded that he "had a history of psychiatric problems and severe behavioral problems" including socialization and impulse control, suicidal ideation and attempts, auditory hallucinations, depression, and aggression. (*Id.* at PageID 3454.) She noted "patchy impairments" from the neuropsychological testing. (*Id.* at PageID 3453.) Auble stated that a CT scan in 1987 did not reveal evidence of recurrence of a tumor that was removed from Petitioner's brain. (*Id.*) However, she recommended medical imaging of Hugueley's brain given the neuropsychological data, his "left arm/leg symptoms, and the frequent severe headaches." (*Id.*)

In 2003, psychiatrist Keith Caruso evaluated Petitioner at the request of his attorney to form an opinion about Petitioner's competency to stand trial, mental state at the time of the offenses, and extenuating or mitigating factors for sentencing. (*See id.* at PageID 3457.) With regard to his competency, Caruso stated:

> Despite a severe mental disease, Intermittent Explosive Disorder, the defendant understands the nature of the proceedings against him and the possible consequences and can cooperate intelligently with his attorney in his own defense in accordance with the criteria listed in *State v. Blackstock.* He accurately stated the charge against him as "first degree murder," and knew the date, victim, and

4

location of the allegation. He was aware that he could face the death penalty or life in prison without the possibility of parole, or life with the possibility of parole, although he acknowledged that, compounded with his earlier sentences, even the latter would amount to spending the remainder of his life in prison.

Hugueley identified his attorneys as Michie Gibson and T.J. Cross-Jones, stated that they "got along okay," and felt that they were adequately representing his interests. He identified Elizabeth Rice as the prosecutor who would present evidence against him. He recognized that his attorneys would not want him to make incriminatory statements to the prosecutor, although he had already done so in an effort to ensure that he is given the death penalty. Hugueley knew that the Judge was the Honorable Jon Kerry Blackwood and understood the Judge's role to be "to hear all the evidence and make rulings on objections and motions and instruct the jury, make sure Constitutional Rights aren't violated." He further acknowledged that the Judge was impartial.

Hugueley knew that the jury heard all evidence, deliberated, and decided issues of guilt or innocence and passed sentence in the event of a first degree murder conviction. He defined evidence as "proof of something," and stated that witnesses "verify the accuracy of events or provide scientific information, such as DNA or psychiatric opinions." He knew the possible please [sic] of guilty and not guilty and understood the concept of presenting an insanity defense, although he acknowledged that he did not "think that it would fly." He stated that at trial, "the prosecutor puts up evidence proving the defendant committed the crime, and the defense tries to rebut it. The jury is instructed and deliberates." He named potential outcomes as verdicts of "guilty and not guilty, as well as justifiable homicide or a lesser included offense." He stated that a guilty verdict on first degree murder would lead to a sentencing hearing where aggravators and mitigators would be presented to the jury, who would again deliberate and pass sentence.

Hugueley stated that he wanted to receive the death penalty. He initially stated, "I'm suicidal, I just ain't got the guts to do it myself." He later corrected himself, saying that he was not suicidal, but did not care whether he lived or died under the current conditions. He further added, "I have no intention of living 30 or 40 years in prison." Hugueley stated that he did not believe that life ended at physical death, believing that there was an after-life. He stated that he imagined that he would go to hell if he did not change his ways. He was non-committal as to whether he would change his ways. Hugueley also stated that conditions at Unit 2, where he would likely be housed if given a death sentence, were in fact better than conditions had been at other facilities. While this may seem unusual, it is a sentiment that I have heard expressed by several other inmates.

Hugueley further added that he understood that, if given the death penalty, he would be executed by lethal injection. He acknowledged that he would have selected this method over electrocution, as that may have led to a more painful

death.

Hugueley understands the nature of the proceedings against him on a factual and rational level. He also understands the possible consequences of those proceedings, specifically that he could face the death penalty or life in prison. Hugueley's current assertion that he wants to be convicted and receive the death penalty requires careful analysis to determine whether he has reached this stance rationally.

A key issue to examine in Hugueley's case is the distinction between rational and conventional. Under most circumstances, we would question the reasoning of someone who made efforts to engineer his own death. We must carefully safeguard to be certain that someone is not doing so out of mental illness, such as Major Depression, Bipolar Disorder, or Schizophrenia or some other psychotic disorder. Hugueley is not psychotic at this time. He does not suffer currently from delusions, hallucinations, or other forms of disorder in his thinking. He is not seeking to end his life as a means of ending some imagined suffering that is the irrational product of a delusion or hallucination.

Neither does Hugueley currently suffer from Major Depression or Bipolar Disorder. Depressed individuals often are so hopeless and tormented by their depression that they see suicide as the only means of escaping their intolerable pain. Conversely, an individual in the throes of a manic episode may be so grandiose as to believe that his death would not be permanent or would serve some other greater societal cause, such as saving the world. Manic individuals lack the insight to project themselves into the future and appreciate the ramifications of their impulsive decisions. In each of these cases, an individual may make an irrational decision that leads to his own death, failing to recognize that he is viewing the world in an irrationally distorted manner and in fact has a condition that may be alleviated by treatment.

Hugueley's assertion that he wants the death penalty is conditional. He stated that he would be happy to live as a free man and raise a family, although he recognizes that this is not an option for him. Hugueley's desire to be executed is also conditional in that it has arisen in the setting of frustration and thwarted desires. Hugueley is a man with little control over his environment. He is constitutionally a man who requires instant gratification; thus, his lack of control and the tedium of prison are difficult for him to tolerate. Hugueley never developed a sense that he could enact socially acceptable behavior that would lead to him receiving positive reinforcements. Instead, his life has been a series of disappointments, abandonment, broken promises, and frustration.

Hugueley realistically appreciates that his circumstances will not change. He feels that he cannot tolerate "30 to 40 more years in prison," seeing this as intolerable suffering. While there certainly is a significant degree of suffering involved, this could in no way justify changing his circumstances. He acknowledges that he has

tried treatments with various antipsychotic, mood stabilizing, and antidepressant medications without effect, and he does not meet criteria for one of these conditions. While conventionally most people would elect to preserve their lives even in prison without the possibility of parole, Hugueley is certainly unconventional. However, his reasoning is not irrational, given his unconventional personality and life's experience.

Finally, Hugueley is capable of cooperating with his attorneys in his own defense. At times, he has not chosen to do so; nevertheless, these are again unconventional choices, as opposed to choices driven by irrational delusional beliefs, psychotically disordered thinking, or hallucinations.

(ECF No. 43-2 at PageID 3466-3469.) Petitioner was considered to be competent stand trial in 2003.

Hugueley moved to withdraw his post-conviction petition after issues with his visitation were resolved. *See Hugueley v. State*, No. W2009-00271-CCA-R3-PD, 2011 WL 2361824, at *4–7 (Tenn. Crim. App. June 8, 2011). A competency hearing was held on November 14, 2008. *Id.* at *11. (*See* ECF No. 42-12.) The post-conviction court found Petitioner competent to waive post-conviction review and dismissed the petition in 2009. *Hugueley*, 2011 WL 2361824, at *16.

On appeal, the Tennessee Court of Criminal Appeals heard Petitioner's motion to remand the matter to the post-conviction court and the merits of the case contemporaneously. *Id.* at *1.[2] In 2011, the court determined that Petitioner could not "belatedly withdraw his decision to dismiss his petition for post-conviction relief" and that the post-conviction court did not err in concluding Petitioner was competent. *Id.* at *1, *43.

The Tennessee Court of Criminal Appeals thoroughly reviewed issues related to Petitioner's mental health:

---

[2] In November 2009, this Court stayed Petitioner's habeas case during the state post-conviction proceedings finding good cause for Petitioner's failure to exhaust "competency issues raised in the post-conviction proceedings" and to allow the state court to determine whether a remand of state post-conviction appellate proceedings would be allowed. (ECF No. 11 at 5.)

On August 1, 2008, the post-conviction court appointed Dr. Bruce Seidner to evaluate the Petitioner's competency.

During a competency hearing [on] November 14, 2008, Dr. Seidner, a licensed clinical psychologist, testified that he was appointed by the court in August 2008, to evaluate the Petitioner's competency to withdraw his petition for post-conviction relief. Dr. Seidner reported that he met with the Petitioner on August 27 and 28, 2008. He utilized the PAI, which is a self-report inventory, and administered a test of malingering called the VIP. Dr. Seidner also administered the Wisconsin Card Sort Test and the Wechsler Adult Intelligent Scale, 3rd Edition. As a result of this testing, Dr. Seidner opined that the Petitioner "presents as really quite capable." Dr. Seidner determined that the Petitioner was not struggling with depression and talked about the Petitioner's self-responsibility and self-interests. Dr. Seidner concluded that there was no impairment of the Petitioner's capacity.

The Petitioner's counsel elicited responses from Dr. Seidner delineating the differences between a psychologist and a neuropsychologist. Dr. Seidner acknowledged that Dr. Pamela Auble was a neuropsychologist and had administered different tests during her evaluation of the Petitioner in 2003. Dr. Auble did not conclude that the Petitioner was not competent. Dr. Seidner noted, however, that while he was not a neuropsychologist, there was no trauma or brain disease evident from Dr. Auble's evaluation in 2003, which would necessitate the need for evaluation by a neuropsychologist in 2008.

Dr. Seidner related that, upon contacting Brushy Mountain on August 25, 2008, he was advised by the unit manager that the Petitioner refused to take any tests and requested no-contact visitation. Dr. Seidner explained that while he did meet with the Petitioner, they were separated by a glass partition. Dr. Seidner related that the Petitioner was operating at a fourth grade level. He also related that the Petitioner's score indicated a high risk for suicide. However, Dr. Seidner rejected any conclusion that the Petitioner was "extremely depressed and suicidal." While he conceded that he had noted that the Petitioner wanted to commit "suicide by State," Dr. Seidner also acknowledged that the Petitioner had stated that "he's not suicidal." Dr. Seidner explained the apparently-conflicting statements:

> [The Petitioner] does not want to live on death row. Suicide is an unfortunate and . . . rather permanent solution to a temporary problem. There are people who have a permanent problem and there's no solution. . . . He's been sentenced to death . . . and he has weighed his self[-]interests in terms of challenging this and what he would get, which is continued decline and a life on death row[,] which he has rejected. . . .

Dr. Seidner further noted that Dr. Keith Caruso made the distinction clear in his 2003 report when he discussed that the Petitioner was unhappy about his situation. Dr. Seidner acknowledged the Petitioner's history of contradictions and

history with the criminal justice system. Dr. Seidner related that the Petitioner went to trial in 2003, rather than pleading guilty. The Petitioner then attempted to abandon his appeals. In 2005 and 2006, the Petitioner made statements that he was not filing a petition for post-conviction relief. In 2006, he made statements to the media that he was looking forward to his execution. He then filed a petition for post-conviction relief, which he later asked the judge to dismiss. Dr. Seidner described the Petitioner as dismissive of psychiatrists and psychologists. He stated that the Petitioner described himself as manipulative. Dr. Seidner conceded that the Petitioner's father committed suicide and that the Petitioner had a very dysfunctional childhood. Additionally, he acknowledged a history of mental illness in both his paternal and maternal family members.

Dr. Seidner reported that the Petitioner described his current living conditions as "sensory deprivation—breaks people mentally and physically . . . it's torture." Dr. Seidner had no knowledge that another inmate in the Petitioner's unit had committed suicide and that only two other death row inmates were housed at Brushy Mountain. Dr. Seidner was questioned regarding the Petitioner's destruction of two television sets and treasured personal items. Dr. Seidner noted that this behavior was "not impulsivity;" rather, the actions were "egregious and dramatic manipulation." Dr. Seidner remarked that the Petitioner "knows exactly what he is doing."

Dr. Seidner acknowledged that on July 15, 1981, a report indicated that "Stephen Hugueley directs destructiveness to himself, head banging, cutting and low impulse control." He acknowledged that on January 15, 1983, when the Petitioner was fourteen years old, a report indicated that the Petitioner was transferred from one juvenile institution to another, noting that the Petitioner "attempts to inflict self[-]injury and self[-]mutilation." While a juvenile, the Petitioner was medicated with Mellaril, Haldol, Thorazine, Elavil, and Sinequan, all of which are classified as antidepressants. Dr. Seidner also acknowledged a psychiatric report from November 23, 1983, documenting at least two incidents of self[-]injurious behavior after which the Petitioner requested to be isolated. At this time, the Petitioner also indicated that he had huffed inhalants, had engaged in chronic substance abuse, heard voices telling him to do things, thought about suicide, and was depressed and angry. On December 9, 1983, the Petitioner was placed in medical isolation because he tried to hang himself twice with a sheet. At this time, the Petitioner reported family problems and that voices told him to kill his mother. In a report dated June 8, 1984, the Petitioner was certified as severely emotionally disturbed, a finding necessary to qualify for special education services. Four days later, following a disagreement with a girlfriend, the Petitioner was admitted to the hospital following ingestion of several pills with alcohol. On November 25, 1984, a report indicated at least six incidents of self-inflicted wounds resulting from the Petitioner's swallowing thumb tacks. Dr. Seidner acknowledged that the Petitioner was admitted to the hospital on February 26, 1986, and again on February 28, 1986, from overdoses of Sinequan. He noted,

however, that the reports indicated that these overdoses were "not being anything more than a gesture and manipulative."

Dr. Seidner stated that a CAT scan of the Petitioner on July 25, 1986, revealed an osteolytic lesion on the right rear juncture of the frontal and temporal lobes. On October 31, 1986, the Petitioner was admitted to the Tennessee State Prison hospital with a history of recurrent auditory hallucinations. The Petitioner had surgery to remove the tumor. On February 23, 1987, the Petitioner complained of blackouts and weakness in his left arm and leg.

On August 16, 2007, Dr. Pamela Auble provided an affidavit in which she stated that she performed a neuropsychological evaluation of the Petitioner, as authorized by the trial court in 2003. She noted that the Petitioner had a long history of psychiatric illness, including major depression, suicide attempts, and hallucinations. Dr. Auble concluded that the Petitioner's ability to engage in abstract reasoning was variable. She noted that a medical record indicated that a right frontal tumor was removed in 1986, without damage to the Petitioner's brain. Due to symptoms in his left arm and leg and the Petitioner's self-report of frequent headaches, Dr. Auble recommended medical imaging of the brain to rule out a recurrence of the tumor. Dr. Auble further noted that "[c]ompetency is not static, but rather a function of the individual's present state." Dr. Auble concluded that she was unable to "venture an opinion on [the Petitioner's] present competency" because she had not seen him in four years.

Dr. Seidner remarked that Dr. Auble did not state that the Petitioner lacked competence. Rather, Dr. Auble noted that she observed signs that could potentially be a problem. Dr. Seidner stated that Dr. Auble found a deficit in motor speed and finger tapping and related these deficits to the tumor which was removed.

. . .

On August 20, 2007, Dr. Keith Caruso, through affidavit, stated that he evaluated the Petitioner in June 2003. Dr. Caruso recommended a CT scan due to the removal of a tumor when the Petitioner was eighteen years old. Dr. Caruso concluded that the Petitioner met the criteria for several disorders, including Intermittent Explosive Disorder. Dr. Caruso added that the Petitioner suffers from instability in his relationships, affect, impulse control, anger modulation, and sense of personal identity. The Petitioner has a history of suicidal ideation and self-injury and is prone to paranoid ideation and transient psychotic symptoms under stress. The competency of individuals such as this can wax and wane depending upon the circumstances. Dr. Caruso noted that he could not offer an opinion as to the Petitioner's present competency because he has not seen him in more than four years but stated that it would be prudent to reassess his current competency based upon prior evaluations.

On January 8, 2009, the post-conviction court entered an order dismissing the petition for post-conviction relief. The order reflected the procedural history of this matter, including the Petitioner's letters to the court expressing his desire to withdraw the petition for post[-]conviction relief. Specifically, the post-conviction court entered the following findings of fact and conclusions of law:

> At an initial status hearing . . . this court inquired whether it was petitioner's desire to persist with his motion to withdraw his post-conviction petition. Petitioner responded that he wished to forego any further appeal of his conviction and sentence and stated that he was aware of the consequences of his actions. Petitioner indicated that he never intended to pursue post[-]conviction review. He stated that he had consented to the filing of his post[-]conviction petition in order to allow him time to resolve problems he was having with his visitation rights at the prison. He stated that those matters had been resolved; thus, he no longer wished to move forward with the pending litigation.
>
> Again, prior to the start of the actual hearing to determine if a "genuine issue" as to competency existed, the court again inquired whether petitioner desired to withdraw his post-conviction petition and petitioner again indicated his desire to withdraw the petition. . . . Petitioner's responses were coherent and showed not only a clear understanding of the post-conviction process; but, also demonstrated a remarkable ability to manipulate and bend the system to accommodate his needs and desires. . . .
>
> . . . .
>
> At the "genuine issue" hearing, counsel for petitioner was permitted to present proof which she argued demonstrated there was a "genuine issue" as to petitioner's competency to withdraw his post[-]conviction petition. . . . She informed the court that petitioner had a history of mental illness and brain damage. . . . [She] did reveal an incident in March of 2007, where petitioner was disciplined for smearing feces on the walls of his cell. . . .
>
> . . . .
>
> The court allowed the petitioner to address counsel's assertions on the record and petitioner indicated that he could produce witnesses who would testify that he is rational and could say that he has not changed his mind on the issue of withdrawing his post-conviction petition. With regard to the incident alluded to by [petitioner's counsel] regarding petitioner being disciplined for smearing feces on the walls of his cell, petitioner explained that such action was a form of protest over what he and other inmates perceived as mistreatment by the guards. . . . He claimed his actions were a form of civil disobedience aimed at forcing changes in prison policy. . . .

. . . .

. . . [T]his court found . . . a genuine issue existed as to whether petitioner is competent to withdraw his post-conviction petition. . . . Thus, pursuant to Rule 28, this court ordered the parties to submit a list of mental health experts who could perform a timely evaluation of the petitioner's present competence.

The post-conviction court related that the court appointed Dr. Hutson, a clinical psychologist, and Dr. Brown, a psychiatrist, to evaluate the Petitioner for competency. Dr. Hutson timely submitted a report in which he indicated that he found the Petitioner was competent to waive post-conviction review. The court later learned that Dr. Hutson had mistakenly been compensated with funds from the Tennessee District Attorney General's Conference. Although the court found the State made no attempt to influence Dr. Hutson's opinion, the court ruled that Dr. Hutson's report would be disregarded. Dr. Brown failed to begin the evaluation six months after appointment and indicated that he would need an additional seven months. In light of the delay, the court appointed Dr. Seidner to evaluate the Petitioner. Dr. Seidner found the Petitioner competent to withdraw his petition for postconviction review. Notwithstanding, "out of an abundance of caution," the post-conviction court scheduled an evidentiary hearing as to competency of the Petitioner.

. . .

The post[-]conviction court continued to provide a summary of the Petitioner's medical and psychiatric history relating that:

At the age of ten, petitioner set his house on fire and was evaluated by mental health professionals of Northwest Tennessee Mental Health Center. While in juvenile custody, the petitioner's I.Q. was evaluated and he was found to have a full scale I.Q. of 78. Three years later, Petitioner was diagnosed as "socialized aggressive". . . . In 1983, he was given the Stanford–Binet I.Q. test and was found to have an I.Q. of 77. Later that year, he was evaluated by Tom Biller, Ed.D. . . . Biller found petitioner has "deeply rooted antisocial tendencies." In 1986 the petitioner killed his mother and was diagnosed with "sociopathic personality disorder." He was later referred to Midtown Mental Health Institute (MTMHI), where he was found competent to stand trial.

In August of 1986 doctors discovered a benign tumor on the right side of petitioner's skull. At the same time, petitioner was diagnosed with substance abuse and antisocial personality disorder. Notes from MTMHI indicate that the "CT abnormality had nothing to do with [petitioner's] thinking." Later in 1986, the petitioner had surgery to remove the tumor in his front/parietal

bone. Notes from Meharry Hubbard Hospital indicate that follow up testing revealed a small tumor in the right posterior bone: however, petitioner refused further surgery. A later EEG showed normal functioning and "no evidence of brain damage." Additionally, a later CT scan was negative for tumor.

Tennessee Department of Correction records indicate that the Petitioner has been previously diagnosed with intermittent explosive disorder and antisocial/narcissistic personality disorder. In January of 2002, petitioner killed a prison counselor. In 2003 . . . Petitioner was evaluated by Pamela Auble, a clinical neuropsychologist. Dr. Auble found that petitioner's "estimated intelligence fell within the average range." . . . Dr. Auble indicated that she had ruled out depressive disorder and psychotic disorder. However, she found petitioner may be suffering from antisocial personality disorder and indicated she could not rule out borderline personality disorder. Finally, Dr. Auble found petitioner had no "widespread compromise in functioning." . . . Her reports indicate that, at the time, petitioner had a full scale IQ of 98. She noted that "the tumor that was removed in 1986 . . . without damage to the brain."

During this period, petitioner was also evaluated by Dr. Keith Caruso, a clinical psychologist. . . . [I]n 1995, petitioner was diagnosed with Delusional Disorder, Persecutoriy [sic] Type. . . . Dr. Caruso states that he found the petitioner's thought processes "were linear, logical and goal-directed." . . . Dr. Caruso stated that the petitioner later indicated that he was not suicidal; but, had "no intention of living 30 to 40 years in prison." Dr. Caruso found "no evidence of delusions or perceptual disturbance." . . .

Dr. Caruso concluded that the petitioner suffered from Intermittent Explosive Disorder, which he described as "a severe mental disease;" however, he found the petitioner was competent to stand trial.

Based upon this evidence, the court declined to find that the Petitioner's then-current comments or desires indicated that he suffered from a mental disease or defect in the form of chronic severe depression. In addition, the court did not conclude that the Petitioner was suicidal or suffered from some other disorder or defect that might affect his ability to make a rational choice to withdraw from further post-conviction review of his conviction and sentence. The court continued to find that:

Even if this court were to find petitioner does indeed suffer from a mental disease or defect either in the form of chronic, severe depression; brain abnormality or injury; or some other psychological malady, because this court finds that such mental disease or defect does not prevent petitioner from understanding his legal position, the court would nonetheless find

> petitioner is competent to withdraw his post[-]conviction petition.

> . . . [T]his court finds petitioner has a broad grasp of the legal ramifications of his decision. [T]he petitioner has demonstrated a detailed understanding of the sentence he faces, the ramifications of withdrawing his current petition for post-conviction relief, and the legal procedures associated with such a decision.

> The lower court further noted that the "petitioner appears particularly adept at manipulating the system to suit his purpose. Thus, his choices appear both cogent and rational." Finally, the lower court determined that "even if it were to presume petitioner suffers from some mental disease or defect, any such affliction has not compromised petitioner's ability to make a rational choice amongst the legal options available to him."

*Hugueley*, 2011 WL 2361824, at *10–16 (some alterations in original).

The Tennessee Court of Criminal Appeals noted that, in 2008, Petitioner "consistently expressed a desire to withdraw his post-conviction petition" and drafted coherent, "extremely articulate and meticulously thought-out" pro se pleadings. *Id.* at *27. He asserted in the post-conviction process that Hutson had found him competent and that "finding should suffice." *Id.*

Seidner concluded that Petitioner suffered from antisocial personality disorder. *Id.* at *40. However, he determined that the disorder did not affect Petitioner's understanding of his legal position:

> Mr. Hugueley has no mental disease or defect that prevents him from understanding his legal position and options. His mental status and performance on objective measures of intelligence, executive decision[-]making capacity, and personality testing demonstrate his rationality and high level of flexible cognition that is not distorted by affect. He fully appreciates his position and makes rational choices with respect to abandoning further litigation.

*Id.* Seidner addressed whether Petitioner was able to make a rational choice amongst his legal options:

> There is no observable or measurable impairment in Mr. Hugueley's

rational process as it relates to his functioning in this litigation. He has the demonstrated capacity to make rational, pertinent, and reasoned decisions. He fully understands and anticipates the consequences of these decisions from both a personal and legal perspective.

*Id.* at *41.

The Tennessee Court of Criminal Appeals opined:

The records in the present case and in the Petitioner's direct appeal indicate that the Petitioner has a firm grasp of the legal process and the legal ramifications of his decisions. The record further demonstrates the Petitioner's willingness to use his knowledge of the legal system to manipulate proceedings to further his own interests or agenda. The Petitioner is currently serving a death sentence and two life sentences under severe prison restrictions because of his violent history. The post-conviction court's determination of competency is supported by the fact that the Petitioner arrived at the competency hearing with a presumption that he was competent. This presumption was bolstered by previous determinations of competency. The record reflects that the post-conviction court had no doubt as to the Petitioner's competency but merely ordered the evaluation out of an abundance of caution with consideration of the severity of the proceedings. With consideration of the evidence and the applicable standard of review, we conclude that sufficient basis exists to support the lower court's finding that the Petitioner is competent to withdraw his petition for post-conviction relief.

*Id.*

In the habeas proceedings, Hugueley filed a pro se motion to withdraw his petition. (*See* ECF No. 60.) His counsel relied on information from Woods and Nadkarni to support his assertions that Petitioner was incompetent to stand trial, waive the presentation of mitigation evidence, and waive the post-conviction proceedings, and that he remains incompetent. (*See* ECF No. 67 at 2–3; *see* ECF No. 67-1.) Before a competency hearing could be held, Petitioner expressed his desire to proceed with the federal habeas petition. (*See* ECF No. 76.)

## III.    STAY AND ABEYANCE

In *Rose v. Lundy*, 455 U.S. 509, 510 (1982), the United States Supreme Court held that a district court must dismiss a "mixed" § 2254 petition containing both exhausted and unexhausted

claims, "leaving the prisoner with the choice of returning to state court to exhaust his claims or of amending or resubmitting the habeas petition to present only exhausted claims to the district court." Subsequently, in *Rhines v. Weber*, 544 U.S. 269, 278 (2005), the Supreme Court held that a district court has discretion to stay a mixed habeas petition to allow the prisoner to exhaust his unexhausted claims. The Supreme Court emphasized that "stay and abeyance should be available only in limited circumstances." *Id.* at 277. "Because granting a stay effectively excuses a petitioner's failure to present his claims first to the state courts, stay and abeyance is only appropriate when the district court determines there was good cause for the petitioner's failure to exhaust his claims first in state court." *Id.* The stay-and-abeyance procedure under *Rhines* has three requirements: (1) it "is only appropriate when the district court determines there was good cause for the petitioner's failure to exhaust his claims first in state court"; (2) even with good cause, a "district court would abuse its discretion if it were to grant [a petitioner] a stay when his unexhausted claims are plainly meritless"; and (3) if the preceding factors are met, a "district court's discretion in structuring a stay is limited by the timeliness concerns reflected in AEDPA"; the district court should not grant a stay to a petitioner who "engages in abusive litigation tactics or intentional delay." *See Rhines*, 544 U.S. at 277–78. The fact that a petitioner has "an independent proceeding pending in state court does not render his federal petition a mixed petition" subject to stay and abeyance under *Lundy. Bowling v. Haeberline,* 246 F. App'x 303, 306 (6th Cir. 2007).

In *Granberry v. Greer*, 481 U.S. 129, 134–35 (1987), the Supreme Court stated that, if a "case presents an issue on which unresolved questions of fact or of state law might have an important bearing, comity and judicial efficiency may make it appropriate . . . to insist on complete exhaustion" so the district court can make a "fully informed" decision. *See Cowan v. Stovall*, 645 F.3d 815, 818–21 (6th Cir. 2011) (remanding case to district court for amendment of a claim that is

not "plainly meritless" if the petitioner can show good cause for failure to exhaust the claim in state court). The Sixth Circuit, in *Jones v. Parke*, "has clearly stated that a district court is not required to dismiss or stay 'a petition containing only exhausted claims because the petitioner attempts to raise additional but unexhausted claims during the course of the habeas corpus proceedings.'" *Lee v. Wilson*, No. 1:04 CV 2169, 2008 WL 1775523, at *8 (N.D. Ohio Apr. 16, 2008) (citing *Jones v. Parke*, 734 F.2d 1142, 1145 (6th Cir. 1984)); *see also Shamburger v. Rowland*, 8 F.3d 29 (9th Cir. 1993) (table opinion) (reaching the same conclusion); *Martin v. Warden, Lebanon Corr. Inst.*, 1:12-CV-458, 2013 WL 6087007, at *3–4 (S.D. Ohio Nov. 19, 2013), *report and recommendation adopted*, 2014 WL 1271020 (S.D. Ohio Mar. 27, 2014) (denying relief where "the claim petitioner seeks to exhaust in the state courts has not been asserted as a ground for relief in the petition," and petitioner has not demonstrated good cause for the failure to exhaust).

## IV.    ANALYSIS

Hugueley's undersigned counsel requests that the Court stay and abate Petitioner's federal habeas proceedings pending the outcome of the state court litigation related to the petition for writ of error coram nobis. (ECF No. 101 at 1.) Petitioner asserts that "comity and federalism" require the case to be stayed because the "state court may moot issues at the heart of [the] federal habeas proceedings." (*Id.*) He contends that the state court has not "determine[d] issues that directly impact the parallel federal [habeas] case" and asserts that "various courts have adhered to this logic" of granting a stay of federal habeas proceedings pending the outcome of state court proceedings. (*Id.* at 1–2.)

The inmate asserts that the "state court proceedings involve . . . his []competenc[e] to stand trial," his "waive[r] of the presentation of mitigation evidence," and the "waive[r] of his

post-conviction proceedings." (*Id.* at 2.) He argues that "the issue of his []competenc[e] render[s] his underlying conviction and sentence infirm" and that his "competen[ce] to waive his constitutional claims in state court . . . impacts the claims he can now raise in [his] federal habeas" proceedings. (*Id.*) Petitioner argues that it would be "prudent" and "in the interest of comity and federalism" for the Court to stay his federal habeas proceedings until the state court case is resolved. (*Id.* at 2–3.)

He avers that he has good cause for the failure to exhaust his claims because: (1) "he has been incompetent throughout these proceedings"; (2) "he was . . . unable to litigate his incompetency in state court"; and (3) alternatively, his "[p]ost-[c]onviction [c]ounsel [p]erformed [i]neffectively." (*Id.* at 3–8.)

The Warden argues that Petitioner's motion should be denied because "the principles of comity favor the steadfast progression of this federal litigation over another cycle of delay." (ECF No. 102 at 1; *see* ECF No. 102-1 at 2.) Petitioner's motion, the Warden argues, "does not establish good cause for a stay because its timing reeks of intentional delay and litigation tactics." (ECF No. 102 at 1.) He further insists that "[c]omity and federalism favor this Court's deference to the integrity and finality of state court judgment." (ECF No. 102-1 at 2.) Finally, he asserts that delay is not favored where "this Court has already denied permission to amend the habeas petition to include untimely competency-related claims" and Petitioner's writ is "unlikely to gain any traction in state court." (ECF No. 102 at 1.)

## A.    The Claims

Petitioner does not raise a substantive competency claim in his habeas petition with regard to any stage of the state court proceedings. He has attempted to amend his habeas petition to raise

ineffective assistance of counsel claims based on brain imaging. (ECF No. 59 at 6–11.) However, the Court denied those claims as time-barred. (ECF No. 82 at 24.)

The Warden asserts that "[c]onspicuously absent from the petitioner's motion for a stay, however, is any acknowledgment that his habeas petition does not properly include any claim regarding his competency." (ECF No. 102-1 at 5.) He maintains that, because the coram nobis petition does not concern a claim in the federal habeas petition, Petitioner is not entitled to a stay. (*Id.*) Respondent reminds that this Court already has determined that the "competency-related claims are time-barred," and the coram nobis petition is "an attempt to re-litigate a previous state-court competency determination." (*Id.* at 6.)

In reply, Hugueley argues that his "competency is at the heart of several of his claims" and that the claims directly implicated by the state court litigation are Claims, I, K, and L, which are of ineffective assistance of counsel. (ECF No. 104-1 at 1–2.) In Claim I, Petitioner alleges that his "counsel rendered ineffective assistance in their investigation and preparation for the capital case against him" and particularly that his counsel "failed to fully investigate, raise, and litigate Mr. Hugueley's competency to waive the presentation of mitigating evidence." (ECF No. 58 at 7.) He asserts that, had counsel investigated, presented, and litigated his competency, "there is a reasonable probability that [he] would not have [been] convicted of first-degree murder and/or sentenced . . . to death." (*Id.*) He further asserts that his "[c]ounsel should have investigated and discovered issues . . . crucial to determining whether [he] was competent to stand trial, assist in his defense, and waive mitigation . . . ." (*Id.* at 7–8.) In Claim K, Petitioner avers that his "counsel rendered ineffective assistance of counsel in their defense of him in the penalty phase of trial," including failure to investigate and challenge Petitioner's competence to stand trial and enter a plea for his prior convictions. (*Id.* at 14–18.) In Claim L, the inmate claims that his counsel

rendered ineffective assistance on direct appeal for "[f]ailure to raise and litigate [his] incompetence to waive the presentation of mitigating evidence." (*Id.* at 18.) These specific claims were not raised in the state court proceedings and have not been presented in the petition for writ of coram nobis. (*See* ECF No. 58 at 13, 18–19.)

Petitioner's ineffective assistance of counsel claims are related to the competency issues in the petition for writ of error coram nobis. However, the evaluation of his ineffective assistance of counsel differs from the evaluation of the competency claims. Nothing prevents Petitioner from litigating his federal ineffective assistance of counsel claims while he pursues his petition for writ of coram nobis. To the extent Petitioner contends that there are unresolved questions of fact and/or law relevant to his habeas claims, those questions can be resolved through an evidentiary hearing or expansion of the record in federal court as deemed necessary.

## B. Good Cause

Hugueley argues that he has "good cause" under *Rhines* because his "brain defects render him incompetent," and "he does not (and did not at any point during these proceedings) have any awareness or insight into his defects and his resulting mental, cognitive, and psychological limitations . . . ." (ECF No. 101 at 3.) He insists that "[w]ithout brain imaging, first available to Mr. Hugueley on September 27, 2013, these defects were impossible to detect" and that "never before were the appropriate tests conducted." (*Id.* at 4.) Petitioner argues that he has good cause because he was previously unable to litigate his incompetency in state court, both at trial and at post-conviction. (*Id.* at 4–5.) He asserts that corrections guards thwarted attempts to obtain Magnetic Resonance Imaging by "refus[ing] to remove [Petitioner's] handcuffs . . . ." (*Id.*) His inability to obtain the brain scan evidence sooner, Petitioner contends, was caused by the state

court's denial of funding and process and establishes "'good cause' for [the] failure to timely present the claim." (*Id.* at 5.)

Alternatively, the inmate argues that his post-conviction counsel performed ineffectively for failure to plead a request for the brain scans "with sufficient particularity." (*Id.*) Petitioner's "post-conviction counsel requested the services of a psychiatrist, neuropsychologist, pharmacologist, and funding for neurological imaging . . . ." (*Id.*) However, "the state court found that counsel failed to specify the particularized need for such testing as required by [Tennessee Supreme Court Rule 13]," stating that "[P]etitioner's current medical condition has little if any bearing on the type of representation provided by counsel at the time of trial." (*Id.*; ECF No. 101-2 at 3–5.) He asserts that, as a result of post-conviction counsel's ineffectiveness, the post-conviction court denied counsel's requests for experts and for neuroimaging. (ECF No. 101 at 5.)

The Warden states that "[P]etitioner posits his alleged ongoing incompetency, the inadequacy of the state courts as a forum for litigating his competency, and the ineffectiveness of his state post-conviction counsel's efforts in litigating his competency" as good cause for the stay. (ECF No. 102-1 at 2.) The Warden points out that Petitioner has acknowledged in earlier pleadings that his "competency has been hotly litigated in state court." (*Id.* (quoting ECF No. 10 at 1).) The Warden further asserts that the state court has "deemed [Petitioner] competent." (ECF No. 102-1 at 2.) *See Hugueley*, 2011 WL 2361824, at *43 (finding that Petitioner was competent to withdraw his post-conviction petition). Respondent maintains that Petitioner's "desire to re-fight that state-court battle with fresh ammunition in the form of new brain-scan evidence does not establish good cause for a stay." (ECF No. 102-1 at 2.)

21

The Tennessee Court of Criminal Appeals determined that Petitioner was competent to waive post-conviction review. *See Hugueley*, 2011 WL 2361824, at *1, *43. To the extent that he bases a request for stay on that claim, Petitioner has not demonstrated good cause because: (1) that claim has been exhausted in the state court and is ripe for review; and (2) that claim has not been raised in the habeas petition.[3]

The issue of Petitioner's competence at the time of trial has been presented in the state court by examination of the opinions of Auble and Caruso. *See Hugueley,* 2011 WL 2361824, at *11, *13, *16. There has not been a factual finding on collateral review related to Petitioner's competence to stand trial. However, Petitioner has had mental health issues since childhood, and the record is replete with evaluation of his mental health status and information related to his brain tumor. The record also indicates Petitioner's unwillingness to be evaluated for competency in the state court proceedings. *Hugueley*, 2011 WL 2361824, at *5, *11. Competence to stand trial is based on the defendant's ability to understand the proceedings, to communicate with counsel, and assist in his defense. *See Black v. Bell*, 664 F.3d 81, 101 (6th Cir. 2011) ("To be competent to stand trial, a defendant must have sufficient present ability to consult with his lawyer with a reasonable degree of rational understanding and a rational as well as factual understanding of the proceedings against him." (citation omitted) (internal quotation marks omitted)). Considering the litigation about Petitioner's competency in the state court proceedings, the initial grant of a stay in this

---

[3] Petitioner raises the issue of ineffective assistance of counsel related to Petitioner's incompetence to waive the post-conviction petition in the habeas proceedings to assert cause and prejudice for the procedural default of the claim. (ECF No. 58 at 6–7, 13, 18–20.)

habeas case related to competency issues in 2009, and his counsel's assertions in December 2013,[4] the argument that Petitioner had no "awareness or insight into his defects" is simply implausible.

Hugueley also relies on *Sample v. Carpenter*, No. 11-2362 (W.D. Tenn. Oct. 20, 2014), to support his request for a stay. (ECF No. 106 at 1.) However, *Sample* involved intellectual disability, not competency. (*See* ECF No. 106-1 at PageID 5204.) The Supreme Court in *Atkins v. Virginia*, 536 U.S. 304, 317 (2002), left to the states "the task of developing appropriate ways to enforce the constitutional restriction" related to imposition of the death penalty for intellectually disabled defendants. The same deference is not accorded the states with regard to the determination of the ineffective assistance of counsel issues presented in this habeas petition.

Petitioner has not demonstrated good cause for a stay.

## C.    Timeliness

The Warden complains that comity and federalism are not served by intentional delay in pursuing a claim. (ECF No. 102 at 1; ECF No. 102-1 at 2.) He argues that, under *Rhines*, the district court should not grant a stay when the "petitioner engages in abusive litigation tactics or intentional delay." (ECF No. 102-1 at 2–3.) He points out that Petitioner obtained the brain-scan evidence on September 27, 2013, but he waited almost a year until September 26, 2014, to file his coram nobis petition. (*Id.* at 3.) Respondent argues that the filing delay, "[w]ithout any such explanation . . . presents as a deliberate and strategic choice." (*Id.*)

---

[4] In response to Petitioner's motion to remove counsel, his counsel argued:

> Mr. Hugueley has a long and well documented history of irrational behavior. Mr. Hugueley is incompetent; he is unable to meaningfully appreciate his choices and make rational decisions. He was incompetent to stand trial, incompetent to waive the presentation of mitigating evidence, and incompetent to waive his post-conviction proceedings. He remains incompetent.

(ECF No. 67 at 2.)

Petitioner asserts that there was no intentional delay in filing the coram nobis petition. (ECF No. 104-1 at 1.) He contends that the results of the brain scans were available to counsel on October 29, 2013, but Bigler's full opinion letter was not provided to counsel until September 16, 2014. (*Id.* at 2.) Those conclusions were then provided to Woods, and he was able to consult with Nadkarni and provide an expert report on September 17, 2014. (*Id.*) Nadkarni has not been able to finalize a report due to illness. (*Id.*)[5]

Petitioner asserts that the Warden's claim of intentional delay is misplaced. (ECF No. 104-1 at 2.) He contends that he sought coram nobis relief shortly after obtaining the evidence which supports his claims. (*Id.* at 3.) Further, he asserts that the delay in discovery of Petitioner's brain defects was caused by trial and post-conviction counsel. (*Id.*)

"[U]nreasonable delay in returning to state court to exhaust . . . claims precludes [a habeas petitioner] from relying on the abeyance procedure." *Wiedbrauk v. Lavigne*, 174 F. App'x 993, 999 (6th Cir. 2006). Petitioner's habeas counsel has long contended that there are issues concerning his competency. In 2009, when Petitioner's counsel requested the initial stay of these habeas proceedings, his counsel stated that "[t]he issue of Mr. Hugueley's competency has been hotly litigated in state court." (ECF No. 10 at 1.) On November 8, 2013, the inmate filed a motion to amend his petition by adding claims related to brain imaging. (ECF No. 59 at 6–13.) In April

_____

[5] Nadkarni provided a letter dated November 7, 2013, which was filed as an exhibit in response to Petitioner's motion to withdraw his habeas petition which stated that Petitioner "has significant asymmetry in his mesial temporal structures" and "a possibly cystic lesion in his right mesial temporal lobe and potential atrophy there." (ECF No. 67-1 at PageID 4762.) Nadkarni stated that "[l]esions of this sort . . . are consistent with syndromes such as temporal lobe epilepsy and psychotic illness" and "may affect Mr. Hugueley's ability to meaningfully appreciate his choices and make rational decisions." (*Id.*) The letter does not specifically address Petitioner's competence at the time of trial or the post-conviction proceedings. However, Petitioner's counsel presents the letter to support his argument that Petitioner was not competent to stand trial. (ECF No. 67 at 2–3.)

2014, this Court denied Petitioner's motion to amend his petition to add claims based on brain

imaging stating:

> Hugueley asserts that Claims P through S are timely based on 28 U.S.C. § 2244(d)(1)(D) which provides a one-year period of limitation to an application for writ of habeas corpus from "the date on which the factual predicate of the claim or claims presented could have been discovered through the exercise of due diligence." (Id. at 12.) He contends that he is not at fault for failing to raise these claims earlier because his court-appointed trial counsel and his post-conviction counsel failed to investigate and develop the proof of his brain damage/malformation and resulting incompetence and inability to form the requisite intent for the underlying crime. (Id. at 12-13.)

> Petitioner further argues that habeas counsel could not have reasonably discovered this proof earlier because the case was administratively stayed pending the resolution of the inmate's state court litigation for much of the time that counsel had been appointed, and funding remained a problem even after the case was re-opened. (Id. at 13.) Petitioner contends that habeas counsel's presentation of these claims less than fifty days after counsel was able to coordinate the funding, hospital availability, medical order, order for transport, and interpretation of the scans constitutes due diligence. (Id.) His attorney argues that these claims could not have been presented until after the factual predicate was developed in the September 2013 brain scans. (Id.)

> . . .

> Claims P through S address ineffective assistance of counsel related to the failure to investigate and litigate Petitioner's competency, mental state, social history, and intellectual capacity and failure to consult with experts related to these issues. (See D.E. 59 at 6-11.) As evidenced by the Tennessee Court of Criminal Appeals' decision in 2011, Hugueley's mental health and competency including issues of brain damage have been present in Petitioner's cases for some time. See Hugueley v. State, No. W2009-00271-CCA-R3-PD, 2011 WL 2361824, at *13-14, 18, 36-43 (Tenn. Crim. App. June 8, 2011). Petitioner also presented claims that were substantially similar in his prior motion to amend the petition, and these claims were determined to be time barred. (D.E. 29 at 9-28.) Although the brain imaging conducted in September 2013 may have provided additional information in support of Petitioner's claims, the allegations in Claims P through S did not rely on a new factual predicate. Petitioner has not demonstrated due diligence in presenting these habeas claims. Section 2244(d)(1)(D) does not apply. Amendment would be futile.

(ECF No. 82 at 22–24.) The court found that the factual predicate for these claims existed prior to the September 2013 brain imaging, and that Petitioner was not diligent in presenting his claims. (*Id.* at 24.)

This Court stayed Petitioner's case from November 18, 2009, until February 26, 2013, to allow Petitioner to exhaust his competency issues in state court.[6] Similar to Petitioner's attempt to amend his petition based on brain imaging, Petitioner's current attempt to exhaust his competency claims is untimely.

## D.     The Likelihood of Success on the Merits

"The writ of error coram nobis is an 'extraordinary procedural remedy,' filling only a 'slight gap into which few cases fall.'" *Freshwater v. State*, 160 S.W.3d 548, 553 (Tenn. Crim. App. 2004) (citing *State v. Mixon*, 983 S.W.2d 661, 672 (Tenn. 1999)). Title 40, chapter 26, section 105(b) of the Tennessee Code Annotated provides:

> [t]he relief obtainable by this proceeding shall be confined to errors dehors the record and to matters that were not or could not have been litigated on the trial of the case, on a motion for a new trial, on appeal in the nature of a writ of error, on writ of error, or in a habeas corpus proceeding. Upon a showing by the defendant that the defendant was without fault in failing to present certain evidence at the proper time, a writ of error coram nobis will lie for subsequently or newly discovered evidence relating to matters which were litigated at the trial if the judge determines that such evidence may have resulted in a different judgment, had it been presented at the trial.

"The purpose of this remedy is to bring to the attention of the court some fact unknown to the court[,] which if known would have resulted in a different judgment. *Freshwater*, 160 S.W.2d at 553 (citation omitted) (internal quotation marks omitted). With regard to the standard to be applied when a trial court reviews a petition for writ of error coram nobis, the Tennessee Supreme Court

---

[6] The Tennessee Court of Criminal Appeals, quoting the trial court, noted that there were "orchestrated delays" to the competency determination in state court. *Hugueley*, 2011 WL 2361824, at *27.

stated:

> [T]he trial judge must first consider the newly discovered evidence and be "reasonably well satisfied" with its veracity. If the defendant is "without fault" in the sense that the exercise of reasonable diligence would not have led to a timely discovery of the new information, the trial judge must then consider both the evidence at trial and that offered at the coram nobis proceeding in order to determine whether the new evidence may have led to a different result.

*State v. Vasques*, 221 S.W.3d 514, 527 (Tenn. 2007). The decision to grant or deny a petition for writ of error coram nobis is within the sound discretion of the trial court. *Id.* at 527–28.

Hugueley argues that "the post-conviction court found there to be a genuine issue as to [his] competency based on [his] long history of mental health and medical problems." (ECF No. 101 at 6.) He argues that the post-conviction court proceeded without his expert Peter Brown's report "largely due to [his post-conviction counsel's] 'game playing.'" (*Id.*) The post-conviction "court relied . . . on the state-tendered psychologist, Bruce Seidner," for the competency determination. (*Id.*) Petitioner argues that

> [w]ithout an expert independent of the state, Mr. Hugueley's counsel could not present an opinion contrary to that of Seidner, nor was she able to subject Seidner's testimony to a meaningful cross examination without an expert to assist in challenging Seidner's qualification, techniques, methodology, and conclusions. Given this, it is not surprising that the post-conviction court credited Seidner's testimony, found Mr. Hugueley competent, and dismissed his post-conviction petition.

(*Id.* at 7.) He contends that his "competency has never been adequately adjudicated." (*Id.*)

The Warden argues that the coram nobis petition has a "[n]egligible [c]hance" of success. (ECF No. 102-1 at 3.) He contends that the Sixth Circuit in *Hodge v. Haeberlin*¸ 579 F.3d 627, 636–38 (6th Cir. 2009), held that a stay is not warranted "where the evidence sought to be developed in state court did not have the ability to exonerate the petitioner[] and where the evidence would not likely lead the state court to hold further proceedings." (*Id.*) The Warden

asserts that it is "self-evident that the brain-scan evidence does nothing to exonerate the petitioner." (*Id.*)

Respondent contends that Petitioner is unlikely to be successful in state court because: (1) coram nobis is "confined to errors outside the record" and not previously litigated, and the petition concerns a competency issue that has been "hotly litigated in state court" and does not present a new factual predicate; and (2) the "petition is untimely." (*Id.* at 3–4.) *See* Tenn. Code Ann. §§ 27-7-102, 27-7-103, 40-26-105(b). The Warden further argues that the statute of limitations cannot be tolled because Petitioner does not qualify as "actually innocent" of the underlying crimes. (*Id.* at 4–5.) The Warden asserts that Petitioner's coram nobis petition was "filed more than a decade after . . . [P]etitioner's conviction." (*Id.* at 5.)

Petitioner asserts that the Tennessee courts have held that due process can require tolling of the statute of limitations based on the *Burford* three-prong test, which requires the state court to determine: (1) "[w]hen the limitations time period would normally have begun to run"; (2) "[w]hether the grounds for relief actually arose after the limitations period would normally have commenced"; and (3) "if . . . a strict application of the limitations period would effectively deny the petitioner a reasonable opportunity to present the claim." (ECF No. 104-1 at 3–4.) *See Sands v. State*, 903 S.W.2d 297, 301 (Tenn. 1995) (citing *Burford v. State*, 845 S.W.2d 204, 207 (Tenn. 1992)).

The statute of limitations for filing a petition for writ of error coram nobis has expired. Further, it appears that the grounds for relief arose before the limitations period would have normally begun to run. However, this Court will not speculate on whether the state trial court will determine that due process requires equitable tolling.

The information related to Petitioner's brain imaging is outside the record. The issues

raised in the petition for writ of error coram nobis could have and, to some degree, have been litigated at trial and in the post-conviction proceedings. Petitioner will have difficulty demonstrating that he was "without fault" for failing to present this evidence earlier. He has been evaluated by several mental health professionals. Despite the presence of mental health issues and various diagnoses, no doctor has determined that Petitioner was incompetent to stand trial until now. In 2007, four years after the trial, Auble and Caruso expressed that the competency of individuals such as Petitioner can "wax and wane," but neither stated that Petitioner lacked competence. *Hugueley*, 2011 WL 2361824, at *13. Now, more than a decade after his trial, Woods has declared that Petitioner was incompetent to stand trial and to waive post-conviction. (*See* ECF No. 108-4 at PageID 5272.) Given the nature of this extraordinary remedy, the likelihood that Petitioner will succeed on the merits of the state court petition is minimal.

## V.     CONCLUSION

Hugueley's attempts at exhaustion in the state court are untimely, the likelihood of success utilizing the extraordinary remedy of a petition for writ of error coram nobis is minimal, and Petitioner has not demonstrated good cause for a second stay and abeyance of this federal habeas case. Petitioner's motion to stay and abate proceedings is DENIED.


IT IS SO ORDERED this 15th day of January, 2015.


s/ J. DANIEL BREEN
CHIEF UNITED STATES DISTRICT JUDGE