IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF TENNESSEE
EASTERN DIVISION

STEPHEN HUGUELEY,        )
                                   )
        Petitioner,       )
                                   )
vs.                               )        No. 09-1181-JDB-egb
                                   )
BRUCE WESTBROOKS, Warden,   )
Riverbend Maximum Security     )
Institution,               )
                                   )
        Respondent.      )
                                   )

**ORDER DIRECTING CLERK TO CHANGE RESPONDENT,
GRANTING RESPONDENT'S MOTION FOR SUMMARY JUDGMENT,
DENYING PETITION PURSUANT TO 28 U.S.C. § 2254,
GRANTING A LIMITED CERTIFICATE OF APPEALABILITY,
AND CERTIFYING THAT AN APPEAL WOULD BE TAKEN IN GOOD FAITH**

## Contents

I.    STATE COURT PROCEDURAL HISTORY.................................................... 1
II.   FEDERAL COURT PROCEDURAL HISTORY ............................................ 11
III.  FACTUAL BACKGROUND............................................................... 13
IV.  HUGUELEY'S FEDERAL HABEAS CLAIMS ............................................ 16
V.   RESPONDENT'S MOTION TO DISMISS.............................................. 18
VI.  STATUTE OF LIMITATIONS.......................................................... 19
    A.   Ineffective Assistance – Investigation, Preparation & Penalty Phase (Claims I(1-4) & K(1 & 3)).......................................................................... 22
    B.   Ineffective Assistance of Appellate Counsel (Claim L(1)) ........................... 26
    C.   Ineffective Assistance - Hugueley's Prior Convictions (Claims I(5),  K(2) & L(2)) ... 27
VII. THE LEGAL STANDARD ............................................................. 31
    A.   Merits Review under § 2254 ....................................................... 31
    B.   Waiver and Procedural Default...................................................... 33
    C.   Summary Judgment Standard........................................................ 35

VIII. ANALYSIS .................................................................................................................... 36

   A.   *Batson* ...................................................................................................................... 37

      1.   Procedural Default – Hudson, Gibbs & Pirtle ............................................. 37

      2.   The Exhausted *Batson* Claim .................................................................... 42

   B.   Peremptory Challenges Based on Gender .................................................... 62

   C.   Prospective Juror Barry Watkins .................................................................. 64

   D.   Insufficient Evidence of Aggravating Circumstances ................................... 75

   E.   Jury Instruction on the Aggravating Circumstance of Killing A Correctional Employee

      81

      1.   Plain Error Review & Procedural Default ................................................... 82

      2.   Merits .......................................................................................................... 84

   F.   Waiver of Mitigation Evidence ..................................................................... 91

   G.   Weighing of Aggravating & Mitigating Circumstances ............................... 98

   H.   Death is a Disproportionate Penalty ........................................................... 100

   I.   Ineffective Assistance of Counsel – Investigation, Preparation & Penalty Phase Defense

   (Claims I & K) ....................................................................................................... 105

      1.   The *Strickland* Standard ......................................................................... 107

      2.   Procedural Default .................................................................................... 108

      3.   Merits ........................................................................................................ 127

   J.   Ineffective Assistance of Counsel – Jury Selection (Claim J) .................... 135

   K.   Ineffective Assistance of Counsel - Direct Appeal (Claim L) .................... 136

IX. CONCLUSION ........................................................................................................... 137

X. APPEAL ISSUES ....................................................................................................... 138

In 2002, while Petitioner, Stephen Hugueley, was incarcerated at the Hardeman County Correctional Facility ("HCCF") on two murder convictions and one attempted murder conviction, he stabbed corrections counselor Delbert Steed multiple times killing him. Hugueley was convicted of first degree premeditated murder and sentenced to death for Steed's murder. *State v. Hugueley*, 185 S.W.3d 356, 363 (Tenn. 2006). He now seeks federal habeas relief. For the reasons addressed below, summary judgment is GRANTED, and Hugueley's habeas petition is DENIED.

## I. STATE COURT PROCEDURAL HISTORY

The trial in Hugueley's case was held on September 15-16, 2003, before Judge Jon Kerry Blackwood in the Circuit Court of Hardeman County, Tennessee. (*See* ECF No. 41-2 at PageID 369.) Hugueley was represented by Michie Gibson and T. J. Cross-Jones. (*Id*.) Assistant District Attorneys General ("ADA") Terry Dycus and Colin Campbell represented the State. (*Id*.)

In the guilt phase, the State presented the testimony of six witnesses: Judy Ranne, Mary Harris, Donald Watkins, Joseph "Joe" Vernon, Don Dunaway, and Dr. O'Brien Clary Smith. (*See* ECF No. 41-4 at PageID 586-87.) The defense called two witnesses: Hugueley and Howard Cook. (*See id.* at PageID 588.) On September 16, 2003, at 11:33 a.m. the jury retired for deliberations. (*Id.* at PageID 679.) At noon, the jury returned with a verdict finding Hugueley guilty of first degree murder. (*Id.* at PageID 682.)

The penalty phase began that afternoon, and the State presented the testimony of Vernon, Dunaway, Smith, and Willie Leroy Steed. (*Id.* at PageID 588-89.) The State rested on September 16, 2003. (ECF No. 41-5 at PageID 729.) Hugueley decided not to present a mitigation case, however, defense counsel asked that Hugueley's social history be made an exhibit

to the record to show that a mitigation investigation was conducted. (*Id.* at PageID 730.) The jury heard closing arguments, were given the jury instructions, and retired for deliberations at 3:13 p.m. (*Id.* at PageID 738.) The jury returned to court at 4:07 p.m. with the pronouncement of a death sentence. (*Id.*)

Hugueley did not want to appeal. (*See id.* at PageID 749-50.) Nonetheless, the trial court advised him that the Tennessee Supreme Court ("TSC") will automatically review his conviction. (*Id.* at PageID 745-46, 750.) Petitioner was told that a motion for new trial was filed to initiate the appellate process. (*Id.* at PageID 746.) The trial court informed him of his right to an appeal and assured that Hugueley had not been coerced into a decision to waive his appeal rights. (*Id.* at PageID 749-50, 752.) The record states,

> Hugueley is one of the more intelligent individuals that I've come across. He does not display any signs of mental illness or any mental defect. He appears to know exactly what he wants and he appears to understand his rights as well as any criminal defendant that I've ever dealt with.

(*Id.* at PageID 755.) The inmate said, "I'm still sane." (*Id.*) The court allowed Hugueley to withdraw his motion for new trial and relieved his attorneys of the obligation to file a notice of appeal on his behalf. (*Id.* at PageID 750.)

On January 13, 2004, a hearing was conducted concerning Hugueley's appeal rights. (*See id.* at PageID 756.) The court summarized what had occurred previously and noted that it had consulted with capital case attorneys about how to proceed since the appeal would take place regardless of Petitioner's attempts to waive his appeal rights. (*Id.* at PageID 756-59.) Gibson was appointed as counsel and the motion for new trial was overruled. (*Id.* at PageID 759; *see* ECF No. 41-1 at PageID 354.) The trial court noted that Hugueley wrote a letter stating he did not

want Gibson to proceed with an appeal, did not desire to have an appeal, and that any work done by the attorney to further an appeal would be against Hugueley's wishes. (*Id.* at PageID 360; *see* ECF No. 41-5 at PageID 759-60.)

If the appeal was mandatory, the inmate wanted to represent himself. (*Id.* at PageID 760-61.) The trial court examined Hugueley to present a clear record to the TSC. (*Id.* at PageID 761-65.) Gibson was discharged as counsel, and the court arranged for Hugueley to obtain the transcripts and records needed to represent himself on appeal. (*Id.* at PageID 765-68; *see* ECF No. 41-1 at PageID 364-65.)

On March 17, 2005, the Tennessee Court of Criminal Appeals ("TCCA") affirmed Hugueley's conviction and death sentence. (ECF No. 41-12 at PageID 1380.) *See State v. Hugueley*, No. W2004-00057-CCA-R3-CD, 2005 WL 645179 (Tenn. Crim. App. Mar. 17, 2005). On March 15, 2006, the TSC affirmed. (ECF No. 41-15 at PageID 1503.) *State v. Hugueley*, 185 S.W.3d 356 (Tenn. 2006).

On July 24, 2006, Petitioner filed a *Pro Se* Petition for Relief From Conviction or Sentence. (ECF No. 42-1 at PageID 1547-55.) On July 21, 2006, the Office of the Post-Conviction Defender ("PCD") was appointed as counsel for him. (*Id.* at PageID 1557.) On October 5, 2006, Hugueley submitted a petition for an "Order barring attorney Kelly Gleason and the Post-Conviction Defender's Office from raising ANY issues other than those issues raised on his Direct Appeal." (*Id.* at PageID 1561-63.) On October 13, 2006, the State filed a motion to dismiss Hugueley's petition, arguing that only raising the issues that had been previously determined on direct appeal amounted to a waiver of the grounds for post-conviction relief available under Tenn. Code Ann. § 40-30-101, *et seq.* (*Id.* at PageID 1564.) On October 19,

2006, Hugueley's counsel responded to the State's motion, argued that he had represented that his counsel can "raise any claims without limitation," and requested that the motion to dismiss be denied.   (*Id.* at PageID 1583-85.)[1]

At a motion hearing on November 3, 2006, the court addressed Hugueley's *pro se* motions. (ECF No. 42-13 at PageID 2992.)   Petitioner's counsel expressed concerns about Hugueley addressing the issues raised in the *pro se* motions because of: his lack of sleep; unhappiness about being transported to court; physical ailments; not "feeling very good today"; "his mental state in terms of how he feels about being here"; and his "emotional state [which] depends upon, . . . his conditions of confinement, his personal situation and particularly with his girlfriend."   (*Id.* at PageID 2998-3004.)   Hugueley was argumentative with the judge stating,

> No. Fuck you and your questions.
>  . . .
>
> I waived my right to be at this hearing.   Don't want to be here.   Want to be back at the prison.   I got better things to do with my time than be in this fucking courthouse.

(*Id.* at PageID 3010-11.)   The inmate initially refused to answer questions about whether he wanted to represent himself.   (*Id.* at PageID 3011-13.)   He stated that he did not "want them raising mental health and all that crap unless they've got to go through me to get my permission to do so first."   (*Id.* at PageID 3016.)   Hugueley wanted to control his case.   (*Id.* at PageID 3016-17.)

---

[1] Counsel stated that "Hugueley's intentions and pronouncements shift radically depending upon his conditions of confinement, personal situation, and mental state."   (ECF No. 42-1 at PageID 1585.)

On December 6, 2006, Petitioner sent the court a handwritten letter stating that he wanted his post-conviction petition dismissed. (*See* ECF No. 42-4 at PageID 2104; *see* ECF No. 131-7 at PageID 7441-43.) His counsel filed an Amended Petition for Post-Conviction Relief on January 3, 2007, and a motion for an extension of time to file an amended petition and for a continuance of the January 29, 2007 hearing. (ECF No. 42-1 at PageID 1622; *see* ECF No. 42-4 at PageID 2111.)

At a hearing on January 10, 2007, the court addressed the pending motions, Hugueley's letter, and his counsel's concerns about his competency. (*See id.* at PageID 2104; *see* ECF No. 42-14.) The inmate wanted to dismiss the post-conviction petition and refused further mental health evaluations. (*Id.* at PageID 3052-55.) His attorney expressed concerns about his competency because of "a very lengthy history of head trauma and . . . brain surgery to remove a brain tumor," tremors in his hand that could be related to brain trauma, neuropsychological testing consistent with damage to the right side of his brain, impulsivity, and a long history of mental illnesses and treatment with antipsychotic medication. (*Id.* at PageID 3055-58.)[2] Hugueley was not on psychotropic medication at the time of the hearing. (*Id.* at PageID 3061.) He was not being forced and not promised anything to withdraw his petition. (*Id.*) Hugueley stated that he only agreed to sign the petition for post-conviction relief because he was not going to be allowed visitors while on death watch; he no longer wished to pursue the petition now that his visitation

_____

[2] On October 31, 1986, Hugueley was admitted to the Tennessee State Prison hospital and had surgery to remove a right frontal brain tumor. *See Hugueley v. State*, No. W2009-00271-CCA-R3-PD, 2011 WL 2361824 (Tenn. Crim. App. June 8, 2011) 2361824, at *12-13.

problem was resolved.  (*Id.* at PageID 3062-63.)  He did not want to be represented by the PCD or other counsel.  (*Id.* at PageID 3063-64.)

In an order dated January 16, 2007, the post-conviction court found that "a genuine issue as to Hugueley's competency had been raised by post-conviction counsel" and determined that Hugueley's competency be evaluated before he be allowed to withdraw his post-conviction petition.  (ECF No. 42-4 at PageID 2106-08.)  The court denied the motion for a continuance. (*Id.* at PageID 2107-08.)[3]

Petitioner was granted permission to appeal the Court's order denying the motion for a continuance.  (*Id.* at PageID 2109-14.)  On January 25, 2007, the TCCA stayed proceedings in the trial court pending the interlocutory appeal.  (*Id.* at PageID 2123-24.)  The State filed an answer to the amended petition on January 26, 2007.  (*Id.* at PageID 2117-20.)  On June 12, 2007, the TCCA denied the application for interlocutory appeal and vacated the stay of proceedings.  (*Id.* at PageID 2125-27.)

On June 22, 2007, Hugueley wrote a letter to Judge Weber McCraw stating "I still DO NOT wish to proceed with a post-conviction appeal[,] therefore please keep that in mind for the next hearing you schedule in my case."  (ECF No. 131-14 at PageID 7464; ECF No. 42-4 at PageID 2128.)  Hugueley sent a handwritten document to ADA Dycus, which he also provided to the court, to make them "aware of facts which his [a]ppointed [c]ounsel Ms. Kelly Gleason failed to mention in her petition" including that he gave permission to file the post-conviction petition to

---

[3] Hugueley contacted his counsel the following day, January 17, 2007, deciding that he wanted to go forward with his post-conviction petition under certain conditions.  (*See* ECF No. 131-9 at PageID 7446-47.)

stall for time to resolve issues with his visitation while on "death watch."  (*Id.* at PageID 2130-31; *see* ECF No. 42-5 at PageID 2175.)  Hugueley sought to gain control of his case because the PCD "feel[s] that the[y] can file in court saying what they want about anything in my life without talking to me about it or giving me the option of whether it is filed or not."  (ECF No. 42-4 at PageID 2131.)

After the visitation problem was resolved, the inmate no longer wanted to pursue post-conviction relief.  (*Id.* at PageID 2131-32.)  He disputed his attorney's representation that he changed his mind based on his mood and asserted that he told Gleason what he planned to do in July 2006.  (*Id.* at PageID 2132.)  Hugueley disagreed with Gleason's statement that he sustained a head injury in a motorcycle accident.  (*Id.* at PageID 2134.)

Hugueley stated that he "should NOT have to go through any type of Mental Health evaluation" since he never signed the petition, and it was filed without his consent.  (*Id.* at PageID 2123.)  He wanted to rely on the 2003 mental evaluation and stated "I will <u>NOT</u> take any more test[s] . . . ."  (*Id.* at PageID 2134.)

At a hearing on August 29, 2007, Hugueley again expressed a desire to withdraw his petition, and his counsel asserted that he was incompetent to do so.  (*See* ECF No. 42-5 at PageID 2176-78.)  Gleason noted inconsistencies with her client's desire to proceed with the post-conviction petition; an incident in March 2007, where he smeared feces on the walls of his cell (purportedly as a form of protest); the termination of his engagement; and depression.  (*Id.* at PageID 2177-78; *see* ECF No. 131-11 at PageID 7454-56 (mental health referral related to smearing feces and "saying that[']s the way he is going to live from now on"); *see also* ECF No. 131-13 at PageID 7460-62 ("gone 'cave man' again").)  Gleason did not present witnesses to

support her claims of Hugueley's incompetence, but she entered on the record a social history and mitigation report, a notebook about his history of mental illness, and reports and affidavits from neuropsychologist Pam Auble and psychologist Keith Caruso. (*See* ECF No. 42-5 at PageID 2178-79.)

On December 3, 2007, the court entered an order addressing Hugueley's desire to withdraw his post-conviction petition, his competency, and counsel's representations that her client wished to proceed. (*Id.* at PageID 2168-95.) The court found that "there is in fact a genuine issue regarding petitioner's competency to withdraw his post conviction petition." (*Id.* at PageID 2169, 2192.) The court ordered the parties to submit a list of mental health professionals to evaluate Hugueley's competency. (*Id.* at PageID 2194-95.) Further, the court stated that, if the inmate decided he wanted to proceed, he should inform the court and that decision would be final. (*Id.*)

On January 23, 2008, the court entered an order appointing John Hutson and Peter Brown, the parties' proffered mental health professionals, to evaluate Hugueley. (ECF No. 42-5 at PageID 2273-79.) The court further stated,

> should petitioner refuse to participate in the ordered mental health evaluations, then this court will proceed with post conviction review. Such failure to cooperate can only be viewed by this court as either a statement by petitioner that he wishes to proceed with post conviction review or as evidence that he is not competent to waive post conviction review. Moreover, once a decision to proceed has been made, the court will not entertain further motions by petitioner to waive post conviction review. Thus, this court advises petitioner to participate in the evaluations. His cooperation in these matters is the clearest path to achieving his stated goals of waiving post conviction review and terminating further proceedings in this matter.

(*Id.* at PageID 2278.)   The parties had until March 6, 2008, to complete their evaluations.   (*Id.* at PageID 2283.)   In an order entered May 19, 2008, the court granted additional time until June 30, 2008, for Brown's evaluation.   (*Id.* at PageID 2324.)

On May 28, 2008, Hugueley filed a document complaining about the mental health evaluations, the waste of taxpayers' dollars, and the judge's inexperience with capital cases; he refused to meet with Brown and again stated that he did not want post-conviction review.   (ECF No. 42-6 at PageID 2329-34.)

On June 30, 2008, the court received a letter from Petitioner that he wanted the PCD removed from his case and be allowed to represent himself.   (ECF No. 42-7 at PageID 2512.)   He noted that he had been declared competent by every mental health professional who had evaluated him since 2003, including Hutson's evaluation on February 29, 2008.   (*Id.* at PageID 2512-13.) Hugueley stated that he did not want the PCD to appeal his case further.   (*Id.* at PageID 2514, 2521-22.)

On July 24, 2008, the court noted that Brown had not evaluated Hugueley and that "it cannot trust that Dr. Brown will be able to expeditiously perform an evaluation of petitioner." (*Id.* at PageID 2564.)   The court ordered counsel to provide a new list of mental health professionals for Hugueley's competency evaluation by July 29, 2008.   (*Id.* at PageID 2568.)

On July 28, 2008, the inmate filed a motion to remove appointed counsel and to represent himself which stated that he would withdraw the post-conviction petition after counsel had been removed.   (*Id.* at PageID 2520-26.)

On August 1, 2008, the trial court appointed Bruce Seidner to evaluate Hugueley.   (*Id.* at PageID 2569, 2573-74.)   Seidner's report was filed on or about November 14, 2008, and a hearing

was held.   (*See id.* at PageID 2595-2613; *see* ECF No. 42-12.)   Seidner testified that he interviewed Hugueley for mental status and that Hugueley had been "reticent to do further testing," believed there was sufficient testing in the record, and asserted that his competence had never been an issue.   (*Id.* at PageID 2872.)

Petitioner agreed to psychological testing in a "no contact visit"; a personality test using the Personal Assessment Inventory (PAI), a malingering test called the Validity Indicator Profile (VIP), the Wisconsin Card Sort test, which tests for cognitive ability and rational processes, and the Wechsler Adult Intelligence Scale IQ test.   (*Id.* at PageID 2873, 2914-15, 2920.)   Hugueley presented "as really quite capable" with an IQ in the high average range; he was fully oriented and did not appear to be struggling with major depression.   (*Id.* at PageID 2873.)   Seidner testified that the inmate talked about "his self responsibility and his self interests" and noted that there was "no condition that I can find that affects his thinking process or the consequences of that."   (*Id.*)   Seidner found no impairment to Hugueley's capacity.   (*Id.*)   Seidner read Pamela Auble's findings and testified that "there was nothing that questioned his capacity from her findings and there was a psychiatrist as well from his psychiatric perspective that did not question [Hugueley's] capacity in 2003."   (*Id.* at PageID 2880.)   Hugueley performed better on these tests than any previous tests and explained that he had been repressing his actual ability in previous tests.   (*Id.* at PageID 2912.) [4]

---

[4]   In addition to finding Hugueley competent, Seidner noted his high verbal IQ of 127 in the superior range of intelligence and that there was no evidence of mood disorder, depression, excessive guilt, internalizing, flight ideas, excessive externalization, delusions, thought blocking, hallucinations, thinking disorder, or neurological defects.   (ECF No. 42-8 at PageID 2713-14.)

On January 8, 2009, the court dismissed the post-conviction petition. (ECF No. 42-8 at PageID 2688-2749.) Seidner concluded that Hugueley was competent to withdraw his post-conviction petition and waive further post-conviction review, and the court found that counsel had failed to demonstrate, by clear and convincing evidence, that Hugueley lacked the competence required to withdraw his post-conviction petition and forego further review of his claims. (*Id.* at PageID 2713, 2749.)

On February 9, 2009, Petitioner appealed. (*Id.* at PageID 2754.) On June 8, 2011, the TCCA affirmed the judgment of the post-conviction court. (ECF No. 43-9 at PageID 4148-98.) *See Hugueley*, 2011 WL 2361824, at *44. Hugueley filed a petition for rehearing, which the TCCA denied on July 27, 2011. (ECF Nos. 43-10 & 43-11.)

On or about September 26, 2011, Hugueley filed an application for permission to appeal to the TSC. (ECF No. 43-12 at PageID 4339.) On December 13, 2011, the TSC denied the application. (ECF No. 43-13 at PageID 4341.)

## II. FEDERAL COURT PROCEDURAL HISTORY

On August 20, 2009, Hugueley filed a *pro se* petition for writ of habeas corpus pursuant to 28 U.S.C. § 2254 and motions for leave to proceed *in forma pauperis* and to appoint counsel. (Electronic Case Filing ("ECF") Nos. 1-3.) On August 27, 2009, the Court granted his motions and directed the Clerk to serve the habeas petition. (*See* ECF No. 4.)

On October 29, 2009, the inmate filed a motion to stay proceedings. (ECF No. 10.) The case was stayed and administratively closed pending the completion of state court post-conviction proceedings. (ECF No. 11.) On February 26, 2013, the stay was lifted, and the case reopened. (ECF No. 23.)

On March 19, 2013, Hugueley moved for leave to amend his petition to assert ineffective assistance of trial and appellate counsel claims. (ECF No. 27 at PageID 88-113.) On March 22, 2013, he filed a corrected motion. (ECF No. 29.) The Court granted the motion in part and required Hugueley to file an amended petition. (*See* ECF No. 52 at PageID 4433.)

On July 9, 2013, Respondent[5] filed the state court record. (ECF Nos. 41-43.) On August 30, 2013, Petitioner filed the Petition Amended As Ordered By the Court, and on November 8, 2013, he submitted the Second Petition Amended As Ordered By the Court ("Second Amended Petition"). (ECF Nos. 53 & 58.) On February 12, 2014, Respondent filed an Answer to the Second Amended Petition. (ECF No. 78) On March 14, 2014, Hugueley filed a reply. (ECF No. 81.)

On February 2, 2015, Warden Westbrook moved to dismiss Claims I, J, and K or to prohibit Hugueley's reliance on undisclosed facts or evidence to support those claims. (ECF No. 110.) On February 3, 2015, Hugueley filed a response. (ECF No. 111.) On April 16, 2015, the Court denied Respondent's motion to dismiss and directed the parties to confer in good faith about the discovery dispute that was the basis for the motion. (ECF No. 119.) The parties presented a joint status report addressing the dispute and agreeing to go forward. (ECF No. 122 at PageID 5509-10.)

---

[5] The proper respondent to a habeas petition is the petitioner's custodian. *Rumsfeld v. Padilla*, 542 U.S. 426, 434–35 (2004). Hugueley is currently incarcerated at Riverbend Maximum Security Institution ("RMSI") where Bruce Westbrooks is the warden. *See* Tennessee Felony Offender Information Lookup, https://apps.tn.gov/foil/search.jsp (last visited Apr. 4, 2017); *see* Tennessee Department of Correction, http://www.tn.gov/correction/institutions/rmsi.html (last visited Apr. 4, 2017). The Clerk shall record the respondent as RMSI Warden Bruce Westbrooks and terminate all references to Wayne Carpenter.

Respondent filed a motion for summary judgment on March 16, 2015. (ECF No. 112.) On June 19, 2015, the inmate responded to the motion with multiple attachments. (ECF Nos. 127-132.) On October 5, 2015, Respondent filed a reply. (ECF No. 137.)

## III.    FACTUAL BACKGROUND

The TSC summarized the evidence presented at trial as follows:

The evidence adduced at Defendant's trial established that, on January 17, 2002, Defendant was an inmate at the Hardeman County Correctional Facility, where he was housed in the "F" pod. That day, correctional counselor Delbert Steed entered the "F" pod in order to counsel inmates. Mr. Steed was sitting at a table when Defendant approached from behind and began stabbing Mr. Steed with a homemade weapon. Defendant stabbed Mr. Steed a total of thirty-six times. Defendant did not cease stabbing the victim until the handle of his homemade weapon broke off. Once Defendant was unable to continue using his weapon, he lay down on the floor of the pod and permitted other correctional officers to restrain and remove him. The victim was recovered with the sharpened portion of the weapon still embedded in his back, and he was transported to the infirmary.

Mary Harris testified that she was working in the control room from which she could view the activity occurring in the pod. She observed Defendant approach the victim from behind and begin stabbing him. Upon witnessing Defendant's attack on Mr. Steed, she called for assistance. Another female officer opened the door to the pod and told Defendant to stop. At that, Defendant rose and started toward the officer "with the knife drawn back like he was going to stab her." The officer closed the door, and Defendant returned to the victim, recommencing his attack. Ms. Harris testified further that Officer Donald Watkins entered the pod and told Defendant to stop. According to Ms. Harris, Defendant stabbed the victim once or twice more and then stopped when the handle on the weapon broke. At that point, Defendant allowed himself to be taken into custody.

Donald Watkins testified that he is a Senior Correctional Officer at the Hardeman County Correctional Facility. He responded to Ms. Harris' call for assistance. As he looked through the door into the pod, he saw Defendant kneeling down next to the victim. When he saw Defendant stab the victim with a homemade weapon, he entered the pod shouting, "Drop your weapon! Drop your weapon!" Mr. Watkins stated that Defendant complied immediately and lay face down on the floor. Mr. Watkins called for medical assistance, and when he heard the victim making a groaning noise "like he was in pain," Mr. Watkins tried to reassure the victim that help was coming.

13

Pursuant to his employment by the Tennessee Department of Correction as an Internal Affairs Investigator, Mr. Joseph Vernon reported to the crime scene where he collected evidence and took photographs. Mr. Vernon was present when the murder weapon was removed from Mr. Steed's body. He described the weapon as a "quarter inch rod that ha[d] been sharpened to a very fine point" on one end. Mr. Vernon stated that the point was "razor sharp." The weapon measured approximately eleven inches long. The handle of the weapon was a "Magic Marker" pen.

Mr. Don Dunaway, also an Internal Affairs Investigator with the Tennessee Department of Correction, interviewed Defendant after the killing. After being informed of his rights and agreeing to waive them, Defendant gave Mr. Dunaway a lengthy statement in which he described his intense dislike of the victim. Mr. Dunaway testified about the statement. Additionally, an audio tape of Defendant's statement was played for the jury, and a transcript of the tape was provided. Defendant described numerous conflicts and confrontations that he had had with Mr. Steed in his capacity as a correctional officer. Defendant claimed that Mr. Steed had threatened to write him up and told Defendant that he was "friends with these gangs around here! They like me! They love me! ... you ain't nothing!"

Defendant killed the victim on a Thursday. Defendant told Mr. Dunaway that he began thinking about killing the victim on the previous Monday. On that day, he got his weapon but then decided to "just ... leave it alone." Defendant described to Mr. Dunaway what then occurred on Thursday, while Mr. Steed was in the pod:

> I started to walk up and say something to him, and one of the little gang members that he talked to a lot there, run up and set down at the table and started talkin' to him. And I stood over to the side for a few minutes, and he looked at me, and he just shook his head ... just turned around and faced the other direction. And I said, "F[-]k this!" And I went to the house, and got my damn knife and packed my property up real quick ... throwed my s[-]t in a box and un-done my TV, and set it over to the side, and went and killed his ass! It was that plain and simple.

Defendant admitted to Mr. Dunaway that he intended to kill the victim by stabbing "the most vital organs first ... the heart and the lung."

Mr. Dunaway testified that in May of 2003, Defendant wrote a letter to the district attorney. Mr. Dunaway obtained this letter and subsequently verified with Defendant that he had written and signed it. This letter was admitted into evidence and states, in pertinent part, the following: "I did with malicious intent

14

premeditatedly murder Delbert Steed, and as indicated in my statement to Internal Affairs, I have no regret or remorse for this crime and I fully intended to kill others that day but was unable to do so because the handle on my weapon broke."

Dr. O'Brian Clary Smith testified as an expert in the field of forensic pathology about the autopsy to the victim. Dr. Smith removed the murder weapon from the victim's back. He stated that the victim's cause of death was "[m]ultiple stab wounds, thirty-six." Twelve of these wounds were lethal. Dr. Smith testified that there were ten wounds to the victim's chest area, three of which were fatal. There were fourteen wounds to the victim's back area, nine of which were fatal. Additionally, there was one wound to the victim's abdomen and eleven wounds to the victim's left arm.

Defendant testified at trial. He stated about his attack on the victim:

I was stabbing Counselor Steed. He was laying on the floor, stomach down. I was trying to drive it plumb through and hit the concrete below him. That was my intentions. I heard the door pop behind me. I turned around and it was the Watkins guy that testified yesterday, and a little girl named Perry. When I seen them, I took one and a half steps toward them. At that time, I still had the weapon in my hand. And they said, "He's got a knife," and slammed the door.

And they stood outside the door while I stabbed the man while he was laying on the floor, face down, I stabbed him about eight more times trying to run it plumb through him. They didn't come in until when I drawed back going to hit him again, I didn't see nothing but a piece of pen, Magic Marker sticking out of my hand....

At that point, Defendant threw the weapon handle away and lay down on the floor. Defendant also testified about a grievance he had filed in which he set forth various complaints about the victim and the victim's supervisor. He explained that he had made numerous cell change requests and requests to be placed in the anger management program, "all in an effort to get away from Counselor Steed" and the unit manager. Defendant stated that the victim "had a smart ass mouth" which was the source of their "problem." Defendant continued: "He had a habit of shooting his mouth off to inmates, threatening them, and I wasn't going to stand for it in any way, shape or form."

On cross-examination, Defendant stated, "In the world I live in, you die for disrespect. It should apply to both employee and inmate." He explained that he had made the murder weapon from a piece of metal removed from a laundry cart. He used sandpaper from a belt sander to sharpen the point. He stated that he would not

have quit stabbing the victim if the handle of the weapon had not broken off. He admitted that he aimed for the victim's vital organs.

Defendant acknowledged that his actions in killing the victim were both intentional and premeditated. He also acknowledged that during his conversations with defense counsel he had consistently maintained that he wanted the death penalty.

Upon considering this proof, the jury returned a verdict of guilty on Defendant's charge of first degree premeditated murder.

*Hugueley*, 185 S.W.3d at 363-66.

The State argued the following four aggravating circumstances in the penalty phase:

(1) Defendant was previously convicted of one or more felonies whose statutory elements involved the use of violence to the person;

(2) the murder was especially heinous, atrocious, or cruel in that it involved torture or serious physical abuse beyond that necessary to produce death;

(3) Defendant committed the murder while he was in a place of lawful confinement; and

(4) the victim was a corrections employee.

*Id.* at 363, 367; *see* Tenn. Code Ann. § 39-13-204(i)(2), (5), (8), (9) (Supp. 1999). The jury determined that the aggravating circumstances outweighed the mitigating circumstances beyond a reasonable doubt. *Hugueley*, 185 S.W.3d at 363, 367.

## IV.    HUGUELEY'S FEDERAL HABEAS CLAIMS

Hugueley alleges that his Sixth, Eighth and Fourteenth Amendment rights were violated when:

A.    The State exercised peremptory challenges on the basis of race in violation of the dictates of *Batson v. Kentucky*, 476 U.S. 79 (1986).

B.      The State exercised peremptory challenges against female jurors on the basis of their gender in violation of *J.E.B. v. Alabama ex rel. T.B.*, 511 U.S. 127, 129 (1994).

C.      The trial court erred in refusing to dismiss for cause potential juror Barry Watkins, whose brother worked at the prison where the murder occurred and who Mr. Watkins knew was a potential witness for the prosecution.

D.      The evidence was insufficient to support the jury's finding of the aggravating circumstances.

E.      The trial court erred in instructing the jury as to the aggravating circumstances relating to the killing of a correctional employee by failing to charge the jury as to all of the elements of the offense.

F.      The trial court erred by allowing Mr. Hugueley to waive the presentation of mitigation evidence.

G.      The proof presented as to the aggravating circumstances was insufficient to outweigh the mitigating circumstances presented in the guilt/innocence portion of the trial.

H.      The death sentence is disproportionate to the penalty in similar cases.[6]

I.      Hugueley's counsel rendered ineffective assistance of counsel in their investigation and preparation for the capital case against him.

J.      Hugueley's counsel was ineffective during the jury selection process.

K.      Hugueley's counsel rendered ineffective assistance of counsel in their defense of him at the penalty phase of his trial.

L.      Hugueley's counsel rendered ineffective assistance of counsel on direct appeal.

(ECF No. 58 at PageID 4663-78.)

---

[6] Hugueley also asserts a violation of Tennessee law.   (*See* ECF No. 58 at PageID 4666.)

## V.     RESPONDENT'S MOTION TO DISMISS

When the Warden filed the motion for summary judgment, he asserted that he was not abandoning his motion to dismiss, but merely intended to supply the Court with alternative bases for dismissing Claims I, J, and K.   (ECF No. 112-1 at PageID 5440.)   Respondent refers to his arguments in the motion to dismiss to support his request for summary judgment for Claims I, J, and K.   (*Id.* at PageID 5468, 5470-71.)

On April 16, 2015, after Respondent's motion for summary judgment was filed, the Court denied his motion to dismiss.   (ECF No. 119.)

In a joint status report addressing the discovery dispute underlying the Warden's motion to dismiss filed April 27, 2015, Respondent stated that the denial of the motion was without prejudice and indicated that the parties agreed not to further pursue dismissal of Claims I, J, and K under Federal Rule of Civil Procedure 37(b)(2)(A).   (ECF No. 120 at PageID 5503.)

The parties stated their positions about the discovery dispute:

1.      Respondent contends that Petitioner's delay in providing documents and failure to respond to interrogatories has irrevocably frustrated Respondent's desire to obtain discovery before the Court imposed deadline for filing dispositive motions. Respondent also contends that Petitioner has an "on-going duty" (D.E. 119 at 4 n.2) to provide interrogatory responses and documents in accordance with the Court's order granting him discovery. (D.E. 103) Given the late stage of proceedings and the fact that Petitioner's dispositive motion response is due June 13, 2015, Respondent further contends that Petitioner's April 24, 2015, offer for him to review 34 boxes of documents without at least pre-marking the responsive documents therein has irrevocably prejudiced Respondent by frustrating the purpose for seeking and obtaining discovery in this case. Respondent requests exclusion of any evidence proffered in support of Petitioner's Claims I, J, and K under Fed. R. Civ. P. 37(b)(2)(A)(ii).

2.      Petitioner contends that because of Respondent's rejection of every effort Petitioner made to provide Respondent the discovery, including Respondent's decision to not review the 34 boxes Petitioner made available, Respondent's failure

to confer from January 14 until April 24, 2015, and Respondent's filing of his motion for summary judgment while the discovery dispute was still pending with this Court, the Court should not exclude any evidence offered in support of Petitioner's Claims I, J, and K.

(ECF No. 122 at PageID 5503-04.)

The parties agreed to the following going forward:

1.      Respondent will not further seek dismissal of Petitioner's Claims I, J, and K based on the alleged discovery violation. Nor will Respondent amend the grounds for his motion to exclude evidence to encompass the time period since the Court ordered the parties to confer.

2.      Petitioner's on-going duty to supplement the discovery provided in this case will necessarily be fulfilled when Petitioner files his response to Respondent's motion for summary judgment.

3.      Any additional relief requested from this Court will be requested by the parties in the regular course of summary judgment litigation. The parties will more fully brief their position on Respondent's Rule 37 motion as part of the summary judgment litigation.

(*Id.* at PageID 5504-05 (citation omitted).)

In Respondent's reply to the motion for summary judgment, he incorporated his motion to dismiss by reference and argued that the motion to dismiss should be considered in the Court's determination that Respondent is entitled to summary judgment as a matter of law.   (ECF No. 137 at PageID 7664, 7687.)   Respondent relies on his motion to dismiss to assert that Hugueley did not timely disclose evidence relevant to Claims A, I, J, and K.   (*Id.* at PageID 7669, 7683-84.)

## VI.     STATUTE OF LIMITATIONS

Although the Court addressed the timeliness of the ineffective assistance of counsel claims in its Order on Hugueley's motion to amend the petition, Respondent reasserted the statute of limitations as an affirmative defense to the amended claims in the Second Amended Petition.

(*See* ECF No. 52 at PageID 4414, 4419-22; ECF No. 112-1 at PageID 5441 n.2.) The Warden argued that the amended claims were raised after the expiration of the one-year limitations period and were time-barred because these claims do not relate back to the *pro se* petition. (*Id.* at PageID 5441-50.) He contended that the facts underlying the claims differ in time and type. (*Id.* at PageID 5445-46, 5449-50.) Respondent insisted that Hugueley is not entitled to equitable tolling and seeks reconsideration of the Court's determination that the amended claims relate back to the *pro se* petition. (*Id.* at PageID 5451.) Hugueley asserted that the Court had already determined that his ineffective assistance claims were timely. (ECF No. 127 at PageID 5621-23.)

In *Mayle v. Felix*, the United States Supreme Court held that an amended habeas petition "does not relate back when it asserts a new ground for relief supported by facts that differ in both time and type from those the original pleading set forth." 545 U.S. 644, 650 (2005)[7]; *see Cowan v. Stovall*, 645 F.3d 815, 818 (6th Cir. 2011).

The Sixth Circuit recently addressed relation back of an untimely amendment to a habeas petition in *Watkins v. Deangelo-Kipp*, 854 F.3d 846, 849-50 (6th Cir. 2017),

> An untimely amendment to a habeas petition "relates back" to an original petition filed within the Antiterrorism and Effective Death Penalty Act's (AEDPA) one-year limitations period if the original petition and the amended petition arise out of the same "conduct, transaction, or occurrence." Fed. R. Civ. P. 15(c)(1)(B); see also 28 U.S.C. §§ 2242, 2244(d)(1). The Supreme Court in *Mayle* defined the standard for relation back in the context of a habeas petition. There, the petitioner argued that his amended petition, which alleged his Fifth Amendment rights were violated during pretrial interrogation, related back to his original petition, filed *pro se*, where he argued that the admission of videotaped evidence during trial violated his rights under the Sixth Amendment's Confrontation Clause. 545 U.S. at 648–49, 651–52, 125 S. Ct. 2562. The Court emphasized that, in filing the petition, the

---

[7] In *Pinchon v. Myers*, 615 F.3d 631, 642 (6th Cir. 2010), the Sixth Circuit recognized the retroactive application of *Mayle* as a clarification of existing law.

petitioner must specify all grounds for relief, stating the facts supporting each ground. *Id*. at 649, 655, 661, 125 S. Ct. 2562. Consequently, it held that an amended habeas petition does not relate back to the original petition "when it asserts a new ground for relief supported by facts that differ in both time and type from those the original pleading set forth." *Id*. at 650, 125 S. Ct. 2562. Rather, to qualify for relation back, the original and amended petitions must "state claims that are tied to a common core of operative facts." *Id*. at 664, 125 S. Ct. 2562. The Court cautioned not to read the "conduct, transaction, or occurrence" requirement, so broadly as to render meaningless the statute of limitations. *Id*. at 662-64, 125 S. Ct. 2562. Turning to the facts of the case, the Court concluded that the petitioner's untimely amended petition did not relate back to the timely original petition because the two petitions "targeted separate episodes": the pretrial interrogation of the witness, and the petitioner's own interrogation, which occurred "at a different time and place." *Id*. at 660, 125 S. Ct. 2562.

Though *Mayle* dealt with two separately designated claims—a Fifth Amendment violation versus a Sixth Amendment violation—its reasoning equally applies to claims with the same designation—here, ineffective assistance of counsel—that do not rely on the same common core of operative facts, or that target separate episodes.

In *Watkins*, the petitioner filed a timely habeas petition alleging ineffective assistance of counsel for "failure to investigate and raise a defense." *Watkins*, 854 F.3d at 847, 849. Nearly four years later, he filed an amended petition arguing ineffective assistance of counsel for "failure to request another psychiatric evaluation after Watkins' conduct during trial." *Id*. The district court granted habeas relief but the Sixth Circuit determined that the amendment was untimely. *Id*. at 847. The Sixth Circuit held that, because Watkins' original petition did not raise facts supporting the underlying ineffective assistance of counsel claims, the amended petition did not relate back. *Id*. at 850-51.

In *Hill v. Mitchell*, the Sixth Circuit described cases where relation back had been upheld because the amended claim arose out of the same set of operative facts as the original claim and expanded on or amplified the facts alleged in the original claim. 842 F.3d 910, 924 (6th Cir.

2016). Although both the original and amended claims were *Brady* claims, the original claim "did not even raise a potential claim for relief" and was "completely bereft of specific fact allegations or evidentiary support and was not tied to any particular theory of relief." *Id.* at 924. The court noted the "utter lack of substance" in the original claim and determined that the claims did not share a common core of operative facts. *Id.* at 924-25.

Respondent argues that the amended claims do not relate back to the *pro se* petition. (ECF No. 112-1 at PageID 5442.) He asserts that the Supreme Court rejects a broad interpretation of Fed. R. Civ. P. 15's "conduct, transaction or occurrence" language. (*Id.* at PageID 5442-43.)

### A. Ineffective Assistance – Investigation, Preparation & Penalty Phase (Claims I(1-4) & K(1 & 3))

The Warden contends that the amendment allowing Claims I(1-4) and K(1 & 3) is not proper and that these claims are time-barred because they do not relate back to the *pro se* petition. (ECF No. 112-1 at PageID 5442-43.) Claim I addresses ineffective assistance of counsel in the preparation and investigation of Hugueley's capital case including the failure to: (1) fully investigate, raise, and litigate his competence to waive the presentation of mitigation evidence (formerly Claim 14 ¶ 1(c)); (2) investigate issues related to Hugueley's competence to stand trial and assist in his defense (formerly Claim 14 ¶ 2); (3) investigate his social history to determine his incompetence to waive the presentation of mitigation evidence (formerly Claim 14 ¶ 7(a)(2)); and (4) retain the proper experts pre-trial to discover his incompetence to waive the presentation of mitigation evidence (formerly Claim 14 ¶ 11(k)). (*See* ECF No. 58 at PageID 4666-67.) In Claim K(1), Petitioner alleges that his trial counsel failed to fully investigate his social history in their defense of him at the penalty phase and discover that he was incompetent to waive the

presentation of mitigation evidence ((formerly Claim 17 ¶1(a)(2)).   (*Id.* at PageID 4673-74.)   In

Claim K(3), he claims that his trial counsel failed to move for a hearing and establish that he was

incompetent to waive the presentation of mitigation evidence.   (*Id.* at PageID 4676.)

The Court addressed these claims in the motion to amend stating,

4. Waiving Presentation of Mitigation Evidence

In Paragraph 11 of the *pro se* petition, Petitioner includes Sixth, Eighth, and
Fourteenth Amendment violations concerning waiver of the presentation of
mitigation evidence. (D.E. 1 at 4.) In Claim 14 Paragraphs 1(c), 2, 7(a)(2), and
11(k) of the proposed amendment, he alleges ineffective [assistance] of counsel
because counsel failed to fully investigate, raise, and litigate Petitioner's
competency to waive the presentation of mitigation evidence and investigate
Petitioner's social history to discover that he was incompetent to waive the
presentation of mitigation evidence. (D.E. 29 at 9-12.) Petitioner makes similar
allegations in Claim 17 Paragraphs 1(a)(2) and 5 related to the penalty stage (<u>id.</u> at
12-22 & 25) and Claim 18 Paragraph 2 related to counsel's performance on direct
appeal (<u>id.</u> at 26-27). These claims share a common core of operative facts with and
relate back to Paragraph 11 of the *pro se* petition. Petitioner has stated a reasonable
argument to establish cause for procedural default, *see* supra pp. 12-16.
Amendment would not be futile, and he is entitled to amend his petition to add the
allegations in Claim 14 Paragraphs 1(c), 2, 7(a)(2), and 11(k), Claim 17 Paragraphs
1(a)(2) and 5, and Claim 18 Paragraph 2.

(ECF No. 52 at PageID 4421-22.)

Paragraph 11 states, "[i]n violation of the Sixth, Eighth, and Fourteenth Amendments, the

trial court erred by allowing Mr. Hugueley to waive the presentation of mitigation evidence."

(ECF No. 1 at PageID 4.)   The Warden contends that the facts underlying *pro se* Paragraph 11 and

the amended claims differ in time and type because *pro se* Paragraph 11 involves a trial court error

claim, relying on the trial court records, and the amended ineffective assistance claims involve a

question of trial counsel's performance and required further development in the waived state

post-conviction proceedings.   (*Id.* at PageID 5443-44.)   Respondent argues that *pro se* Paragraph

11 does not assert trial counsel's ineffective assistance or Hugueley's incompetence.  (*Id.* at PageID 5444-45.)   Further, Respondent submits that the claims differ in time because the *pro se* claim involved the trial court allowing waiver of mitigation evidence and the ineffective assistance claim concerned the adequacy of counsel's representation based on his investigation efforts before trial and sentencing.   (ECF No. 112-1 at PageID 5444.)

In *Zagorski v. State*, 983 S.W.2d 654, 660-61 (Tenn. 1998), the TSC sets out steps the trial court must take to protect a defendant's interests when he goes against counsel's advice and refuses to permit the investigation and presentation of mitigation evidence.  *Id.*[8]   The procedure was to insure that the waiver was "intelligently and voluntarily made."  *Id.* at 660.   Further, with regard to defense counsel's performance, the court stated,

> We recognize the professional, personal, and moral conflicts that lawyers encounter when representing a defendant who chooses to forego the use of mitigating evidence. Nevertheless, we must preserve a competent defendant's right to make the ultimate decisions in his or her case once having been fully informed of the rights and the potential consequences involved.
>
> Accordingly, when a defendant instructs counsel not to investigate or present mitigating evidence, counsel must follow the procedure outlined in this case to insure on the record that the defendant is competent and fully aware of his rights and the possible consequences of that decision. Thereafter, counsel will not

---

[8] *Zagorski* requires the trial court to: (1) inform the defendant of his right to present mitigating evidence and make a determination on the record whether the defendant understands this right and the importance of presenting mitigating evidence in both the guilt phase and sentencing phase of trial; (2) inquire of both the defendant and counsel whether they have discussed the importance of mitigating evidence, the risks of foregoing the use of such evidence, and the possibility that such evidence could be used to offset aggravating circumstances; and (3) after being assured the defendant understands the importance of mitigation, inquire of the defendant whether he or she decides to forego the presentation of mitigating evidence.  *Zagorski*, 983 S.W.2d at 660; *see State v. Johnson*, 401 S.W.3d 1, 16 (Tenn. 2013) (same).

be adjudged ineffective for abiding by the defendant's lawful decision.

*Id.* at 661.

Hugueley did not plead facts in the *pro se* petition related to Paragraph 11 or in relation to the amended claims now being disputed as time-barred. However, the same core of operative facts surrounding the waiver of mitigation evidence and counsel's actions related to that waiver are at issue in the *pro* se and amended claims. Unlike the *Brady* claim in *Hill*, where there was a complete lack of factual support and pure speculation, the state court record in this case demonstrates the colloquy that occurred when Hugueley expressed his desire to waive the presentation of mitigation evidence and counsel's representations to the trial court about the waiver. (*See* ECF No. 41-5 at PageID 730-38.) Despite the lack of fact pleading on the issues, the record demonstrates common facts that support these claims. The Court, however, notes that additional facts beyond the scope of the record may support Hugueley's ineffective assistance of counsel claims.

Petitioner alleged an unspecified Sixth Amendment violation surrounding the trial court's purported error in allowing him to waive the presentation of mitigation evidence. The ineffective assistance of counsel claims in Claim I and K are Sixth Amendment violations, the same type of claim alleged in the *pro se* petition.

To the extent Respondent contends that Hugueley's competence was not specifically raised in the *pro se* petition, the defendant's competence to make such a decision is inherent in determining trial court error and whether counsel were ineffective. *See State v. Smith*, 993 S.W.2d 6, 8 (Tenn. 1999) ("[T]he trial court had no authority to override the will of a competent and informed defendant and force Smith to present mitigation evidence . . . in his capital

sentencing hearing."); *id.* at 15-16 ("[W]e have no doubt that these experienced attorneys would have presented [the issue of defendant's competency] to the trial court at the jury-out hearing, particularly in light of the trial court's specific questions regarding its existence.").

In the instant case, the inmate was acting against the advice of counsel, and it was necessary to ascertain his state of mind. *See id.* at 14 ("counsel will not be adjudged ineffective for following the decision of a competent and fully informed defendant who chooses to forego investigation and presentation of mitigating evidence at the sentencing phase of a capital trial"). The TSC acknowledges the right to waive mitigation, while requiring that the defendant be competent to do so. *Johnson*, 401 S.W.3d at 16-17.

Competence to waive mitigation is equated with competence to stand trial. *Id.* at 17. Therefore, the timing of the claims, whether in the preliminary stages or at the penalty phase has no bearing, because the same competence is required to stand trial and to waive mitigation.

The amended claims share common facts and are similar in time and type as Paragraph 11. As this Court has previously stated, the amendments specifying an examination of Hugueley's competence in light of his desire to waive mitigation proof relate back and are not time-barred.

## B.     Ineffective Assistance of Appellate Counsel (Claim L(1))

The Court allowed amendment of Claim L(1), that Hugueley's appellate counsel were ineffective for "failure to raise and litigate his incompetence to waive the presentation of mitigation (formerly claim 18 ¶ 2)," based on a common core of operative facts with Paragraph 11 of the *pro se* petition. (*See* ECF No. 52 at PageID 4421-22.)   The Warden argues that Claim L(1), is time-barred.   (ECF No. 112-1 at PageID 5445.)      He contends that the amended claim differs in time and type from the Paragraph 11 in the *pro se* petition.   (ECF No. 112-1 at PageID

5446.)  Based on Fifth and Eighth Circuit cases, Respondent maintains that failure to file an appeal is a separate occurrence in both time and type from conduct that occurs at the sentencing phase and before trial.  (*Id.* at ¶ PageID 5446-47 (citing *United States v. Gonzalez*, 592 F.3d 675, 680 (5th Cir. 2009) and *United States v. Craycraft*, 167 F.3d 451 (8th Cir. 1999).)

Respondent contends that Claim L(1) differs in time and type because the *pro se* petition does not include claims of ineffective assistance, incompetency or appellate error and offers no factual basis to support the assertion that the trial court erred in permitting Hugueley to waive mitigating evidence or that he is or was incompetent.  (*Id.*)  Although Hugueley raises a Sixth Amendment violation related to his right to effective counsel at trial and the purported trial court error of allowing him to waive mitigation evidence, he does not address the performance of Jones and Gibson as appellate counsel in his *pro se* petition.[9]  There is some difference in time relevant to Claim L(1) and the *pro se* petition, although the operative facts and the players are the same. Both claims require an assessment of the counsels' effectiveness at trial with regard to the waiver of mitigation evidence.  Claim L(1) relates back to the *pro se* petition.  *See Lee v. Haas*, 197 F. Supp. 3d 960, 970 (E.D. Mich. 2016) (finding that claim of ineffective assistance of appellate counsel arises from the same core of operative facts as and relates back to the self-representation claim in the original habeas petition).

C.    Ineffective Assistance - Hugueley's Prior Convictions (Claims I(5),  K(2) & L(2))

---

[9] Jones and Gibson represented Hugueley both at trial and on appeal.  (*See* ECF No. 58 at PageID 4677.)

With regard to the allegations about Hugueley's counsels' failure to investigate and challenge the validity of his prior violent convictions in Claims I(5) and K(2), Respondent disagrees with the Court's reasoning that Paragraphs 9 and 12 of the *pro se* petition share a common core of operative facts and asserts that the facts underlying the claims differ in time and type. (ECF No. 112-1 at PageID 5447-48.) The Court stated,

## 2. Aggravating Circumstances

Hugueley presented several claims related to aggravating circumstances in both the *pro se* petition and the proposed amendment. In Paragraph 9 of the *pro se* petition, he alleges violations of the Sixth, Eighth, and Fourteenth Amendments based on insufficient evidence to support the jury's finding of the aggravating circumstances related to his prior convictions; the heinous, atrocious, and cruel killing; the fact that the defendant was in lawful custody at the time of the murder; and the fact that the victim was a corrections employee. (D.E. 1 at 3.) In Paragraph 12, Petitioner submits Sixth, Eighth, and Fourteenth Amendment violations based on the proof of aggravating circumstances being insufficient to outweigh the mitigating circumstances. (*Id.* at 4.)

In Claim 14 Paragraph 13 of the proposed amendment, the inmate alleges ineffective assistance of counsel in the investigation and preparation of his capital case, specifically failure to investigate the circumstances surrounding Petitioner's prior violent convictions which were used as statutory aggravating circumstances. (D.E. 29 at 14-18.) In Claim 17 Paragraph 2 of the proposed amendment, Petitioner contends ineffective assistance of counsel in the penalty phase of trial for counsel not investigating or challenging the validity of the prior violent crimes used as aggravating circumstances. (D.E. 29 at 22-25.) In Claim 18 Paragraph 5 of the proposed amendment, Hugueley includes ineffective assistance of counsel on direct appeal for the failure to investigate and challenge Petitioner's prior violent convictions which were used as aggravating factors. (*Id.* at 27.)

The assertions in Claims 14, Paragraph 13; 17, Paragraph 2; and 18, Paragraph 5 share a common core of operative facts with and relate back to Paragraphs 9 and 12 of the *pro se* petition. Petitioner has stated a reasonable argument to establish cause for procedural default, *see* supra pp. 12-16. Amendment would not be futile and he is entitled to amend his petition to add these allegations.

(ECF No. 52 at PageID 4419-20.)

Respondent contends that the *pro se* claims challenge the sufficiency of proof of aggravating circumstances offered by the State and the jury's weighing of that proof against mitigating circumstances. (ECF No. 112-1 at PageID 5448.) He contends that resolution of the *pro se* claims is dependent on the trial record, while the amended ineffective assistance claims "necessarily" involve facts outside the state-court record. (*Id.*) The Warden argues that the facts supporting the *pro se* and amended claims differ in time because the *pro se* claims involve proof offered during trial and the amended claims inquire into counsel's representation before trial and sentencing. (*Id.* at PageID 5448-49.) He acknowledges that the claims share the fact of the jury's reliance on the prior aggravating circumstances, but he contends the claims do not share a "'common core of operative facts' given the divergence, in both time and type." (*Id.* at PageID 5449.)

To prove the sufficiency of the evidence claims alleged in the original petition, Hugueley must show that a rational trier of fact could have found proof beyond a reasonable doubt that he had the prior violent convictions that were presented before the trial court. *See Jackson v. Virginia*, 443 U.S. 307, 324 (1979). The convictions and the violent nature of the crimes were the evidence needed to prove the aggravating circumstances and required for weighing those circumstances against mitigating factors.

That same information is needed to determine if Hugueley's counsel conducted a reasonable investigation and appropriately challenged the aggravating circumstances at trial. Although additional evidence may support the ineffective assistance of counsel claims, the *pro se* and amended claims arise out of a common core of operative facts, namely the convictions and the

29

nature of the underlying crimes.[10]   Further, although Respondent attempts to delineate the timing associated with these claims, the claims all surround the preparation for and presentation of the penalty phase case.   The allegations in Claims I(5) and K(2)) relate back to the *pro se* petition.

With regard to the allegations in Claim L(2), that Hugueley's appellate counsel failed to investigate and challenge their client's prior violent convictions which were used as aggravating factors in the case against him, Respondent argues that Claim L(2) does not relate back to Claims 9 and 12 of the *pro se* petition because they differ in time and type, and again notes that resolution of the *pro se* claims follows from the trial record where the amended claims require information external to the state court record.   (ECF No. 112-1 at PageID 5449-50.)   Further, the Warden avers that the *pro se* petition does not raise any claims of appellate error or ineffective assistance and differs in time from the amended appellate level claims.   (*Id.* at PageID 5450.)   Respondent acknowledges that the *pro se* and amended claims share the fact of the jury's reliance on the prior aggravating convictions, but he contends that the claims do not share a common core of operative facts.   (*Id.* at PageID 5451.)   Because both the *pro se* and amended claims require an assessment of counsel's effectiveness at trial with regard to addressing the aggravating circumstance of Hugueley's prior violent convictions, Claim L(2) relates back to the *pro se* petition.

---

[10]   Although Hugueley contends that his counsel should have investigated the circumstances surrounding these convictions (*see* ECF No. 58 at PageID 4667-72), the circumstances do not eliminate the violent nature of the crimes and would be more useful in mitigation, which he waived, than to combat the finding of an aggravating circumstance.

## VII.  THE LEGAL STANDARD

Relevant legal standards for purposes of summary judgment review of this petition include the habeas standard for merits review, waiver and procedural default standards, and the summary judgment standard as it applies to habeas cases.

### A.  Merits Review under § 2254

The statutory authority for federal courts to issue habeas corpus relief for persons in state custody is provided by 28 U.S.C. § 2254, as amended by the Antiterrorism and Effective Death Penalty Act of 1996 ("AEDPA").   A federal court may grant habeas relief to a state prisoner "only on the ground that he is in custody in violation of the Constitution or laws or treaties of the United States."   28 U.S.C. § 2254(a).

Where a claim has been adjudicated in state court on the merits, a habeas petition can only be granted if the resolution of the claim:

> (1)  resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or
>
> (2)  resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding.

28 U.S.C. § 2254(d)(1)-(2).   The petitioner carries the burden of proof for this "difficult to meet" and "highly deferential [AEDPA] standard," which "demands that state-court decisions be given the benefit of the doubt."   *Cullen v. Pinholster*, 563 U.S. 170, 181 (2011) (quoting *Harrington v. Richter*, 562 U.S. 86, 102 (2011), and *Woodford v. Visciotti*, 537 U.S. 19, 24 (2002) (per curiam)).

Review under § 2254(d)(1) is limited to the record that was before the state court that adjudicated the claim on the merits.   *Pinholster*, 563 U.S. at 181-82, 185.   A state court's

decision is "contrary" to federal law when it "arrives at a conclusion opposite to that reached" by the Supreme Court on a question of law or "decides a case differently than" the Supreme Court has "on a set of materially indistinguishable facts." *Williams v. Taylor*, 529 U.S. 362, 412-13 (2000).[11] An "unreasonable application" of federal law occurs when the state court "identifies the correct governing legal principle from" the Supreme Court's decisions "but unreasonably applies that principle to the facts of the prisoner's case." *Id.* at 413. The state court's application of clearly established federal law must be "objectively unreasonable" for the writ to issue. *Id.* at 409. The writ may not issue merely because the habeas court, in its independent judgment, determines that the state court decision applied clearly established federal law erroneously or incorrectly. *Renico v. Lett*, 559 U.S. 766, 773 (2010) (citing *Williams*, 529 U.S. at 411). "As a condition for obtaining habeas corpus from a federal court, a state prisoner must show that the state court's ruling on the claim being presented in federal court was so lacking in justification that there was an error well understood and comprehended in existing law beyond any possibility for fairminded disagreement." *Richter*, 562 U.S. at 103.

As for challenges under § 2254(d)(2), "when a federal habeas petitioner challenges the factual basis for a prior state-court decision rejecting a claim, . . . [t]he prisoner bears the burden of rebutting the state court's factual findings 'by clear and convincing evidence.'" *Burt v. Titlow*, 134 S. Ct. 10, 15 (2013) (quoting 28 U.S.C. § 2254(e)(1)). A state-court factual determination is not "unreasonable" merely because the federal habeas court would have reached a different

---

[11] The "contrary to" standard does not require citation of Supreme Court cases "so long as neither the reasoning nor the result of the state-court decision contradicts them." *Early v. Packer*, 537 U.S. 3, 8 (2002) (per curiam).

conclusion. *Wood v. Allen*, 558 U.S. 290, 301 (2010); *see also Rice v. Collins*, 546 U.S. 333, 341-42 (2006) ("Reasonable minds reviewing the record might disagree" about the factual finding in question, "but on habeas review that does not suffice to supersede the trial court's . . . determination.").[12] The Supreme Court has described this standard as "demanding but not insatiable" and has emphasized that "deference does not by definition preclude relief." *Miller-El v. Dretke*, 545 U.S. 231, 240 (2005) (internal quotation marks and alteration omitted).

## B. Waiver and Procedural Default

A federal court may not grant a writ of habeas corpus on behalf of a state prisoner unless, with certain exceptions, the prisoner has exhausted available state remedies by presenting the same claim sought to be redressed in a federal habeas court to the state courts pursuant to 28 U.S.C. § 2254(b) and (c). *Pinholster*, 563 U.S. at 181. The petitioner must "fairly present"[13] each claim to all levels of state court review, up to and including the state's highest court on discretionary

---

[12] In *Wood*, the Supreme Court granted certiorari to resolve whether, to satisfy § 2254(d)(2), "a petitioner must establish only that the state-court factual determination on which the decision was based was 'unreasonable,' or whether § 2254(e)(1) additionally requires a petitioner to rebut a presumption that the determination was correct with clear and convincing evidence." *Wood*, 558 U.S. at 299. The Court ultimately found it unnecessary to reach that issue, and left it open "for another day." *Id.* at 300-01, 303 (citing *Rice*, 546 U.S. at 339, in which the Court recognized that it is unsettled whether there are some factual disputes to which § 2254(e)(1) is inapplicable). In *Titlow*, 134 S. Ct. at 15, the Supreme Court applied § 2254(e)(1)'s "clear and convincing" standard but cautioned that "[w]e have not defined the precise relationship between § 2254(d)(2) and § 2254(e)(1), and we need not do so here."

[13] For a claim to be exhausted, "[i]t is not enough that all the facts necessary to support the federal claim were before the state courts, or that a somewhat similar state-law claim was made." *Anderson v. Harless*, 459 U.S. 4, 6 (1982) (per curiam) (internal citation omitted). Nor is it enough to make a general appeal to a broad constitutional guarantee. *Gray v. Netherland*, 518 U.S. 152, 163 (1996).

review, *Baldwin v. Reese*, 541 U.S. 27, 29 (2004), except where the state has explicitly disavowed state supreme court review as an available state remedy, *O'Sullivan v. Boerckel*, 526 U.S. 838, 847-48 (1999). Tennessee Supreme Court Rule 39 eliminated the need to seek review before the TSC to "be deemed to have exhausted all available state remedies." *Adams v. Holland*, 330 F.3d 398, 402 (6th Cir. 2003); *see Smith v. Morgan*, 371 F. App'x 575, 579 (6th Cir. 2010).

There is a procedural default doctrine ancillary to the exhaustion requirement. *See Edwards v. Carpenter*, 529 U.S. 446, 452-53 (2000) (noting the interplay between the exhaustion rule and the procedural default doctrine). If the state court decides a claim on an independent and adequate state ground, such as a procedural rule prohibiting the state court from reaching the merits of the constitutional claim, the procedural default doctrine ordinarily bars a petitioner from seeking federal habeas review. *Wainwright v. Sykes*, 433 U.S. 72, 81-82 (1977); *see Walker v. Martin*, 562 U.S. 307, 315 (2011) ("A federal habeas court will not review a claim rejected by a state court if the decision of the state court rests on a state law ground that is independent of the federal question and adequate to support the judgment.") (internal quotation marks and citation omitted)).[14] In general, a federal court "may only treat a state court order as enforcing the procedural default rule when it unambiguously relied on that rule." *Peoples v. Lafler*, 734 F.3d 503, 512 (6th Cir. 2013).

---

[14] The state-law ground may be a substantive rule dispositive of the case or a procedural barrier to adjudication of the claim on the merits. *Walker*, 562 U.S. at 315. A state rule is an "adequate" procedural ground if it is "firmly established and regularly followed." *Id.* at 316 (quoting *Beard v. Kindler*, 558 U.S. 53, 60-61 (2009)). "A discretionary state procedural rule . . . can serve as an adequate ground to bar federal habeas review . . . even if the appropriate exercise of discretion may permit consideration of a federal claim in some cases but not others." *Id.* (quoting *Kindler*, 558 U.S. at 54) (internal quotation marks and citations omitted).

If a petitioner's claim has been procedurally defaulted at the state level, the petitioner must show cause to excuse his failure to present the claim and actual prejudice stemming from the constitutional violation or that a failure to review the claim will result in a fundamental miscarriage of justice. *Schlup v. Delo*, 513 U.S. 298, 320-21 (1995); *Coleman v. Thompson*, 501 U.S. 722, 750 (1991). The latter showing requires a petitioner to establish that a constitutional error has probably resulted in the conviction of a person who is actually innocent of the crime. *Schlup*, 513 U.S. at 321; *see House v. Bell*, 547 U.S. 518, 536-39 (2006) (restating the ways to overcome procedural default and further explaining the actual innocence exception).

### C.      Summary Judgment Standard

Under Federal Rule of Civil Procedure 56, on motion of a party, the court "shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). The party moving for summary judgment "bears the initial burden of demonstrating the absence of any genuine issue of material fact." *Mosholder v. Barnhardt*, 679 F.3d 443, 448 (6th Cir. 2012) (citing *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986)). "Once the moving party satisfies its initial burden, the burden shifts to the nonmoving party to set forth specific facts showing a triable issue of material fact." *Id.* at 448-49 (citing *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986)).

In considering a motion for summary judgment, a court must draw all reasonable inferences in favor of the nonmoving party. *Tolan v. Cotton*, 134 S. Ct. 1861, 1863 (2014) (per curiam) (citing *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255 (1986)). The central issue is "whether the evidence presents a sufficient disagreement to require submission to a jury or

whether it is so one-sided that one party must prevail as a matter of law." *Anderson*, 477 U.S. at 251-52. "[A] mere 'scintilla' of evidence in support of the non-moving party's position is insufficient to defeat summary judgment; rather, the non-moving party must present evidence upon which a reasonable jury could find in [his] favor." *Tingle v. Arbors at Hilliard*, 692 F.3d 523, 529 (6th Cir. 2012) (quoting *Anderson*, 477 U.S. at 251).

Rule 12 of the Rules Governing Section 2254 Cases in the United States District Courts ("Habeas Rules") permits federal courts to apply the Federal Rules of Civil Procedure to petitions for habeas corpus "to the extent that they are not inconsistent with any statutory provision of these rules." Habeas Rule 12; *see Townsend v. Hoffner*, No. 2:13-CV-14187, 2014 WL 2967949, at *2 (E.D. Mich. July 1, 2014). The AEDPA's significant deference to a state court's resolution of factual issues guides summary judgment review in habeas cases. A federal habeas court must presume the underlying factual determinations of the state court to be correct, unless the petitioner "rebut[s] the presumption of correctness by clear and convincing evidence." 28 U.S.C. § 2254(e)(1); *see Malone v. Fortner*, No. 3:09-0949, 2013 WL 1099799, at *2 n.3 (M.D. Tenn. Mar. 14, 2013) ("[S]ummary judgment rules in evaluating the evidence do not apply given the statutory presumption of correctness of facts found by the state courts."). The Court applies general summary judgment standards on federal habeas review only insofar as they do not conflict with the language and intent of the AEDPA.

## VIII.  ANALYSIS

The Court will review all claims to determine if Respondent is entitled to summary judgment. However, Hugueley only addressed Claims A, E, F, H, I, and K in his response.

### A.    *Batson*

Hugueley alleges that the State exercised peremptory challenges on the basis of race in violation of *Batson v. Kentucky*, 476 U.S. 79 (1986), when it dismissed prospective jurors: Ida Ferguson, Everette Woods, Phyllis McKinnie, Willie Heard, Helen Pruitt, Johnny Hudson, Gertrude Gibbs, and Linda Pirtle.   (ECF No. 58 at PageID 4663-64.)

Petitioner asserts that this claim was raised on direct appeal before the TCCA and the TSC. (*Id.* at PageID 4664.)   On direct appeal, the TSC addressed a *Batson* claim about Ferguson, Woods, McKinnie, Heard, and Pruitt.   *See Hugueley*, 185 S.W.3d at 368-75.   Respondent maintains that the claim is procedurally defaulted to the extent Hugueley seeks relief for prospective jurors Johnny Hudson, Gertrude Gibbs, and Linda Pirtle.   (ECF No. 112-1 at PageID 5463-64.)   The Court will address the unexhausted aspects of the claim first.

### 1.    Procedural Default – Hudson, Gibbs & Pirtle

The Warden contends that Hugueley failed to object to the removal of prospective jurors Hudson, Gibbs, and Pirtle during jury selection, and the state court determined the claim was waived as it relates to these potential jurors.   (ECF No. 112-1 at PageID 5463-64.)   The TSC considered the inmate's claim related to Hudson, Gibbs, and Pirtle waived because he failed to object to the State's challenges to these potential jurors in a timely fashion.   *See Hugueley*, 185 S.W.3d at 369.   The court cited Tenn. R. App. P. 36(a) as support for the waiver.   *Id.*   Rule 36(a) states that "[n]othing in this rule shall be construed as requiring relief to be granted to a party responsible for an error or who failed to take whatever action was reasonably available to prevent or nullify the harmful effect of the error."   The TSC opined,

Before this Court, Defendant alleges that the prosecution improperly excluded eight African-American venire persons, adding Mr. Johnny Hudson, Ms. Gertrude Gibbs, and Ms. Linda Pirtle. Defendant's argument as to these additional three venire persons is waived because Defendant failed to object to the State's challenges to these three persons in a timely fashion. *See State v. Peck*, 719 S.W.2d 553, 555 (Tenn. Crim. App. 1986). This Court is not bound to grant relief to a party who fails to take "whatever action was reasonably available to prevent or nullify the harmful effect of an error." Tenn. R. App. P. 36(a). In this case, Defendant had the opportunity at trial to object to each and every one of the State's peremptory challenges, thereby giving the trial court the opportunity to assess the constitutionality of the State's choices. Defendant did not do so with respect to Mr. Hudson, Ms. Gibbs, and Ms. Pirtle. Accordingly, he will not now be heard to complain about the State's challenges to these three venire persons. *See State v. Johnson*, 980 S.W.2d 414, 419 (Tenn. Crim. App. 1998). We will, therefore, limit our examination of Defendant's race-based *Batson* claim to the five venire persons previously named.

*Hugueley*, 185 S.W.3d at 369 (footnotes omitted).

Respondent argues that the claim is barred by procedural default as it relates to these jurors. (ECF No. 112-1 at PageID 5463.) He notes that the TSC cited the applicable procedural rule and two Tennessee cases applying the rule, which demonstrate that the waiver rule was established and regularly enforced. (*Id.* at PageID 5463-64.)

A federal habeas claim is procedurally defaulted when:

(1) the petitioner fails to comply with a state procedural rule; (2) the state courts enforce the rule; (3) the state procedural rule is an adequate and independent state ground for denying review of a federal constitutional claim; and (4) the petitioner cannot show cause and prejudice excusing the default.

*Lovins v. Parker*, 712 F.3d 283, 296 (6th Cir. 2013). The second prong of this test requires that the state courts actually enforce the state procedural rule in denying relief. *Id.* To qualify as an "adequate" procedural ground under the third prong, a state rule must be "firmly established and regularly followed." *Walker*, 562 U.S. at 316. Even a discretionary state procedural rule can serve as an adequate ground to bar federal habeas review. *Id.*

Hugueley argues that Rule 36(a) only applies in non-capital cases. (ECF No. 127 at PageID 5667.) He asserts, citing *State v. Rimmer*, 250 S.W.3d 12, 32 (Tenn. 2008), that Tennessee has an exception to the waiver doctrine in capital cases. (*Id.* at PageID 5668.) The inmate insists that the exception exists because of the statutory obligation to review a capital defendant's conviction and death sentence. (*Id.*) He also contends that the "non-waiver" rule for capital cases had existed for three decades beginning in 1985, before Hugueley's trial and appeal. (*Id.*)

Petitioner claims that the waiver applied in his case has not been strictly and regularly applied in capital cases and cannot bar his claim as to these prospective jurors in federal court. (*Id.* at PageID 5670.) He asserts that there is a legion of capital cases in which the TSC has addressed claims on the merits that were not raised below. (*Id.*) According to the inmate, the TSC does not consistently rely on this rule of waiver and Respondent's allegations of procedural default do not rest upon an adequate state ground. (*Id.* at PageID 5672.) He argues that the Court should order further proceedings and a *Batson* evidentiary hearing. (*Id.* at PageID 5673.) In response, the Warden notes that a review of state cases reveals that Tennessee has routinely denied *Batson* claims on the basis of waiver. (ECF No. 137 at PageID 7686.)

The first prong is satisfied by Hugueley's counsel's failure to object to the State's challenges to these three prospective jurors in violation of Tennessee Rule of Appellate Procedure 36.

With regard to the second and third prongs, although Petitioner contends that there is an exception to the waiver rule in capital cases, Tennessee courts have enforced the waiver rule

against capital defendants. In *Johnson v. State*, the TCCA emphasized the importance of a timely

*Batson* challenge stating

> In *Griffith v. Kentucky*, 479 U.S. 314, 327, 107 S. Ct. 708, 715, 93 L.Ed.2d 649 (1987), the United States Supreme Court gave limited retroactivity to *Batson* by ruling that it applies to all cases, state and federal, which raised a *Batson* challenge and which were pending on direct appeal at the time *Batson* was announced. There is nothing in either of these cases to suggest that a challenge to the unconstitutional exercise of peremptory challenges can be made in other than a timely fashion, that is, prior to the time the jury is actually selected and sworn. Here, Defendant failed to raise the correct claim before the jury was sworn. At voir dire, trial counsel did not challenge the prosecution's use of peremptory challenges. Instead, the *Batson* claim was not raised until the case was on direct appeal to the supreme court.
>
> Accordingly, we find that the applicable procedural barrier is waiver, rather than, as the post-conviction court held, that the issue was previously determined. *See* Tenn. Code Ann. § 40-30-112(b)(1) (repealed).

*Johnson v. State*, No. 02C01-9707-CR-00292, 1999 WL 608861, at *13-14 (Tenn. Crim. App.

Aug. 12, 1999), *aff'd*, 38 S.W.3d 52 (Tenn. 2001); *see State v. Johnson*, 762 S.W.2d 110, 113-14

(Tenn. 1988) ("It would seem to us the appropriate procedure would be to call such matters to the

trial court's attention at the time the event occurs in order that a ruling on the issue may be either

made or reserved for consideration.").[15]

The State has, at times, addressed the merits of a *Batson* claim even when some aspect of

that claim has been procedurally waived. *State v. Keen*, 31 S.W.3d 196, 227 n.9 (Tenn. 2000)

("As the State points out, the appellant only challenges the dismissal of three jurors in his motion

for a new trial. Although the challenge to the fourth juror has been waived, this Court opts to

consider this juror because of the qualitative difference between a death penalty sentence and other

---

[15] The TSC cited *Johnson* when determining that the claim was waived. *See Hugueley*, 185 S.W.3d at 369.

sentences.")   The Tennessee courts have applied the waiver rule to capital defendants in other contexts.   *See State v. Austin*, 87 S.W.3d 447, 479 (Tenn. 2002) (holding that failure to make a contemporaneous objection to prosecution's closing argument resulted in waiver on appeal); *see State v. Kiser*, 284 S.W.3d 227, 263 (Tenn. 2009) (finding waiver of claim about limited cross-examination).

The exception Hugueley claims has not been applied consistently to capital defendants. The state courts have used discretion to review the merits of these claims when it finds it appropriate.   Further, the Sixth Circuit has held that a similar contemporaneous-objection rule is an adequate and independent state ground barring federal habeas review.   *See Awkal v. Mitchell*, 613 F.3d 629, 648 (6th Cir. 2010) (en banc); *see also Amos v. Renico*, 683 F.3d 720, 730 (6th Cir. 2012).   A review of Tennessee cases demonstrates that the Tennessee procedural rule on which the TSC relied is firmly established and has repeatedly been applied to *Batson* challenges.   *See, e.g.*, *Johnson*, 980 S.W.2d at 419 (concluding that the issue of racial composition of the jury was waived for failure to timely file the motion for new trial and make *Batson* challenges during jury selection); *State v. Borner*, No. W2012-00473-CCA-R3-CD, 2013 WL 1644335, at *7 (Tenn. Crim. App. Apr. 16, 2013) (holding that appellant waived the issue under Tenn. R. App. P. 36(a), that, as an African-American, he was denied a jury of his peers by raising the challenge for the first time at the motion for new trial);   *State v. Boston*, No. 03C01-9509-CR-00284, 1996 WL 653821, at *3 (Tenn. Crim. App. Nov. 8, 1996) ("This jurisdiction's rule requiring a *Batson* claim to be raised before the jury is accepted and sworn was formulated in 1986, the same year the United States Supreme Court decided *Batson*. This case was tried on July 6, 1995, approximately nine years after the formulation of the waiver rule.   Thus, the appellant knew, or should have known,

41

that either overtly or tacitly accepting the jury and permitting the trial court to swear the jurors before raising the *Batson* claim would result in the waiver of the issue.")

With regard to the fourth factor, Hugueley has not argued cause and prejudice to overcome the procedural default.   He asserts only that the claim is not procedurally defaulted or barred from federal habeas review.   (ECF No. 127 at PageID 5670-73.)

The waiver provision under Tennessee Rule of Appellate Procedure 36(a) presents an independent and adequate state procedural ground to bar habeas review, and Petitioner has not overcome the procedural default of his *Batson* claim as it relates to prospective jurors Hudson, Gibbs, and Pirtle.[16]

### 2.    The Exhausted *Batson* Claim

With regard to the claim addressed by the TSC, the court opined:

### 1. Allegedly Race-based Peremptory Challenges

We first address Defendant's contention that his constitutional rights were violated by the prosecution's exercise of peremptory challenges to certain potential jurors. Defendant asserts in his appellate brief that the State struck eight jurors on the basis of their race in violation of his equal protection rights under *Batson v. Kentucky*, 476 U.S. 79, 106 S. Ct. 1712, 90 L.Ed.2d 69 (1986). The State responds that no violation occurred because the basis of each challenge was race-neutral.

In *Batson*, the United States Supreme Court held that "the Equal Protection Clause [of the United States Constitution] forbids the prosecutor to challenge potential jurors solely on account of their race...."   *Id*. at 89, 106 S. Ct. 1712.   The Court crafted a three-pronged analysis for determining whether the suspect challenges were impermissibly based on the potential juror's race.   At the outset, the defendant must establish a prima facie case of purposeful discrimination.   In doing so, the defendant may rely "solely on evidence concerning the prosecutor's exercise of peremptory challenges at the defendant's trial."   *Id*. at 96, 106 S. Ct.

---

[16] Hugueley did not argue cause and prejudice to overcome the procedural default of his related ineffective assistance of trial counsel claim (Claim J), *see* infra.

1712. That is, the defendant need not prove a past pattern of racially discriminatory jury selection practices by the prosecution. *Id*. at 92-93, 106 S. Ct. 1712; *cf. Swain v. Alabama*, 380 U.S. 202, 223, 85 S. Ct. 824, 13 L.Ed.2d 759 (1965), *overruled in part by Batson*, 476 U.S. at 91-92, 106 S. Ct. 1712 (recognizing that an inference of purposeful discrimination may be raised on proof that the prosecution struck qualified blacks "in case after case, whatever the circumstances, whatever the crime and whoever the defendant or the victim may be ..."). Once the defendant makes out a prima facie case, the State has the burden of producing a neutral explanation for its challenge. *Batson*, 476 U.S. at 97, 106 S. Ct. 1712. This explanation must be a clear and reasonably specific account of the prosecutor's legitimate reasons for exercising the challenge. *Id*. at 98 n. 20, 106 S. Ct. 1712. However, the race or gender neutral explanation need not be persuasive, or even plausible. *Purkett v. Elem*, 514 U.S. 765, 767-68, 115 S. Ct. 1769, 131 L.Ed.2d 834 (1995). "'Unless a discriminatory intent is inherent in the prosecutor's explanation, the reason offered will be deemed race neutral.'" *Id*. at 768, 115 S. Ct. 1769 (quoting *Hernandez v. New York*, 500 U.S. 352, 360, 111 S. Ct. 1859, 114 L.Ed.2d 395 (1991) (plurality opinion)). If a race-neutral explanation is provided, the trial court must then determine, from all of the circumstances, whether the defendant has established purposeful discrimination. *Batson*, 476 U.S. at 98, 106 S. Ct. 1712. The trial court may not simply accept a proffered race-neutral reason at face value but must examine the prosecutor's challenges in context to ensure that the reason is not merely pretextual. *See Miller-El v. Dretke*, 545 U.S. 231, 125 S. Ct. 2317, 162 L.Ed.2d 196 (2005) ("*Miller-El II* "). In that case, the Court reiterated that "the rule in *Batson* provides an opportunity to the prosecutor to give the reason for striking the juror, and it requires the judge to assess the plausibility of that reason in light of all evidence with a bearing on it." *Id*. at 2331. If the trial court determines that the proffered reason is merely pretextual and that a racial motive is in fact behind the challenge, the juror may not be excluded. *Woodson v. Porter Brown Limestone Co.*, 916 S.W.2d 896, 903 (Tenn. 1996).

As this Court has noted in the past, "determination of the prosecutor's discriminatory intent or lack thereof turns largely on the evaluation of the prosecutor's credibility, of which the attorney's demeanor is often the best evidence." *State v. Smith*, 893 S.W.2d 908, 914 (Tenn. 1994). We accord a trial court's findings in this regard great deference and will not set them aside unless clearly erroneous. *Woodson*, 916 S.W.2d at 906; *see also Batson*, 476 U.S. at 98 n. 21, 106 S. Ct. 1712 ("Since the trial judge's findings in [this] context ... largely will turn on evaluation of credibility, a reviewing court ordinarily should give those findings great deference."). For this reason, "[t]he trial judge must carefully articulate specific reasons for each finding on the record, i.e., whether a prima facie case has been established; whether a neutral explanation has been given; and

whether the totality of the circumstances support a finding of purposeful discrimination." *Woodson*, 916 S.W.2d at 906.

In this case, defense counsel objected at trial to the State's peremptory challenge of five potential jurors: Ms. Ida Ferguson, Mr. Everette Woods, Ms. Phyllis McKinnie, Ms. Willie Heard, and Ms. Helen Pruitt. The record indicates that all of these persons are African-American; Defendant is Caucasian. . . .

### Ida Ferguson

During voir dire questioning by the State, Ms. Ferguson acknowledged that she had a religious belief against the death penalty, but stated she could "follow the law." She acknowledged having stated on her jury questionnaire that she felt a sentence of life without parole was "adequate" and that she would not want to consider the death penalty, but reiterated that she "ha[d] to obey the laws of the land." In response to subsequent questions by defense counsel, Ms. Ferguson stated that she "would have to have very hard evidence to consider" imposing either life in prison with no opportunity for parole or the death penalty. The State thereafter used one of its peremptory challenges to remove Ms. Ferguson from the panel. Upon defense counsel's *Batson* objection, the prosecutor referred to Ms. Ferguson's response in the jury questionnaire to the question, "do you have any personal, moral or religious beliefs against imposition of the death penalty?" According to the prosecutor, Ms. Ferguson had answered, "yes," with the explanation that she believed that a "life sentence without parole is adequate, vengeance is mine said the Lord." The prosecutor maintained that "the State is striking her based upon the answer to that question." The trial court thereupon overruled defense counsel's *Batson* objection.

### Everette Woods

The State asked Mr. Woods during voir dire if he believed in the death penalty. Mr. Woods responded that he did not believe in it. He stated further, however, that he could follow the law and sign the death warrant if Defendant was guilty. After the State peremptorily challenged Mr. Woods, defense counsel lodged a *Batson* objection. The prosecutor responded that Mr. Woods had indicated on his jury questionnaire that he did not believe in the death penalty. Defense counsel claimed that Mr. Woods had been rehabilitated during voir dire. The trial court stated nothing on the record but excused Mr. Woods.

### Phyllis McKinnie

Defense counsel objected to the State's challenge of Ms. McKinnie, stating that she was the sixth African-American struck by the State. The State had lodged

five peremptory challenges prior to challenging Ms. McKinnie. The State referred to Ms. McKinnie's statement on her questionnaire that she "just [does not] want to be a part of putting any person to death because it could turn out to be an innocent person after you have put him or her to death." The prosecutor also averred that "all six of the individuals [he] struck [had] indicated on the back of their jury questionnaires they would have a problem with the death penalty." Defense counsel claimed that Ms. McKinnie had been rehabilitated. The trial court found that the State had established a racially neutral reason for its challenge and overruled the objection.

### Willie Heard

The State next challenged Ms. Heard, stating that she had indicated on her questionnaire that she had personal, moral, or religious beliefs against the death penalty, and that she did not like it but could not stop it. Defense counsel responded,

> this is their seventh black juror and it's their sixth woman that they have struck. She, like the others, went through and said she could listen to all three sentencing phases just like the others but we feel at this point in time you've got seven black jurors that have been stricken from the record.

The trial court then stated, "The Court finds that there is a racially neutral reason for the challenge but you might be careful about rehabilitating. The Court will look at it a little closer next time."

### Helen Pruitt

On defense counsel's *Batson* objection to the State's challenge of Ms. Pruitt, the prosecutor stated,

> This is the one I challenged because when I was questioning her, Judge, her eyes, she looked like she was going to cry to the point that I backed off asking her questions because she was sitting on the far side over there and I really felt that she was about to break out in tears and I backed off and I noticed when she was going into the jury box she got teary-eyed again and was shaking her head no. That's the reason.

Defense counsel replied, "Your Honor, we just want for the record that's the eighth African-American person and it's the seventh African-American woman stricken." The prosecutor retorted that they "still have four on there," and the trial

court ruled that the State's reason for challenging Ms. Pruitt was "not racially motivated."

The State lodged no further peremptory challenges. The Report of Trial Judge in Capital Cases, filed by the trial court pursuant to Tennessee Supreme Court Rule 12.1 ("the Rule 12 Report"), indicates that seven of the twelve jurors that decided Defendant's case were white.

As noted previously, this Court has instructed trial courts that, when making a determination regarding a *Batson* objection, they "must carefully articulate specific reasons for each finding on the record, i.e., whether a prima facie case has been established; whether a neutral explanation has been given; and whether the totality of the circumstances support a finding of purposeful discrimination." *Woodson*, 916 S.W.2d at 906. Thus, we are initially constrained to point out that the trial court's findings on Defendant's *Batson* objections at trial are barely adequate to permit our review. After each of defense counsel's objections, the trial court failed to make a specific finding that a prima facie case of purposeful discrimination had been made. Nevertheless, the prosecutor's response to each objection clearly implies that the trial court expected the State to proffer its reasons for challenging the subject venire person. That is, after each *Batson* objection by defense counsel, the trial court indicated in some fashion that the second prong of the *Batson* analysis was called into play. Thus, we assume that the trial court determined that, as to each of these five venire persons, Defendant had made out a prima facie case of impermissible discrimination. *See Woodson*, 916 S.W.2d at 905 (even where trial court made no explicit finding that the objecting party had made out a prima facie case, it was appropriate to conclude that the trial court had done so because "[o]therwise, the court would not have required [the striker] to explain the challenge"). Nor did the trial court offer much commentary on the State's proffered reasons for its strikes, or render detailed findings about its reasons for overruling each of Defendant's *Batson* claims. We are especially concerned about the trial court's failure to make specific findings in light of the United States Supreme Court's recent decision in *Miller-El II*. Although decided after the trial of this case, *Miller-El II* demonstrates the importance of a complete record and comprehensive findings by the trial court.

In *Miller-El II*, the United States Supreme Court expounded on the methodology used to assess a *Batson* claim. In that case, the defendant was tried and convicted on a capital murder charge and sentenced to death. 125 S. Ct. at 2322. During jury selection, the prosecution used peremptory strikes against ten qualified African-American venire men. *Id.* The defendant argued, and the Court agreed, that the prosecution's challenges were racially motivated. *Id.* at 2340. In analyzing the defendant's claim, the Court engaged in an exhaustive and

fact-intensive inquiry, relying upon not only the transcript of the voir dire, but the completed juror questionnaires and the juror cards utilized by the prosecution.

As it examined the extensive evidence before it, the Court noted numerous factors indicative of the prosecution's impermissible motive in challenging the black venire members. Initially, the Court pointed to the fact that the prosecution had peremptorily struck ten of the eleven, or 91%, of the eligible African-American venire members. *Id.* at 2325. What it found "[m]ore powerful than these bare statistics," however, were the results of "side-by-side comparisons of some black venire panelists who were struck and white panelists allowed to serve." *Id.* In making these comparisons, the Court determined that, "[i]f a prosecutor's proffered reason for striking a black panelist applies just as well to an otherwise-similar nonblack who is permitted to serve, that is evidence tending to prove purposeful discrimination to be considered at *Batson*'s third step." *Id.* Thus, "disparate treatment" of potential jurors who responded similarly to similar questions may be indicative of impermissible discrimination where the only significant difference between the persons is their race.

Another factor indicative of the prosecution's improper motive was its "disparate questioning" of the venire members, depending upon the member's race. The Court found that, for 94% of the white members, the prosecutors gave a "bland description" of the death penalty before asking for individual feelings on the subject. *Id.* at 2334. Only 47% of the African-American venire members heard the "bland" description, with the remaining 53% hearing what the Court described as a "graphic script." *Id.* The Court appeared to agree with the defendant that the prosecution used this tactic in an attempt to "prompt some expression of hesitation to consider the death penalty and thus to elicit plausibly neutral grounds for a peremptory strike of a potential juror subjected to it, if not a strike for cause." *Id.* at 2333. A second form of disparate questioning involved what the Court described as "trickery." *Id.* at 2337. The Court elucidated:

> The prosecutors asked members of the panel how low a sentence they would consider imposing for murder. Most potential jurors were first told that Texas law provided for a minimum term of five years, but some members of the panel were not, and if a panel member then insisted on a minimum above five years, the prosecutor would suppress his normal preference for tough jurors and claim cause to strike.

*Id.* The State conceded that the manipulative questioning was used to create cause to strike, but claimed that the five-year information was omitted not on the basis of race, but on stated opposition to or ambivalence about the death penalty. *Id.* The Court found, however, that, while all African-American panel members who had expressed opposition to or ambivalence about the death penalty were asked the

trick question, "most white panel members who expressed similar opposition or ambivalence were not subjected to it." *Id.* The Court then stated, "[o]nce again, the implication of race in the prosecutors' choice of questioning cannot be explained away." *Id.* at 2338.

In addition to examining the questions asked and treatment of venire members, the Supreme Court relied upon history: "We know that for decades leading up to the time this case was tried prosecutors in the Dallas County office had followed a specific policy of systematically excluding blacks from juries...." *Id.* In the *Miller-El II* case, the prosecutors had marked the race of each venire member on their juror cards and "took their cues [on jury selection] from a 20-year old manual of tips" which included reasons for excluding minorities from jury service. *Id.* at 2339-40.

The Court concluded:

It blinks reality to deny that the State struck Fields and Warren ... because they were black. The strikes correlate with no fact as well as they correlate with race, and they occurred during a selection infected by shuffling and disparate questioning that race explains better than any race-neutral reason advanced by the State. The State's pretextual positions confirm [the defendant's] claim, and the prosecutors' own notes proclaim that the Sparling Manual's emphasis on race was on their minds when they considered every potential juror.

The state court's conclusion that the prosecutors' strikes of Fields and Warren were not racially determined is shown up as wrong to a clear and convincing degree; the state court's conclusion was unreasonable as well as erroneous.

*Id.* at 2340. The Court thereupon granted the defendant's claim for habeas corpus relief. *Id.*

In contrast to *Miller-El II*, the sole indication of purposeful impermissible discrimination by the State in this case is the fact that each of the peremptory challenges used by the State was employed against an African-American venire person. A close examination of the record convinces us, however, that the prosecution's exercise of these challenges was for race-neutral reasons.

With respect to the State's proffered reasons for its challenges, the prosecutor maintained that, with respect to Ms. Ferguson, Mr. Woods, Ms. McKinnie, and Ms. Heard, he was challenging each of these venire persons based upon his or her convictions about the death penalty. According to the State, each of

these persons had indicated some personal or religious disinclination to sentence an individual to death. This is certainly a facially race-neutral reason for exercising a peremptory challenge against a potential juror in a capital case. As to Ms. Pruitt, the prosecutor stated that he excused her because, while he was questioning her, she looked as though she was going to cry. She later became "teary-eyed" again and "was shaking her head no." We are satisfied that the prosecutor also provided a facially race-neutral reason for his challenge to this juror.

The trial court ultimately determined that, under all the circumstances, Defendant failed to establish purposeful discrimination. "Because the core issue is the prosecutor's discriminatory intent, or lack thereof, the trial court's finding 'largely will turn on evaluation of credibility.'" *State v. Ellison*, 841 S.W.2d 824, 827 (Tenn. 1992) (quoting *Batson*, 476 U.S. at 98 n. 21, 106 S. Ct. 1712). Both this Court and the United States Supreme Court have previously recognized that "'[t]here will seldom be much evidence bearing on th[e] issue [of discriminatory intent], and the best evidence often will be the demeanor of the attorney who exercises the challenge.'" *Id.* (quoting *Hernandez v. New York*, 500 U.S. 352, 365, 111 S. Ct. 1859, 114 L.Ed.2d 395 (1991) (plurality opinion)). Obviously, we are in no position to second-guess the trial court's assessment of the prosecutor's demeanor unless the record, as it did in *Miller-El II*, contains clear objective indications that the prosecutor's averments concerning his or her reasons for challenging a juror are simply not credible. We remain cognizant of *Batson*'s holding that the ultimate burden of establishing purposeful discrimination lies with the party objecting to the peremptory challenge. 476 U.S. at 93, 106 S. Ct. 1712; *see also Purkett*, 514 U.S. at 768, 115 S. Ct. 1769 (recognizing that "the ultimate burden of persuasion regarding racial motivation rests with, and never shifts from, the opponent of the strike"). We must, examine, therefore, whether the record before us contains such strong evidence of impermissible discriminatory intent by the prosecution as to render clearly erroneous the trial court's determination that Defendant failed to establish purposeful discrimination by the prosecution in its peremptory challenges.

Taking our cue from *Miller-El II*, we first examine the "bare statistics" in this case regarding jury selection. The State exercised eight of its available fifteen peremptory challenges. All of them were against African-American persons. We do not know, however, how many eligible African-American venire members were available. Defense counsel exercised sixteen peremptory challenges, one of which was against an alternate. *See* Tenn. R. Crim. P. 24(e). The record indicates that the State lodged *Batson* objections to two of these challenges, one of them on the basis that the juror was white. The record indicates that at least one of the other venire persons excused by the defense was white, but we are unable to ascertain the race of the remaining fourteen venire persons peremptorily challenged by Defendant. The United States 2000 Census provides that 41% of the population of the county in

which Defendant was tried is black or African-American. It is reasonable to infer, therefore, that a significant proportion of the venire panel was African-American. The Rule 12 Report further indicates that five of the eventual twelve jurors in this case were non-Caucasian. The State had seven peremptory challenges remaining to it at the time the jury, including these five nonwhites, was sworn. These bare statistics do not, in and of themselves, convince us that the State's proffered race-neutral reasons for excusing the five named persons were merely pretextual.

A close review of the transcript of the voir dire reveals no disparate treatment based on race. All but one of the eight persons peremptorily challenged by the State had expressed some hesitation about the death penalty. No other person expressed such hesitation and was left unchallenged. That is, the State was completely successful in eliminating every potential juror who had indicated at some point in the process that he or she had reservations about imposing the death penalty. There is no indication in the record that any nonblack person who expressed hesitation about the death penalty was left unchallenged by the State.

There is furthermore no indication in the record that the prosecution tailored its questions regarding the death penalty depending on the race of the targeted venire person(s). Nor does this Court observe any manipulative questioning by the State during voir dire which we would describe as "trickery." Finally, there is nothing before us to indicate that the prosecutors in Hardeman County have ever followed a specific policy of systematically excluding African-Americans from juries.

Certainly, more thorough findings by the trial court upon Defendant's *Batson* objections would have been helpful in our review of this issue. However, our close and careful review of the record before us convinces us that there is no basis for us to determine that the trial court erred during the third step of the *Batson* analysis. This Court has previously recognized that a juror's reservations about the death penalty may constitute a legitimate explanation for the State's exercise of a peremptory strike. *See Smith*, 893 S.W.2d at 914. As to the State's dismissal of Ms. Pruitt, we acknowledge that "neutral explanations that are based on subjective assessments, such as the juror's demeanor, must be carefully scrutinized." *State v. Carroll*, 34 S.W.3d 317, 320 (Tenn. Crim. App. 2000). We note, however, that defense counsel did not in any way indicate during the jury selection process that the prosecution's description of Ms. Pruitt's conduct in the jury box was inaccurate. A potential juror who verges on tears and shakes her head "no" during voir dire would, we are sure, prompt many a trial lawyer to exercise a peremptory challenge for legitimate reasons. Thus, we are confident that the trial court accurately assessed the prosecutor's credibility with regard to his explanations and properly determined that, under all the circumstances, Defendant had not established

purposeful discrimination by the State in its exercise of its peremptory challenges. Accordingly, we hold that Defendant is not entitled to relief on this issue.

*Hugueley*, 185 S.W.3d at 368-375 (footnotes omitted).

A *Batson* challenge involves "three distinct and sequential steps: (1) the opponent of the peremptory strike must make a prima facie case that the challenged strike was based on race; (2) the burden then shifts to the proponent of the peremptory challenge to articulate a race-neutral explanation for the strike; (3) finally, the trial court must determine whether the opponent of the peremptory strike has proven purposeful discrimination." *United States v. McAllister*, 693 F.3d 572, 578 (6th Cir. 2012). An explanation for the peremptory strike will be deemed race-neutral unless a discriminatory intent is inherent in the prosecutor's explanation. *See Hernandez*, 500 U.S. at 360. The trial court must assess whether the opponent of the strike has proved purposeful discrimination; assess the proponent's credibility under all of the pertinent circumstances; weigh the asserted justification against the strength of the opponent's prima facie case; and determine whether the opponent of the strike has met the ultimate burden of persuasion. *Gray v. Lafler*, 541 F. App'x 518, 521 (6th Cir. 2013). The trial court's determination in a *Batson* hearing is afforded great deference and "must be sustained unless it is clearly erroneous." *Id.*

The Warden argues that the TSC's rejection of Hugueley's *Batson* claim was not contrary to or based on an unreasonable application of clearly established federal law but was founded upon a reasonable determination of fact. (ECF No. 112-1 at PageID 5454.) Respondent contends that Hugueley's mere assertion, without argument, factual support, or an explanation of the state court's decision, that the State exercised peremptory challenges on the basis of race does not demonstrate that the TSC's decision was unreasonable. (*Id.*) He further avers that the claim is

51

inadequately pled under Habeas Rule 2(c) because Hugueley provides no argument or factual support.  (*Id*. at PageID 5476-77.)

Petitioner only disputed the TSC's findings as it relates to Pruitt.  He argued that Respondent is not entitled to summary judgment and that further proceedings are necessary where the State dismissed African-American jurors, provided a patently false justification for the dismissal, and maintained that the strikes were valid because not all African-Americans had been stricken.  (ECF No. 127 at PageID 5525-26.)

Hugueley contends that the prosecution struck Juror Helen Pruitt[17] in violation of *Batson*.  (ECF No. 127 at PageID 5529.)  He insists that the prosecutor tried to justify his strike by claiming that he stopped asking questions because Pruitt looked like she was going to cry and because there were still four African-Americans on the jury.  (*Id.*)  The prosecutor explained,

> This is the one I challenged because when I was questioning her, Judge, her eyes, she looked like she was going to cry to the point that I backed off asking her questions because she was sitting on the far side over there and I really felt that she was about to break out in tears and I backed off and I noticed when she was going into the jury box she got teary-eyed again and was shaking her head no.  That's the reason.

(ECF No. 41-3 at PageID 511.)  The trial court stated that the proffered reason for striking Pruitt was not racially motivated.  (*Id.*)

The inmate submits that the prosecutor's reasons were pretext for racial discrimination and not true, describing them as "but a house of cards that crumbles, built upon falsehoods."  (ECF No. 127 at PageID 5529-30.)  He asserts that the voir dire transcript demonstrates that the

---

[17] The juror's name is spelled "Prewitt" on her jury questionnaire, but "Pruitt" in the transcript and the TSC opinion.  (*See* ECF No. 127 at PageID 5529.)

prosecutor did not back off questioning Pruitt and that the statement that she was about to cry is also false. (*Id.*) Hugueley contends that the prosecutor only asked Pruitt two focused questions about whether she could judge others and sign a death verdict. (*Id.* at PageID 5537-38; *see* ECF No. 41-3 at PageID 494-95.) He claims that Pruitt's answers were acceptable, showing her ability to support the prosecution and identical to those of white jurors who the prosecution found to be acceptable jurors. (ECF No. 127 at PageID 5538.)

Petitioner argues that the assertion that Pruitt was shaking her head going to the jury box is untrue because she never reached the jury box. (ECF No. 127 at PageID 5530.) He asserts that a visual understanding of the seating arrangement demonstrates the falsity of the prosecutor's *Batson* justification. (*Id.* at PageID 5533.) The trial court seated twenty-eight jurors at a time, with twelve jurors in the box and sixteen seated in two rows in front of the box. (*Id.* at PageID 5534; *see* ECF No. 42-1 at PageID 377.) In that configuration, Pruitt was in the last seat on the front row where the additional sixteen jurors were seated and she remained in that seat until she was struck. (ECF No. 127 at PageID 5535-36.) Further, Hugueley states that it was clear from the transcript that the jurors only took a seat in the jury box when ordered by the judge. (*Id.* at PageID 5536.)

The inmate maintains that the prosecution's justifications for striking Pruitt "do not hold up," and because the trial court never found the justifications to be true, but instead dismissed Pruitt, Hugueley is entitled to *Batson* relief. (ECF No. 112-1 at PageID 5530.) He contends that the state court's conclusion that Pruitt was not struck for racial reasons is wrong to a clear and convincing degree. (*Id.* at PageID 5530-31.) The trial court never made a finding that the prosecutor "backed off" questioning Pruitt or credited the prosecutor's underlying basis for

backing off questioning. (*Id.* at PageID 5540-41.) Based on *McCurdy v. Montgomery Cnty., Ohio*, 240 F.3d 512, 522 (6th Cir. 2001), Hugueley posits that "it is only when a trial judge makes specific findings crediting a prosecutor's assertions about a juror's actual demeanor that the judge" complies with the *Batson* requirements. (*Id.* at PageID 5544.)

### a. Habeas Rule 2(c)

The Court first notes that Hugueley failed to plead facts supporting his claim in the Second Amended Petition. (*See* ECF No. 58 at PageID 4663-64.) Habeas Rule 2(c) states that a petition must "specify all the grounds for relief available to the petitioner" and "state the facts supporting each ground." *See McFarland v. Scott*, 512 U.S. 849, 860 (1994) ("[T]he habeas petition, unlike a complaint, must allege the factual underpinning of the petitioner's claims.") (O'Connor, J., concurring in part and dissenting in part); *see Mayle*, 545 U.S. at 669 (same) (Souter, J., dissenting).

### b. Pruitt's Declaration

Petitioner provides Pruitt's declaration in support of his claims. (ECF No. 127-1.) She did not recall the name of the defendant, but she described him as having "lots of tattoos on his arms and a tattoo on his forehead." (*Id.* at PageID 5675.)[18] She stated,

> When I was called to the jury box to talk to the attorney, I was not happy about it. I did not want to be on the jury and was relieved when I was excused from service.

(*Id.*) She disputed the statement that she was "teary eyed and shaking my head." (*Id.*) Hugueley also argues that Pruitt's declaration confirmed his trial counsel's and his appellate

---

[18] Hugueley has numerous tattoos, including a "reversed, winged swastika on his forehead." (ECF No. 41-7 at PageID 919.)

counsel's, statement in the appellate brief that no one in the courtroom saw this juror crying. (ECF No. 127 at PageID 5543 n.8 & 5545; *see* ECF No. 41-9 at PageID 1296.)[19]

The Warden asserts that, under *Pinholster*, the federal review of a claim adjudicated on the merits is limited to the record before the state court and objects to Pruitt's declaration being considered in the habeas proceeding. (ECF No. 137 at PageID 7668-69.) Respondent disputes Hugueley's argument that the declaration can be considered because of his derivative ineffective assistance of counsel claim, noting that the ineffectiveness claim is procedurally defaulted. (*Id.* at PageID 7669.) Respondent contends that *Martinez*[20] provides no basis for considering new evidence on Hugueley's *Batson* claim. (*Id.*) Citing his motion to dismiss, he further argues that Hugueley's failure to timely disclose any evidence about his jury-selection ineffective assistance claim precludes the introduction of new evidence. (*Id.*)

The inmate is limited to the record before the TSC on this claim. *See Pinholster*, 563 U.S. at 181-82. Consideration of Pruitt's declaration is barred under *Pinholster*.

### c. Unreasonable Determinations of Fact

Hugueley argues that the critical question in the third prong of the *Batson* analysis, whether a prisoner has proved purposeful discrimination, is the persuasiveness of the prosecutor's justification for the peremptory strike. (ECF No. 127 at PageID 5532.) He contends that

---

[19] Although counsel made the argument in the appellate brief that no one saw Pruitt crying, this same counsel did not object during voir dire or point out that Pruitt did not appear to be about to cry or crying.

[20] In *Martinez v. Ryan*, 566 U.S. 1, 17 (2012), the United States Supreme Court created an equitable exception that allowed ineffective assistance of post-conviction (collateral review) counsel to be used to overcome the procedural default of an ineffective assistance of trial counsel claim.

implausible and fantastic justifications will be found to be pretexts for discrimination. (*Id.*) Likewise, deference to the trial court does not equate with abandonment or abdication of judicial review. (*Id.*) He insists that the prosecutor's reasons are pretext and demonstrably false because: (1) Pruitt never sat in the jury box; (2) the prosecution never "cut off" questioning; and (3) Pruitt was not "teary-eyed" or going to cry. (*Id.* at PageID 5533.) Further, Hugueley contends that the trial judge made no finding that the prosecution's reasons were true. (*Id.* at PageID 5540.)

To the extent Hugueley seeks to show an unreasonable determination of fact as the basis for the state court's decision, he must present clear and convincing evidence to overcome the presumption of correctness. *See* 28 U.S.C. §§ 2254(d)(2) & (e)(1).

### 1. Pruitt's Placement During Voir Dire

At trial, Hugueley's defense counsel did not argue about Pruitt's placement in the jury box. He now attempts to create a visual picture of the potential jurors' location to dispute whether Pruitt ever sat in the jury box and undermine the prosecutor's assertions about her demeanor. Respondent asserts that where Pruitt was seated is irrelevant to her demeanor, which was the basis for the State's peremptory strike. (ECF No. 137 at PageID 7668.)

There is nothing in the state court record specifically addressing Pruitt's location in relation to the jury box. This information was not presented to the TSC. As stated supra, Pruitt's declaration cannot be considered for purposes of gaining relief under § 2254(d)(1). Further, her

position in the room during voir dire has limited importance given the fact that the neutral reason proffered for the strike was her demeanor.[21]

## 2.     Questioning Pruitt

Hugueley contends that the prosecution's comment that he "backed off" his questioning because of Pruitt's demeanor was false because the prosecutor set forth two issues for questions. (*See* ECF No. 127 at PageID 5543.)   The Warden argues that the transcript does not undermine the prosecutor's statement that he declined to question Pruitt further.   (ECF No. 137 at PageID 7668.)   Furthermore, Respondent avers that there is nothing in the record to show that the prosecutor would not have questioned Pruitt further had it not been for her demeanor.   (*Id.*)

The prosecutor's statement reflects an internal thought process about how he should proceed, a process that would not be clearly indicated on the transcript.   The transcript reveals that the questioning of Pruitt was very limited, which is consistent with the prosecutor's statement. (ECF No. 41-2 at PageID 494-95.)   The TSC made no specific finding about the prosecutor refraining from questioning Pruitt, but instead focused on her demeanor as the neutral reason for the peremptory strike.

## 3.     Pruitt's Demeanor

Race-neutral reasons for peremptory challenges invoking a juror's demeanor make the trial court's firsthand observations greater in importance.   *Snyder v. Louisiana*, 552 U.S. 472, 477 (2008).   The trial court must evaluate whether the prosecutor's demeanor belies a discriminatory

---

[21] Pruitt's declaration, although *Pinholster* barred, actually supports the prosecution's proffered reason because she admits being upset "[w]hen [she] was called to the jury box to talk to the attorneys."   (*See* ECF No. 127-1 at PageID 5675.)

intent and whether the juror's demeanor can be said credibly to have exhibited the basis for the strike.  *Id.*  The trial judge's evaluation of a prospective juror's demeanor is entitled to deference in the absence of exceptional circumstances.  *Id.* at 477, 479.

In *Snyder*, the trial court did not make a determination concerning the juror's demeanor, but simply allowed the challenge.  *Id.* at 479.  The Supreme Court stated,

> It is possible that the judge did not have any impression one way or the other concerning Mr. Brooks' demeanor. Mr. Brooks was not challenged until the day after he was questioned, and by that time dozens of other jurors had been questioned.  Thus, the trial judge may not have recalled Mr. Brooks' demeanor. Or, the trial judge may have found it unnecessary to consider Mr. Brooks' demeanor, instead basing his ruling completely on the second proffered justification for the strike.  For these reasons, we cannot presume that the trial judge credited the prosecutor's assertion that Mr. Brooks was nervous.

*Id.*

The United States Supreme Court has held that none of its decisions clearly establish that a judge must reject a *Batson* demeanor-based peremptory challenge unless he personally observes and recalls that aspect of the juror's demeanor.  *Thaler v. Haynes*, 559 U.S. 43, 44, 48 (2010) (per curiam); *see Russell v. Bunting*, No. 3:15-CV-331, 2016 WL 1170883, at *8 (S.D. Ohio Mar. 25, 2016) ("[E]ven assuming there was some unexpressed demeanor component to the prosecutor's decision, there is no constitutional difficulty with the fact that a successor judge ultimately decided the *Batson* question.").

In *White v. Stephens*, 566 F. App'x 335, 338 (5th Cir. 2014), the prosecution struck an African-American juror because of his reluctant and belligerent demeanor during questioning and the fact that his brother or some relative had legal problems.  The trial court failed to make findings about the juror's demeanor and none were reflected in the record.  *Id.*  The court noted

that *Snyder* does not require a trial court to make findings about a potential juror's demeanor for a *Batson* challenge and thus, the court denied habeas relief in *White*. *Id.* at 338, 340.

The trial court record is also silent about Pruitt's demeanor with the exception of the prosecutor's statement that Pruitt was teary-eyed or looked as if she were going to cry. As noted above, the trial court is not required under *Snyder* to make a specific finding about Pruitt's demeanor. The lack of objection from defense counsel supports the trial court's acceptance of the prosecution's race-neutral reasons. *See Hugueley*, 185 S.W.3d at 375 ("[D]efense counsel did not in any way indicate during the jury selection process that the prosecution's description of Ms. Pruitt's conduct in the jury box was inaccurate."). Further, deference is given to the trial court to determine the credibility of the prosecutor in stating his reasons for the peremptory strike. The TSC relied on the trial court's assessment of the prosecutor's credibility and determined that there was no purposeful discrimination. *Id.*

The TSC stated, "[t]he other person, Ms. Pruitt, had exhibited a demeanor that caused the prosecutor to doubt her ability to sit on the jury in a composed manner." *Hugueley*, 185 S.W.3d at 376. To the extent that Hugueley contends that the TSC's decision is based on an unreasonable determination of facts in light of the evidence presented, he must show clear and convincing evidence to rebut the presumption of correctness. Even with Pruitt's declaration, stating that she "was not happy about" being called to the jury box and that she "never had tears in [her] eyes or cried in the court" (*see* ECF No. 127-1 at PageID 5675), Hugueley has not met the required standard to rebut the presumption of correctness of the TSC's conclusion that she exhibited a demeanor indicating that she could not sit "in a composed manner."

59

### d. Contrary to *Batson*

Petitioner asserts that the justification for the strike was that four African-Americans remained in the jury pool is contrary to *Batson*.   (ECF No. 127 at PageID 5545.)   He argues that the trial court's decision allowing a peremptory strike because four African-Americans were sitting on the petit jury is contrary to *Batson* based on the Sixth Circuit's unpublished decision in *Drain v. Woods*, 595 F. App'x 558 (6th Cir. 2014).   (*Id.* at PageID 5545-46.)   Hugueley contends that the reasons for the prosecution's strike were "implausible, incredible, and simply not true." (*Id.* at PageID 5549-50.)   Accordingly, he insists that the state court's denial of relief was contrary to and an unreasonable application of *Batson* and based on an unreasonable determination of fact. (*Id.* at PageID 5531, 5547, 5550.)

In *Drain*, the Michigan Court of Appeals' sole reason for rejecting the trial court's conclusion that a prima face case of discrimination had been made was that the prosecutor struck two white jurors, seven black jurors, and four black jurors remained.   *Drain*, 595 F. App'x at 570. The Michigan Court of Appeals based its decision on a state court case that held "[t]hat the prosecutor did not try to remove all blacks from the jury is strong evidence against a showing of discrimination."   *Id.* (citing *People v. Eccles*, 677 N.W.2d 76, 83 (Mich. App. 2004).   The Sixth Circuit found that case to be "manifestly contrary to clearly established federal law" that "a single racially discriminatory peremptory strike requires reversal."   *Drain*, 595 F. App'x at 570.

The Warden contends that Hugueley's assertion that the prosecutor improperly justified the strike by stating "'We still have four' African Americans on the jury" was an inaccurate restatement taken out of context.   (ECF No. 137 at PageID 7668.)   Respondent submits that the statement was made immediately after defense counsel's comment that Pruitt was the eighth

African-American person and the seventh African-American woman stricken. (*Id.*) He maintains that the prosecutor's reliance on Pruitt's demeanor alone was a sufficient basis for the strike. (*Id.*)

Drain is not Supreme Court precedent and affects only a prima facie showing of a *Batson* claim, which the TSC found in this instance. The transcript reveals and the TSC noted that it was unclear whether the four jurors referenced were a combination of African-American men and women or instead were four African-American women. (*See* ECF No. 41-3 at PageID 511.) *See Hugueley*, 185 S.W.3d at 371 n.8. The TSC noted that seven of the twelve jurors were white and "assumed" that a prima face case of impermissible discrimination had been made unlike in *Drain*. *Id.* at 371. Further, the TSC observed that the specific *Batson* findings required by *Miller-EL II* did not become law until after Hugueley's trial. *Hugueley*, 185 S.W.3d at 371. The TSC followed the methodology for *Batson* from *Miller-El II*, about examining the "bare statistics" of the jury pool, disparate questioning, disparate treatment, and a history of exclusion of jurors based on race. *Id.* at 371-75. The "bare statistics" that 41% of the county's population was black and the Rule 12 report indicating five of the twelve jurors were non-white did not convince the TSC that the state's proffered race neutral reasons were pretextual. *Id.* at 374-75. Further, the TSC found that there was "no indication in the record that the prosecution tailored its questions regarding the death penalty depending on the race of the targeted venire person(s)," did not "observe any manipulative questioning" and found no evidence of "a specific policy of systematically excluding African-Americans from juries." *Id.* at 375. The TSC stated that, "[i]n contrast to *Miller-El II*, the sole indication of the purposeful impermissible discrimination by the State in this case is the fact that each of the peremptory challenges used by the State was employed

61

against an African-American venire person." *Id.* at 373, 375.   The TSC noted the issues with the trial court's inadequate findings, relied on the subjective assessment of Pruitt's demeanor, and the trial court's credibility determinations and still found no intentional discrimination in the exercise of peremptory challenges.   *Id.* at 375.

As stated supra, the TSC cited and applied the correct Supreme Court precedent in *Batson*. *See Hugueley*, 185 S.W.3d at 368-69.   Hugueley has not demonstrated that the strike against Pruitt was racially discriminatory.   He has not established that the TSC's decision is contrary to or an unreasonable application of clearly established Supreme Court precedent or based on an unreasonable determination of facts in light of the evidence presented.   Summary judgment is GRANTED, and Claim A is DENIED.

### B.      Peremptory Challenges Based on Gender

Petitioner alleges the State exercised peremptory challenges against female jurors on the basis of their gender in violation of *J.E.B. v. Alabama ex rel. T.B.*, 511 U.S. 127, 129 (1994). (ECF No. 58 at PageID 4664.)   He contends the prosecution's dismissal of potential jurors Pruitt, Heard, McKinnie, and Ferguson violated his constitutional rights.   (*Id.*)   Hugueley asserts that his claim was raised on direct appeal before the TCCA and the TSC.   (*Id.*)

On this issue, the TSC ruled:

### 2. Allegedly Gender-based Peremptory Challenges

We turn now to Defendant's claim that the prosecution peremptorily challenged Ms. Prewitt, Ms. Heard, Ms. McKinnie, and Ms. Ferguson because of their gender.   In *J.E.B. v. Alabama ex rel. T.B.*, 511 U.S. 127, 129, 114 S. Ct. 1419, 128 L.Ed.2d 89 (1994), the United States Supreme Court held that "gender, like race, is an unconstitutional proxy for juror competence and impartiality." We analyze a party's claim that a peremptory challenge is impermissibly gender-based

in the same manner as a claim that a challenge is racially motivated. *See id*. at 144-45, 114 S. Ct. 1419.

Initially, we note that Defendant first lodged a *Batson* objection to a peremptory challenge by the State upon the prosecution's removal of Ida Ferguson. By this time in the proceedings, the State had peremptorily challenged Linda Pirtle, Gertrude Gibbs, and Johnny Hudson. Thus, the State used three of its first four peremptory challenges to remove women from the jury. The record does not indicate the specific basis for Defendant's *Batson* claim as to Ms. Ferguson. Nor do the trial court's findings indicate a specific ruling as to what type of prima facie case Defendant apparently made out. Nevertheless, the trial court determined that the State's rejection of Ms. Ferguson was permissible. We see nothing in the record before us to indicate that the trial court's conclusion in this regard was clearly erroneous.

The State peremptorily challenged four more jurors, three of them female. Thus, of a total of eight peremptory challenges exercised by the prosecution, six were utilized against female venire persons, or 75%. However, as to each of the four women peremptorily challenged and to which Defendant lodged a *Batson* objection, the State proffered gender-neutral reasons for their removal. The trial court obviously determined that the State's proffered reasons were legitimate and not merely pretextual. The record before us does not convince us that the trial court thereby erred. The jury that tried Defendant included six female jurors. The State had seven of its peremptory challenges remaining when the jury was empaneled. All but one of the venire persons peremptorily challenged by the State and to which Defendant lodged a *Batson* objection had indicated some disinclination to impose the death penalty. The other person, Ms. Pruitt, had exhibited a demeanor that caused the prosecutor to doubt her ability to sit on the jury in a composed manner. In sum, we are satisfied that the trial court's findings on Defendant's gender-based *Batson* claims are not clearly erroneous. Accordingly, Defendant is not entitled to relief on this issue.

*Hugueley*, 185 S.W.3d at 375-376 (footnotes omitted).

The Warden argues that Hugueley has offered no argument or factual basis to support his claim and has not demonstrated that the decision was unreasonable. (ECF No. 112-1 at PageID 5444-45.) Respondent further asserts that the TSC's rejection of the gender bias claim was not contrary to or an unreasonable application of clearly established federal law and was based on a

reasonable determination of facts in light of the evidence presented. (*Id.* at PageID 5445.) He contends that the claim is inadequately pled. (*Id.* at PageID 5476.)

Hugueley has failed to plead facts supporting his claim under Habeas Rule 2(c). (*See* ECF No. 58 at PageID 4664.) Hugueley also has not presented an argument in opposition to the motion for summary judgment.

The TSC applied the correct legal precedent from *J.E.B.*, 511 U.S. at 144-45, extending *Batson* to intentional gender discrimination in the use of peremptory strikes. *See Hugueley*, 185 S.W.3d at 375. Three of the female jurors—Heard, McKinnie, and Ferguson—were removed because of their opposition to the death penalty, and Pruitt was removed based on her demeanor as discussed *supra*. *See Hicks v. Collins*, 384 F.3d 204, 224 (6th Cir. 2004) (explaining that the prosecution's use of peremptory challenges to exclude jurors who opposed the death penalty does not deny a capital defendant an impartial jury, as long the strike is not based on race or gender). The proffered reasons for the strike were not pretextual, and there is no indication of purposeful discrimination on the record. *See Strickland v. Pitcher*, 162 F. App'x 511, 518 (6th Cir. 2006) (denying habeas relief where the prosecution presented facially valid reasons for the peremptory strike without inherent discriminatory intent). The TSC's decision is not contrary to or an unreasonable application of clearly established Supreme Court precedent and is based on a reasonable determination of facts in light of the evidence presented. Summary judgment is GRANTED, and Claim B is DENIED.

### C.     Prospective Juror Barry Watkins

Hugueley next argues that the trial court erred in refusing to dismiss for cause prospective juror Barry Watkins, whose brother Donald Watkins worked at HCCF and was a potential witness

for the prosecution.   (ECF No. 58 at PageID 4664.)   He asserts that this claim was raised on direct appeal before the TCCA and the TSC.   (*Id.*)

The TSC held on this issue as follows:

## B. Trial Court's Refusal to Dismiss Juror for Cause

Defendant also asserts in this appeal that the trial court erred in refusing to dismiss potential juror Barry Watkins for cause. The State disagrees.

During the trial court's initial questioning of the venire, Mr. Barry Watkins responded that he knew something about the case. When asked for the source of his information, Mr. Watkins replied that one of his brothers worked at the prison where the killing occurred. Mr. Watkins stated, however, that the information he had obtained had not caused him to form an opinion about Defendant's guilt or innocence. Defense counsel subsequently requested a sequestered voir dire of Mr. Watkins, which the trial court granted. During this additional voir dire, defense counsel asked Mr. Watkins if he was a convicted felon. Mr. Watkins responded that he had been arrested but not convicted.   He explained that more than twenty years earlier, he had been arrested for a robbery.   While he was being held, they arrested "the guy that did it."   The charges against Mr. Watkins were then dismissed. He was under the impression that his arrest was still "on record" because he was not allowed to buy guns.

Mr. Watkins stated that Mr. Donald Watkins was his half-brother. Mr. Watkins explained that he knew his half-brother might be called as a prosecution witness, but maintained that "that's all I knew."   His half-brother told him that he would need to advise the court of their relationship. When asked by the court if this relationship would affect his judgment, Mr. Watkins replied, "I can listen to the facts and what's been proven to me. He is my brother but he can be mistaken like anybody else." Mr. Watkins maintained that he would not give his relative's testimony any more weight or believability than that of the other witnesses. Mr. Watkins told the trial court that his brother had not told him what his testimony would be about, or what he claimed the facts to be. Mr. Watkins stated that he had not heard Defendant's name until "today."

Following this individual voir dire, defense counsel moved to strike Mr. Watkins for cause on the grounds that "it's too hard to overcome the bias of your brother testifying in the State's case in chief."   The trial court denied defense counsel's request.   Defendant now contends that the trial court's ruling resulted in a violation of his constitutional rights to a fair and impartial jury.

65

We are initially constrained to point out that Defendant did not raise this issue in his motion for new trial. Accordingly, this issue has been waived. *See* Tenn. R. App. P. 3(e) ("[I]n all cases tried by a jury, no issue presented for review shall be predicated upon error in the admission or exclusion of evidence, jury instructions granted or refused, misconduct of jurors, parties or counsel, or other action committed or occurring during the trial of the case, or other ground upon which a new trial is sought, unless the same was specifically stated in a motion for a new trial; other-wise such issues will be treated as waived."). Nevertheless, because this is a capital case, and because this issue involves Defendant's fundamental constitutional rights to a fair and impartial jury, we choose to address it on the merits.

Both the United States and Tennessee Constitutions guarantee criminal defendants the right to a trial by an "impartial jury." U.S. Const. amend. VI; Tenn. Const. art. I, § 9. "The impartial jury guaranteed by constitutional provisions is one which is of impartial frame of mind at the beginning of trial, is influenced only by legal and competent evidence produced during trial, and bases its verdict upon evidence connecting defendant with the commission of the crime charged." *State v. Lawson*, 794 S.W.2d 363, 367 (Tenn. Crim. App. 1990). To protect this right, litigants have the right to lodge a "propter affectum" challenge for cause to a potential juror on the basis that he or she is biased or prejudiced for or against one of the parties. *See Toombs v. State*, 197 Tenn. 229, 270 S.W.2d 649, 650 (1954); *State v. Akins*, 867 S.W.2d 350, 355 (Tenn. Crim. App. 1993). A propter affectum challenge should be upheld where some bias or partiality is either actually shown to exist or is presumed to exist from circumstances. *Durham v. State*, 182 Tenn. 577, 188 S.W.2d 555, 559 (1945). Circumstances justifying a presumption of bias include a juror's willful concealment of "ulterior and prejudicial motives" arising from his prior conviction and prior involvement as prosecuting witness in a case very similar to the defendant's, *see id.* at 559, and a juror's failure to disclose a "very close" familial relationship between the juror and the prosecuting attorney's wife, *see Toombs*, 270 S.W.2d at 651.

In this case, the trial court overruled defense counsel's challenge for cause to Mr. Watkins after both the prosecution and defense counsel had an opportunity to closely question him during a period of sequestered voir dire and after the trial court itself probed Mr. Watkins' impartiality. The trial court was obviously satisfied that Mr. Watkins' relationship would not prevent or substantially impair the performance of his duties as a juror in accordance with his instructions and his oath. A determination of the qualifications of a juror rests within the sound discretion of the trial court. *State v. Howell*, 868 S.W.2d 238, 248 (Tenn. 1993). We find no abuse of discretion in the trial court's refusal to excuse juror Watkins for cause in this case.

66

Defendant relies heavily on the Court of Criminal Appeals' opinion in *State v. Pamplin*, 138 S.W.3d 283 (Tenn. Crim. App. 2003). In that case, the defendant was on trial for assaulting a city police officer and resisting arrest. One of the potential jurors was a county deputy sheriff who knew both the assaulted officer and the defendant. The deputy had previously served as a judicial commissioner for eight years and his sister-in-law worked for the district attorney. The deputy was a member of the same law enforcement agency as one of the prosecution's primary witnesses; indeed, the deputy was a subordinate employee of that witness. The deputy reported for jury duty in his uniform, including his badge and sidearm. The trial court denied the defendant's challenge to excuse the deputy from jury duty for cause. Because the defendant had exhausted all of his peremptory challenges, the deputy remained on the jury and was subsequently elected its foreman.

On appeal, the intermediate appellate court determined that the trial court had committed manifest error in refusing to excuse the deputy juror, finding that his "professional relationship and interest in the case was entirely too close to that of [the State's witness] and [the victim]." *Id.* at 286. The court noted not only the relationship between the deputy and the State's witnesses, but the nature of the case (involving an assault on a police officer) and the fact that the deputy served on the jury while in full uniform and wearing his sidearm. *Id.* The court emphasized that "the jury selection process should endeavor to select jurors who are not only fair and impartial but are also free from the suspicion of impartiality." *Id.* at 287.

We find the *Pamplin* case to be readily distinguishable from Defendant's. The combination of factors present in the *Pamplin* case created an egregious set of circumstances which are simply not present in the case before us. While we certainly agree that a close familial relationship between a juror and a witness may give rise to a suspicion of partiality, we are reluctant to conclude that a half-sibling connection is sufficient, in and of itself, to raise a presumption of bias so as to require a trial court to grant a propter affectum challenge. We recognize that many ties of kinship do not result in close relationships, and we are therefore unwilling to presume any particular level of bias arising from the familial relationship between Mr. Watkins and the State's witness. Rather, we agree with Maryland's high court on this point: "Although the relationship of a juror to one of the witnesses may present an opportunity for prejudice, bias will not be presumed and the defendant is not relieved of the burden of presenting facts in addition to mere relationship which would give rise to a showing of actual prejudice." *Bristow v. State*, 242 Md. 283, 219 A.2d 33, 34 (1966); *see also Bowman v. State*, 598 S.W.2d 809, 812 (Tenn. Crim. App. 1980) (recognizing that, when the challenged juror disclosed her social relationship with one of the prosecuting attorneys, "[t]he burden is on the defendant to demonstrate that the juror was in some way biased or prejudiced" because the prosecuting attorney testified as a rebuttal witness).

In this case, Defendant has failed to present sufficient facts about juror Watkin[s'] relationship with his half-brother to demonstrate either actual prejudice or that a presumption of prejudice is justified. Juror Watkins was forthcoming about his relationship with one of the State's witnesses. Moreover, he obviously convinced the trial court that he could judge the evidence in a non-biased manner and with no preconceived notion of Defendant's guilt. There is nothing in the record before us that convinces us that the trial court erred in reaching this conclusion.

Moreover, as this Court has previously held, "the failure to correctly exclude a juror for cause is grounds for reversal only if the defendant exhausts all of his peremptory challenges and an incompetent juror is forced upon him." *Howell*, 868 S.W.2d at 248 (emphasis added). In this case, Defendant did, indeed, exhaust all of his peremptory challenges, using one of them to excuse Mr. Watkins. However, we disagree with Defendant that an incompetent juror was thereby thrust upon him. Defendant argues that "[b]ased on the non-exclusion of . . . Barry Watkins for cause, [he] was forced to accept at least three (3) jurors that were incompetent, biased and/or not impartial" because they had prior knowledge of the allegations against Defendant from the media or personal relationships. Defendant particularly targets the jury foreperson, Mr. Burrough, who acknowledged some prior familiarity with the case from an acquaintance who worked at the Hardeman County Correctional Facility.

Mr. Burrough answered affirmatively the trial court's initial inquiry as to whether he had "heard or read anything at all about this case [.]" Mr. Burrough explained that his source of information was an acquaintance that worked at the prison. Mr. Burrough stated that the information he had heard had not caused him to form an opinion about Defendant's guilt or innocence and stated further that he would be able to base his verdict on the law and evidence charged by the trial court. Similarly, jurors Edna Blake and Eric Bolden indicated that they had each gained some information about the case from the media and/or "hearsay at work" prior to trial. Each assured the trial court that they had not formed an opinion about Defendant's guilt or innocence based on what they had heard.

Our rules of criminal procedure provide that a prospective juror may be challenged for cause where

[t]he prospective juror's exposure to potentially prejudicial information makes the person unacceptable as a juror. Both the degree of exposure and the prospective juror's testimony as to his or her state of mind shall be considered in determining acceptability. A prospective juror who states that he or she will be unable to overcome preconceptions shall be subject to challenge for cause no matter how slight the exposure. If the prospective

juror has seen or heard and remembers information that will be developed in the course of trial, or that may be inadmissible but is not so prejudicial as to create a substantial risk that his or her judgment will be affected, the prospective juror's acceptability shall depend on whether the testimony as to impartiality is believed. If the prospective juror admits to having formed an opinion, he or she shall be subject to challenge for cause unless the examination shows unequivocally that the prospective juror can be impartial.

Tenn. R. Crim. P. 24(b)(2). The record reveals that defense counsel made no attempt to challenge Mr. Burrough, Ms. Blake, or Mr. Bolden for cause. Apparently, defense counsel determined that none of these persons was so biased or prejudiced by the information they had heard prior to trial as to justify a for-cause challenge. Yet, Defendant now contends that he was forced to accept these "incompetent, biased and/or not impartial" jurors because he exercised a peremptory challenge against Mr. Watkins.

Defendant fails to explain how these jurors' mild familiarity with the case prior to trial rendered them incompetent as jurors. Defendant has demonstrated neither partiality on the part of any of these jurors, nor any prejudice that he suffered as a result of any of these three persons sitting on the jury. "Juror bias must be shown, not just suspected." *Lawson*, 794 S.W.2d at 367 (citing *Smith v. Phillips*, 455 U.S. 209, 102 S. Ct. 940, 71 L.Ed.2d 78 (1982)). We are not persuaded that any of these three jurors was "incompetent" as required by *Howell*. Defendant has simply failed to demonstrate that he is entitled to a new trial on the basis of the trial court's refusal to dismiss Barry Watkins for cause. Accordingly, Defendant is not entitled to relief on this issue.

*Hugueley*, 185 S.W.3d at 376-80 (footnote omitted).

The TSC determined that the claim was waived, but decided to address it on the merits.

*Id.* at 377.[22] The Court will therefore address the merits of the claim.

The Warden asserts that Barry Watkins did not sit on the jury, and there was no viable constitutional claim. (ECF No. 121-1 at PageID 5455.) He notes that Hugueley has offered no argument or factual basis for his claim. (*Id.*) Respondent argues that the TSC's rejection of

---

[22] Respondent argues that, if the Court does not find this claim procedurally defaulted, it should be denied as meritless. (ECF No. 121-1 at PageID 5455.)

Hugueley's claim was not contrary to or an unreasonable application of clearly established federal law or based on an unreasonable determination of fact. (*Id.*) Hugueley does not address this claim in his response to the motion for summary judgment.

The Sixth Amendment commands that every criminal defendant "shall enjoy the right to a speedy and public trial, by an impartial jury." U.S. Const. amend. VI. In addition to the safeguards articulated in the Sixth Amendment, the Constitution's due process protections likewise afford to criminal defendants the right to be tried by an impartial jury. *Dennis v. Mitchell*, 354 F.3d 511, 520 (6th Cir. 2003) (citing *Morgan v. Illinois*, 504 U.S. 719, 727 (1992)). As is recognized, the voir dire process is designed to protect this right "by exposing possible biases, both known and unknown, on the part of potential jurors." *Id.* at 520 (quoting *McDonough Power Equip., Inc. v. Greenwood*, 464 U.S. 548, 554 (1984)). "A court must excuse a prospective juror if actual bias is discovered during voir dire." *Hughes v. United States*, 258 F.3d 453, 459 (6th Cir. 2001). Actual bias or "bias in fact" is "the existence of a state of mind that leads to an inference that the person will not act with entire impartiality." *Id.* at 463. The doctrine of presumed or implied bias provides that, in exceptional cases, courts should employ a conclusive presumption that a juror is biased when "the relationship between a prospective juror and some aspect of the litigation is such that it is highly unlikely that the average person could remain impartial in his deliberations under the circumstances." *Treesh v. Bagley*, 612 F.3d 424, 437 (6th Cir. 2010). Implied bias may be found when a juror has "a relationship in which the potential for substantial emotional involvement, adversely affecting impartiality, is inherent," such as when there juror is a close relative of one of the trial participants. *United States v. Russell*, 595 F.3d 633, 641 (6th Cir. 2010). The Sixth Circuit has questioned the continued viability of implied

bias.  *Treesh*, 612 F.3d at 437.   Further, the implied-bias doctrine is not supported by clearly

established Supreme Court precedent.   *See Lang v. Bobby*, No. 5:12 CV 2923, 2015 WL 1423490,

at *45 (N.D. Ohio Mar. 27, 2015).

The relevant question for juror impartiality is "did [the] juror swear that he could set aside

any opinion he might hold and decide the case on the evidence, and should the juror's protestation

of impartiality have been believed."   *See Patton v. Yount*, 467 U.S. 1025, 1036 (1984).   The

Supreme Court has stated:

> To hold that the mere existence of any preconceived notion as to the guilt or
> innocence of an accused, without more, is sufficient to rebut the presumption of a
> prospective juror's impartiality would be to establish an impossible standard. It is
> sufficient if the juror can lay aside his impression or opinion and render a verdict
> based on the evidence presented in court.

*Irvin v. Dowd*, 366 U.S. 717, 723 (1961).

In *Treesh,* the Sixth Circuit did not find implied bias based on a "mere student-teacher

relationship" and noted that the record did not establish actual bias where the juror and defense

counsel did not appear to have a close relationship.   *Treesh*, 612 F.3d at 437-38.

In *Lang*, a potential juror's stepfather was the brother of the victim.  *Lang*, 2015 WL

1423490, at *46.   The juror attended the victim's funeral with her stepfather without knowing

anything about his brother's death other than what was in the newspaper.   *Id.*   The court did not

find implied-bias where the juror had not seen the victim in some time, did not live with her

stepfather, and did not talk to anyone in her family about the case.   *Id.*   Further, the juror assured

the court that her relationship to the victim did not cause her any personal problem or prevent her

from being impartial.   *Id.*

71

In *United States v. Weir*, 587 F. App'x 300, 305-06 (6th Cir. 2014), the Sixth Circuit analyzed implied bias of a juror because of a loose familial relationship with the kidnapping victim. The juror's sister's husband's brother (brother-in-law's brother) was married to the victim's daughter. *Id.* at 305. The victim's daughter was a godparent to the juror's nephews. *Id.* However, the juror said the relationship would not impact her ability to be objective. *Id.* The Sixth Circuit held that, "even assuming implied bias is still a basis for juror disqualification," the relationship was not sufficiently close to warrant the doctrine of implied bias. *Id.* at 305-06.

In the instant case, Watkins informed the court that "[o]ne of my brothers works out at the prison." (ECF No. 41-2 at PageID 394.) The court followed up with questions:

> THE COURT:  Has that caused you to form an opinion about the guilt or innocence of the accused?
>
> MR. WATKINS:  No.
>
> THE COURT:  Would you be able to judge this case on the law and evidence you hear today and tomorrow and the next day?  Could you do that?
>
> MR. WATKINS:  Yes, sir.

(*Id.* at PageID 394-95.)  Watkins said that his brother worked at HCC[F] where the incident took place.  (*Id.* at PageID 421.)

The prosecutor continued:

> GENERAL DYCUS:  HCC[F]?  You know that's where this incident is alleged to have taken place.  I think the judge asked if you heard about it but you can sit fairly in this case.  You realize what you heard is not proof; it's going to come from the stand?
>
> MR. WATKINS:  Right.
>
> GENERAL DYCUS: All right.  And you sat on a jury once before, criminal jury, about twelve years ago, I think.

MR. WATKINS:    I was dismissed.

GENERAL DYCUS: You were dismissed.    Okay.    Could you sign a death warrant?

MR. WATKINS:    I could.

(*Id.*)

Barry Watkins stated that he was the half-brother of Donald L. Watkins.    (*Id.* at PageID 440.)   The State indicated that Donald Watkins would be one of its witnesses, and Barry Watkins was aware that his half-brother might be called as a witness for the State.    (*Id.*)   Barry Watkins said that it would not affect him.    (*Id.*)   He said, "I can listen to the facts and what's been proven to me.   He is my brother but he can be mistaken like anybody else."    (*Id.*)   Donald Watkins only told Barry "that something happened at the prison and that he would be a witness and that's all that I know."   (*Id.* at PageID 440-41.)   Donald told Barry that "I needed to let y'all know."   (*Id.* at PageID 441.)   Donald did not tell Barry about the facts of the case.    (*Id.*)   Barry Watkins had not heard the defendant's name until voir dire; two or three days before voir dire, Barry had read a headline about the case.    (*Id.*)

Defense counsel objected for cause saying, "I believe it's too hard to overcome the bias of your brother testifying . . . ."   (*Id.* at PageID 444.)   The prosecution noted that Barry Watkins specifically said "brothers are sometimes wrong, too, and he said he'd be open-minded about it and listen to all the proof . . . ."   (*Id*.)   The court overruled the motion to strike Barry Watkins for cause.    (*Id.*)

Barry Watkins exhibited that he was impartial and not influenced by his half-brother's involvement. Neither actual or implied bias has been shown, and the trial court's denial of the strike for cause is reasonable.

After the denial of defense counsel's for cause challenge, Watkins was excluded from the jury based on a peremptory strike. The United States Supreme Court has held,

> we reject the notion that the loss of a peremptory challenge constitutes a violation of the constitutional right to an impartial jury. We have long recognized that peremptory challenges are not of constitutional dimension. They are a means to achieve the end of an impartial jury.

*Ross v. Oklahoma*, 487 U.S. 81, 88 (1988) (citation omitted); *United States v. Martinez-Salazar*, 528 U.S. 304, 311 (2000) (noting that peremptory challenges are "auxiliary" and "not of federal constitutional dimension"); *see id.* at 313 (stating that without more, the loss of a peremptory challenge does not constitute a violation of the constitutional right to an impartial jury). Consistent with *Ross*, the Sixth Circuit in *Beuke v. Houk*, 537 F.3d 618, 638 (6th Cir. 2008), denied habeas relief to a petitioner who claimed that the denial of four prospective jurors for cause forced him to use valuable peremptory challenges. The court stated any claim that the jury was not impartial must focus on the jurors who ultimately sat on the jury. *Id.* Since Watkins did not sit on Hugueley's jury, his right to an impartial jury was not denied by the trial court's failure to strike Watkins' for cause. Hugueley's constitutional rights have not been violated.

The TSC's decision was not contrary to or an unreasonable application of clearly established Supreme Court precedent and was based on a reasonable determination of facts in light of the evidence presented.

Summary judgment is GRANTED, and Claim C is DENIED.

## D.        Insufficient Evidence of Aggravating Circumstances

Hugueley alleges the evidence was insufficient to support the jury's finding of the aggravating circumstances that: (1) he had prior convictions involving the use of violence; (2) the killing was especially heinous, atrocious, or cruel; (3) he was in lawful custody at the time of the killing; and (4) the victim was a corrections employee.   (ECF No. 58 at PageID 4665.)

On direct appeal, the TSC held on this issue:

### B. Sufficiency of Aggravating Circumstances

We turn now to the sufficiency of the evidence supporting the jury's finding of statutory aggravating circumstances. In this case, the jury determined that the State had proven beyond a reasonable doubt four aggravating circumstances: (a) Defendant was previously convicted of one or more felonies, other than the present charge, whose statutory elements involve the use of violence to the person; (b) Defendant's murder of the victim was especially heinous, atrocious, or cruel in that it involved torture or serious physical abuse beyond that necessary to produce death; (c) Defendant committed the murder while he was in lawful custody or in a place of lawful confinement; and (d) the murder was committed against a corrections employee who was engaged in the performance of official duties. *See* Tenn. Code Ann. § 39-13-204(i)(2), (5), (8), (9) (Supp. 1999). We must now review the evidence supporting each of these aggravating circumstances in the light most favorable to the State and determine whether a rational trier of fact could have found the existence of each beyond a reasonable doubt. *State v. Bane*, 57 S.W.3d 411, 426 (Tenn. 2001).

### 1. Prior Convictions

During the sentencing phase of Defendant's trial, the State introduced by stipulation three certified judgments against Defendant. These documents indicate that judgments of conviction were entered against Defendant in 1986 for first degree murder; in 1992 for first degree murder; and in 1998 for criminal attempt to commit first degree murder. Obviously, the statutory elements of the felony of first degree murder involve the use of violence to the person. *See* Tenn. Code Ann. § 39-13-202(a). This Court has further held that the statutory elements of attempted murder involve the use of violence to the person. *State v. Cribbs*, 967 S.W.2d 773, 782-83 (Tenn. 1998). Accordingly, we hold that the evidence is sufficient to support the jury's finding of the existence of this aggravating circumstance. See Tenn. Code Ann. § 39-13-204(i)(2) (Supp.1999).

## 2. Especially Heinous, Atrocious, or Cruel

The jury determined that Defendant's murder of Steed was especially heinous, atrocious, or cruel in that it involved torture or serious physical abuse beyond that necessary to produce death. *See id.* at (i)(5). This aggravating circumstance may be applied if the evidence is sufficient to support either torture or serious physical abuse beyond that necessary to produce death. *State v. Suttles*, 30 S.W.3d 252, 262 (Tenn. 2000).

This Court has defined "serious physical abuse beyond that necessary to produce death" as follows:

> The word "serious" alludes to a matter of degree. The abuse must be physical, as opposed to mental, and it must be "beyond that" or more than what is "necessary to produce death." "Abuse" is defined as an act that is "excessive" or which makes "improper use of a thing," or which uses a thing "in a manner contrary to the natural or legal rules for its use."

*State v. Odom*, 928 S.W.2d 18, 26 (Tenn. 1996) (quoting Black's Law Dictionary 11 (6th ed. 1990)). The proof in this case established that Defendant stabbed Steed a total of thirty-six times. Twelve of the wounds were fatal. Dr. Smith testified that Defendant's infliction of so many wounds to the victim qualified for application of the term "overkill." He explained: "there was excessive injury done to the body far in excess of what would be necessary to cause death." The proof is more than sufficient to support the jury's finding of this aggravating circumstance.

## 3. Defendant in Lawful Custody

The proof at trial that Defendant was in lawful custody or in a place of lawful confinement at the time he killed Steed is clear and uncontroverted. The evidence is therefore sufficient to support the jury's finding of this aggravating circumstance. *See* Tenn. Code Ann. § 39-13-204(i)(8) (Supp.1999).

## 4. Corrections Employee Victim

The record in this case contains a copy of the jury's verdict form which includes the written jury instructions provided to the jury by the trial court. These instructions informed the jury that it could apply as an aggravating circumstance that "[t]he murder was committed against any law enforcement officer, corrections official, corrections employee, engaged in the performance of official duties." The verdict form returned by the jury contains a hand-written finding by the jury that it applied as an aggravating circumstance that "the murder was committed against

any law enforcement officer, corrections official, corrections employee, engaged in the performance of official duties."

The written instruction provided to the jury on this aggravating circumstance was erroneous. Our criminal code provides that the fact-finder may consider as an aggravating circumstance that

> [t]he murder was committed against any law enforcement officer, corrections official, corrections employee, emergency medical or rescue worker, emergency medical technician, paramedic or fire-fighter, who was engaged in the performance of official duties, *and the defendant knew or reasonably should have known that such victim was a law enforcement officer, corrections official, corrections employee, emergency medical or rescue worker, emergency medical technician, paramedic or fire-fighter engaged in the performance of official duties.*

*Id.* at (i)(9) (emphasis added). The trial court's written instruction to the jury in this case omitted the element requiring that Defendant knew or reasonably should have known that the victim was a law enforcement officer, corrections official, or corrections employee engaged in the performance of official duties.

Defendant did not raise this issue at trial, in his motion for new trial, or on appeal. Nevertheless, this Court will review a patently incomplete instruction at a capital sentencing hearing under the "plain error" doctrine, regardless of a defendant's failure to raise the issue. *See State v. Stephenson*, 878 S.W.2d 530, 554 (Tenn. 1994); *see also State v. Hines*, 758 S.W.2d 515, 523 (Tenn. 1988) (characterizing as "plain error" the trial court's incomplete instructions on two of three aggravating circumstances found by the jury). This Court will grant relief under the plain error doctrine only "where necessary to do substantial justice." Tenn. R. Crim. P. 52(b). As we have stated previously, "the error must be of such a great magnitude that it probably changed the outcome of the trial." *State v. Faulkner*, 154 S.W.3d 48, 58 (Tenn. 2005). An appellate court will reverse for plain error only if:

(a) the record ... clearly establish[es] what occurred in the trial court;

(b) a clear and unequivocal rule of law [has] been breached;

(c) a substantial right of the accused [has] been adversely affected;

(d) the accused did not waive the issue for tactical reasons; and

(e) consideration of the error is "necessary to do substantial justice."

*State v. Smith*, 24 S.W.3d 274, 282 (Tenn. 2000) (quoting *State v. Adkisson*, 899 S.W.2d 626, 641-42 (Tenn. Crim. App. 1994)). All five factors must be established and an appellate court need not consider all five factors if any one factor indicates that relief is not warranted. *Id*. at 283.

In this case, the proof at trial was uncontroverted that Defendant knew the victim was a corrections employee: [I]ndeed, Defendant committed the murder because of the victim's performance in that role. The proof at trial was further uncontroverted that Defendant knew the victim was engaged in the performance of his official duties when Defendant brutally stabbed him to death. Defendant told Mr. Dunaway that he approached the victim during a counseling session only to be ignored. At that point, Defendant determined to kill the victim.

*Hugueley*, 185 S.W.3d at 381-83.

The Warden argues that the TSC's determination was not an unreasonable application of clearly established federal law and was based on a reasonable determination of fact. (ECF No. 112-1 at PageID 5456.) Respondent argues that Hugueley's two prior murder convictions involved the use of violence. (*Id.*) He notes that Petitioner, knowing that Steed was a prison counselor, stabbed him 36 times with a homemade shank, which was clearly heinous, atrocious, and cruel. (*Id.*) Respondent contends that Hugueley murdered Steed because of his performance in his role as a prison counselor. (*Id.*) He insists that Hugueley has offered no argument or factual basis to support his claim and has not shown that the court's decision was unreasonable. (*Id.*) Respondent also asserts that the claim was inadequately pled under Habeas Rule 2 because the inmate provided no argument or factual support for his conclusory assertion. (*Id.* at PageID 5477-78.)

Hugueley has failed to plead facts supporting his claim under Habeas Rule 2(c). (*See* ECF No. 58 at PageID 4665.) Further, he has failed to present an argument in opposition to the motion for summary judgment on this claim.

In *Jackson v. Virginia*, the Supreme Court held that, "in a challenge to a state criminal conviction brought under 28 U.S.C. § 2254—if the settled procedural prerequisites for such a claim have otherwise been satisfied—the applicant is entitled to habeas corpus relief if it is found that upon the record evidence adduced at the trial no rational trier of fact could have found proof of guilt beyond a reasonable doubt." *Jackson*, 443 U.S. at 324. This standard requires a federal district court to examine the evidence in the light most favorable to the State. *Id.* at 326 ("[A] federal habeas corpus court faced with a record of historical facts that supports conflicting inferences must presume—even if it does not affirmatively appear in the record—that the trier of fact resolved any such conflicts in favor of the prosecution, and must defer to that resolution.").

Hugueley has not stated the basis upon which he seeks habeas relief for this claim. The TSC applied the correct legal standard from *Jackson v. Virginia*. *Hugueley*, 185 S.W.3d at 381. The court found that the evidence was sufficient to support the jury's findings of the following four statutory aggravating circumstances: (1) Hugueley had previously been convicted of one or more violent felonies; (2) the murder was especially heinous, atrocious, or cruel; (3) the murder was committed while the inmate was in lawful custody; and (4) the murder was committed against a corrections employee who was engaged in the performance of his official duties and who Hugueley knew or reasonably should have known was a corrections employee engaged in the performance of his official duties. *Id.* at 381-83.

With regard to the prior violent felony aggravating circumstance, evidence was presented at trial that Petitioner was convicted of murdering his mother in 1986, first degree murder of James Shelton in 1992, and criminal attempt to commit first degree murder of Timmerall Nelson in 1998.

*Id.* (*See* ECF No. 41-5 at PageID 689-90, 825-27; *see* ECF No. 58 at PageID 4667-72.) The last two convictions occurred while Hugueley was incarcerated.

With regard to the heinous, atrocious, or cruel aggravating circumstance, evidence was presented that Hugueley stabbed Steed thirty-six times with twelve wounds being fatal. *Id.* at 364-65, 381. Smith described the wounds as "overkill" and causing "excessive injury" beyond what was required to case death. *Id.* at 381-82. Petitioner testified,

> I was stabbing Counselor Steed. He was laying on the floor, stomach down. I was trying to drive it plumb through and hit the concrete below him. That was my intentions.

(ECF No. 41-4 at PageID 641.) He said "And, like I said, if my knife hadn't broke, there'd been more people dead." (ECF No. 41-5 at PageID 791.) He described the incident, "the knife itself didn't break. I . . . I run it through a spinal c[]ord, I believe it was . . . stuck in there, and when I pulled out . . . when I pulled out, it was still off in it, . . . and I had the handle in my hand." (*Id.* at PageID 792.) Hugueley said "I went for the most vital organs first . . . the heart and the lung." (*Id.* at PageID 795.) He related, "They stood there and watched me stab him a least another eight times." (ECF No. 41-4 at PageID 643.) Hugueley said that he only quit stabbing Steed because the knife handle came off and that otherwise he probably still would have been stabbing the victim today. (*Id.* at PageID 655.)

With regard to the last two aggravating circumstances, the proof was that Hugueley was incarcerated at HCCF at the time that he killed Steed, who was his corrections counselor in the performance of his duties. *Id.* at 382.

Based on this Court's review of the transcript (*see* ECF No. 41 4 at PageID 685-92; *see also* ECF No. 41-5 at PageID 702-841), the testimony and evidence were more than sufficient to

permit a rational trier of fact, examining the evidence in the light most favorable to the State, to find these aggravating circumstances beyond a reasonable doubt. The TSC's decision is not contrary or an unreasonable application of clearly established Supreme Court precedent and is based on a reasonable determination of facts in light of the evidence presented. Summary judgment is GRANTED, and Claim D is DENIED.

**E.    Jury Instruction on the Aggravating Circumstance of Killing A Correctional Employee**

Hugueley alleges that the trial court erred in instructing the jury on the aggravating circumstance relating to the killing of a correctional employee by not charging the jury as to all of the elements of the offense. (ECF No. 58 at 6.) He asserts that the trial court failed to inform the jury as to the statutory requirement that the defendant "knew or reasonably should have known that such victim was a law enforcement officer, corrections official, corrections employee, emergency medical or rescue worker, emergency medical technician, paramedic or firefighter engaged in the performance of official duties." (*Id.*) *See* Tenn. Code Ann. § 39-13-204(i)(9).

The TSC addressed this claim on direct appeal and stated that "the proof was uncontroverted that Defendant knew the victim was a corrections employee . . . . The proof at trial was further uncontroverted that Defendant knew the victim was engaged in the performance of his official duties when Defendant brutally stabbed him to death." *Hugueley*, 185 S.W.3d at 383. The court determined that Hugueley was not entitled to relief because he "admitted his knowledge of the victim's employment and that the victim was engaged in official duties at the time Defendant killed him." *Id.*

### 1. Plain Error Review & Procedural Default

The Warden argues that the claim is barred by procedural default because the TSC's rejection of the claim rested on the enforcement of the independent and adequate state law ground of waiver.  (ECF No. 112-1 at PageID 5465-66.)  *See Hugueley*, 185 S.W.3d at 382.  Respondent contends that the claim was reviewed on plain error, and in the Sixth Circuit, plain error review is not equivalent to a review on the merits and does not save a claim from procedural default.  (*Id.* at PageID 5466.)  He asserts that the TSC correctly noted Hugueley's failure to preserve appellate review and "actually enforced" the state procedural bar of waiver.  (*Id.*)

Petitioner claims that the state procedural bar does not apply.  (ECF No. 127 at PageID 5651.)  He argues that the TSC never used the word "waived" when it reviewed the claim on the merits *sua sponte*, and the TSC's notation that the issue had not been previously raised is not a finding of waiver and does not amount to an adequate procedural bar.  (*Id.*)  He relies on *Harris v. Reed*, 489 U.S. 255 (1989), for the proposition that consideration of a federal claim is not prohibited unless the state court "clearly and expressly states that its judgment rests on a state procedural bar."  (*Id.* at PageID 5651-52.)  Hugueley contends that in the absence of an express invocation of waiver, *Harris* applies.  (*Id.* at PageID 5652.)  He cites Sixth Circuit cases *Skinner v. McLemore*, 425 F. App'x 491 (6th Cir. 2011), and *Henderson v. Palmer*, 730 F.3d 554, 561 (6th Cir. 2013), which state that, where the procedural bar is not expressly invoked or it is ambiguous whether the state court relied on a procedural default, there is no bar to habeas review.  (*Id.* at PageID 5653.)

The Sixth Circuit has held that a state court's plain error analysis does not save a petitioner from procedural default.  *See Scott v. Mitchell*, 209 F.3d 854, 866 (6th Cir. 2000).  The court

stated that "[p]lain error analysis is more properly viewed as a court's right to overlook procedural defects to prevent manifest injustice, but is not equivalent to a review of the merits."  *Lundgren v. Mitchell*, 440 F.3d 754, 765 (6th Cir. 2006).  AEDPA is not applicable based on plain error review of an otherwise procedurally defaulted claim.  *Trimble v. Bobby*, 804 F.3d 767, 788 (6th Cir. 2015); *see Leonard v. Warden, Ohio State Penitentiary*, 846 F.3d 832, 851 (6th Cir. 2017) (addressing the ambiguity over whether to apply AEDPA deference to a claim reviewed for plain error after being procedurally waived and deciding not to address the ambiguity because the petitioner could not prevail under the more lenient standard of *de novo* review).

The Supreme Court in *Harris*, 489 U.S. at 263, applied a "plain statement" rule to address the problem of ambiguous state court references to state law.  The Court said, "Faced with a common problem, we adopt a common solution: a procedural default does not bar consideration of a federal claim on either direct or habeas review unless the last state court rendering a judgment in the case 'clearly and expressly' states that its judgment rests on a state procedural bar."  *Id.* at 263.

Similarly, in *Henderson*, the Sixth Circuit stated,

"neither the mere availability nor the potential, or even obvious, applicability of such a [procedural] rule is determinative. To operate as a bar to habeas review, such a rule must be clearly and expressly invoked." Put another way, "there must be unambiguous state-court reliance on a procedural default to block our [federal habeas corpus] review."

*Henderson*, 730 F.3d at 561 (citations omitted) (quoting *Skinner v. McLemore*, 425 F. App'x 491, 495 (6th Cir. 2011).

In the instant case, the TSC stated, "Defendant did not raise this issue at trial, in his motion for new trial, or on appeal."  *Hugueley*, 185 S.W.3d at 382.  The court did not specifically state

that the claim was waived or cite a procedural rule. Therefore, procedural default should not apply.

Instead, the court cited *State v. Stephenson*, 878 S.W.2d 530 (Tenn. 1994), for application of the plain error rule. In *Stephenson*, the TSC stated, "we note that the State's contention that the issue is waived because of the defendant's failure to raise the issue at the time of the charge or in the motion for new trial is completely without merit. . . . Clearly, the defendant's failure to raise the issue in the motion for a new trial does not constitute waiver under the facts in this case." *Stephenson*, 878 S.W.2d at 553-54, *abrogated on other grounds by State v. Saylor*, 117 S.W.3d 239 (Tenn. 2003). The TSC explained that Tennessee Rule of Criminal Procedure 52(b), embodying the plain error rule, "has been previously applied . . . to allow review of patently incomplete instructions at a capital sentencing hearing despite defense counsel's failure to call such error to the trial court's attention." *Stephenson*, 878 S.W.2d at 554 (citing *Hines*, 758 S.W.2d at 523-24 & n.4). In *State v. Carter*, 988 S.W.2d 145, 152 (Tenn. 1999), the TSC determined that there was no waiver and cited Tennessee Rule of Appellate Procedure 36(b) and Tennessee Rule of Criminal Procedure 52(b), stating that "[a]n error that affects a substantial right of a defendant may be raised at any time where necessary to do substantial justice." Where, as in the instant case, a procedural bar has not been clearly and expressly invoked and Tennessee case law cited by the TSC indicates that the claim is not waived, this Court will not enforce a procedural bar.

### 2. Merits

The Warden argues alternatively that the claim should be denied as meritless. (ECF No. 112-1 at PageID 5456.) He contends that the Court must determine whether the error in this jury

instruction had a substantial and injurious effect or influence on the verdict. (*Id.* at PageID 5457.) Respondent argues that, on habeas review, the *Brecht* standard of whether an error had a substantial and injurious effect or influence on the jury's verdict applies. (*Id.*) *See Brecht v. Abrahamson*, 507 U.S. 619, 623 (1993). He contends that "a habeas court remains free, before turning to *Brecht*, to inquire whether the state court's *Chapman* analysis" of whether the error is "harmless beyond a reasonable doubt" is a reasonable determination. (*Id.*) *See Chapman v. California*, 386 U.S. 18 (1967). If that state court's decision is reasonable, the inquiry ends. (*Id.*) Respondent submits that the TSC's decision reflects a reasonable application of *Chapman* and illustrates that the jury instruction did not have a substantial and injurious effect or influence on Hugueley's sentence. (*Id.*)

Petitioner maintains that the TSC's determination that the instruction was harmless was an unreasonable determination of facts and is contrary to and an unreasonable application of clearly established federal law. (ECF No. 127 at PageID 5640.)[23] He asserts that the instructions were incomplete, and Tenn. Code Ann. § 39-13-204(i)(9) requires that a defendant "knew or reasonably should have known that such victim was a law enforcement officer, corrections official, corrections employee, . . . engaged in the performance of official duties" before he is subjected to the aggravating circumstance. (*Id.* at PageID 5640-41.) He stated that that the trial court failed to charge the *mens rea* element of the circumstance. (*Id.* at PageID 5641.) *See Hugueley*, 185 S.W.3d at 382.

---

[23] Hugueley argues Claim E in conjunction with Claim K(4), his ineffective assistance of counsel claim related to this jury instruction. (*See* ECF No. 127 at PageID 5640.)

Hugueley submits that the TSC's substitution of its determination of the critical *mens rea* element of this aggravating circumstance with that of the jury violates the clearly established federal law of *Apprendi v. New Jersey*, 530 U.S. 466 (2000), and *Ring v. Arizona*, 536 U.S. 584 (2002). (*Id.* at PageID 5642.) He contends that the facts necessary to increase the sentence are the functional equivalent of an element of the crime charged. (*Id.*) The inmate avers that because this essential element of the aggravating circumstance was omitted, the jury never found the i(9) circumstance. (*Id.* at PageID 5643.)[24]

Hugueley asserts that the TSC's decision mischaracterized trial testimony concluding that he killed Steed because of his performance in the role of a correctional employee and knowing that the victim was engaged in the performance of his official duties when Hugueley stabbed him. (*Id.*) Petitioner claims that that the TSC's determination that he admitted Steed was engaged in official duties at the time of the murder was unreasonable under 28 U.S.C. § 2254(d)(2). (*Id.* at PageID 5644.) He contends that he and Don Dunaway, an investigator for the Tennessee Department of Corrections, presented testimony about Hugueley's mental state and knowledge at the time of the killing. (*Id.*) Although the inmate referred to the victim as "Counselor Delbert Steed," he did not address his knowledge of what Steed was doing at the time of the killing. (*Id.*) Hugueley contends that his statements to Dunaway prove that he did not consider Steed to have been engaged in official duties at the time of his death. (*Id.*) The prisoner told Dunaway that Steed and "one of the little gang members that he talked to a lot there" were "just settin' there

_____

[24] This argument was not raised in the Tennessee courts and is not exhausted. Additionally, the argument was not made in the habeas petition and is inadequately pled under Habeas Rule 2(c). In the state court, Hugueley relied on *Ring* and *Apprendi* to assert that the indictment failed to charge the capital offense. *Hugueley*, 185 S.W.3d at 392-93.

laughin' and jokin'." (*Id.* at PageID 5644-45; *see* ECF No. 41-5 at PageID 792.) Hugueley had reported Steed several times and filed grievances against the counselor for not doing his job. (ECF No. 127 at PageID 5645.) Hugueley asserts that he did not kill Steed while he was engaged in his official duties but because Steed failed to fulfill his professional duties. (*Id.*) Petitioner argues that the state court determination that he "admitted that [Steed] was engaged in official duties at the time Defendant killed him" was an unreasonable determination of the facts in light of the evidence presented at trial. (*Id.*) He asserts that Steed was "engaged in inappropriate non-official conduct with various gang members at the time of his death." (*Id.* at PageID 5646.)

Petitioner insists that the TSC's harmless error determination was contrary to and an unreasonable application of clearly established federal law in *Apprendi* and *Ring*. (*Id.*) Hugueley asserts that the court violated this law when it substituted its finding of the facts for that of a jury. (*Id.*)

The inmate argues that, even if application of harmless error doctrine did not violate the Constitution, the Tennessee court's application of the harmless error rule was an unreasonable application of *Neder v. United States*, 527 U.S. 1, 18-20 (1999). (*Id.* at PageID 5647.) He observes that, in *Neder*, the United States Supreme Court found harmless error where the omitted element was supported by uncontroverted evidence. (*Id.*) However, in his case, the TSC made its decision based on an unreasonable determination of fact when there was contradictory testimony at trial. (*Id.* at PageID 5647-48.) Hugueley argues that *Neder* does not support a finding of harmlessness. (*Id.* at PageID 5648.)

The claimant further asserts that he is entitled to habeas relief because the error was not harmless under *Brecht.* (*Id.* at PageID 5649.) He claims that, if one juror had determined that he

did not know that Steed was performing official duties, then the statutory aggravating circumstance would not have applied. (*Id.*) Petitioner contends that, in Tennessee, the negation of any aggravating circumstance changes the sentencing calculus because the aggravating circumstances must outweigh the mitigating circumstances beyond a reasonable doubt. (*Id.*) He argues that no court can determine how a jury would have weighed the remaining aggravating circumstances had the i(9) circumstance not been applied, and therefore, the error was not harmless beyond a reasonable doubt under *Brecht*. (*Id.* at PageID 5649-50.)

In reply, the Warden asserts that Hugueley can "hardly demonstrate" that the erroneous instruction was not harmless under either *Chapman* or *Brecht*. (ECF No. 137 at PageID 7685.) He argues that Hugueley's knowledge of the victim's employee status was evident from the record, and the significance of this aggravating circumstance is "seriously diminished" by the fact that three other aggravating circumstances remain. (*Id.*) Respondent notes that the inmate presented "virtually no mitigation evidence to weigh against" these aggravators making the significance of the i(9) aggravating circumstance "virtually nil." (*Id.*)

The evidence at trial indicated that Hugueley was incarcerated at HCCF and that Steed was his counselor. (*See* ECF No. 41-4 at PageID 649; *see id*. at PageID 686; *see also* ECF No. 41-5 at PageID 789-90, 798-99, 829-30[25].) Hugueley noted the difference in treatment at Corrections Corporation of America and Tennessee Department of Corrections' (TDOC) facilities as he explained why he had an altercation with Steed, a correctional employee,

---

[25] Hugueley states that "[t]he State can prove at least four (4) aggravated circumstances, and there are NO legitimate mitigating circumstances." (ECF No. 41-5 at PageID 830.)

Cause, I've always been treated de[]cent in TDOC. . . . I've never had a problem or altercation with an employee. I mean, that should say something about . . . why in the hell am I going after an employee of the prison.

(*Id.* at PageID 796.)

Steed was working on the day of his murder and Hugueley was waiting to speak with the counselor. That Steed was laughing or joking with another inmate or that Hugueley disagreed with the manner in which Steed performed his duties does not negate the finding that Hugueley knew or should have known that Steed was a corrections officer engaged in the performance of his official duties. (*See* ECF No. 41-5 at PageID 819-22 (inmate grievances & request for white cellmate); *see* ECF No. 41-4 at PageID 649-50 (Hugueley's testimony about Steed); *see* ECF No. 41-7 at PageID 1183-91 (mitigation timeline documenting conflicts with Steed.) Hugueley has not demonstrated that the TSC's decision was based on an unreasonable determination of facts in light of the evidence presented.[26]

The burden on a habeas petitioner who challenges an erroneous jury instruction "is even greater than that required to demonstrate plain error on direct appeal." *Scott*, 209 F.3d at 882. "Allegations of 'trial error' raised in challenges to jury instructions are reviewed for whether they had a substantial and injurious effect or influence on the verdict, and are subject to harmless-error analysis." *Id.* (footnote omitted); *see Brecht*, 507 U.S. at 638 (noting that the harmless error standard applies to "constitutional error of the trial type"); *Coe v. Bell*, 161 F.3d 320, 335 (6th Cir.

---

[26] Petitioner did not dispute the sufficiency of the evidence related to the TSC's findings on aggravating circumstances (Claim D), and the Court determined that the TSC's decision was reasonable under *Jackson*. However, he now asserts that the TSC's decision was based on an unreasonable determination of facts in light of the evidence presented as it relates to this jury instruction.

1998) (applying the *Brecht* harmless-error standard of a substantial and injurious effect on the verdict to determine whether habeas relief was required for a jury instruction). The relevant question is whether the ailing instruction so infected the entire trial that the resulting conviction violates due process—not merely whether the instruction is undesirable, erroneous, or even "universally condemned." *Henderson v. Kibbe*, 431 U.S. 145, 154 (1977). "A habeas petitioner's burden of showing prejudice is especially heavy when a petitioner claims that a jury instruction was incomplete, because an omission, or an incomplete instruction, is less likely to be prejudicial than a misstatement of the law." *Hardaway v. Withrow*, 305 F.3d 558, 565 (6th Cir. 2002). Federal habeas courts do not grant relief, as might a state appellate court, simply because a jury instruction may have been deficient in comparison to a model state instruction. *Estelle v. McGuire*, 502 U.S. 62, 72 (1991).

In *Neder*, the Supreme Court held that an instruction that omits an essential element is not *per se* prejudicial error and the *Chapman* test applies. *Neder*, 527 U.S. at 8-11. In *Davis v. Ayala*, the Supreme Court addressed the test for trial error in a collateral proceeding,

> habeas petitioners are not entitled to habeas relief based on trial error unless they can establish that it resulted in actual prejudice. Under this test, relief is proper only if the federal court has grave doubt about whether a trial error of federal law had substantial and injurious effect or influence in determining the jury's verdict. There must be more than a reasonable possibility that the error was harmful. The *Brecht* standard reflects the view that a State is not to be put to the arduous task of retrying a defendant based on mere speculation that the defendant was prejudiced by trial error; the court must find that the defendant was actually prejudiced by the error.

*Davis v. Ayala*, 135 S. Ct. 2187, 2197-98 (2015) (internal quotations and citations omitted). Where, as here, the evidence is sufficient to demonstrate that the aggravating circumstance was satisfied, the State proved three other aggravating circumstances, and Hugueley waived the

presentation of mitigation evidence, the error in the juror instruction did not have a substantial and injurious effect or deprive the inmate of a fair trial.

The TSC's decision applying plain error review may not be entitled to AEDPA deference as an adjudication on the merits. *See Leonard*, 846 F.3d at 851(addressing ambiguity about AEDPA deference and plain error review); *see Fleming v. Metrish*, 556 F.3d 520, 532 (6th Cir. 2009) ("[T]he heart of the disagreement between ourselves and our dissenting colleague thus boils down to whether a federal constitutional claim reviewed by a state court for 'plain error' can be considered 'adjudicated on the merits' for the purpose of receiving deference under AEDPA. To our knowledge, there is no authority squarely on point that decides this key question. We are persuaded, however, that we would be acting contrary to Congress's intent to have AEDPA 'further the principles of comity, finality, and federalism,' if we simply ignored the Michigan Court of Appeals's evaluation of Fleming's Fifth Amendment claim by reconsidering the issue *de novo*.") (internal citation omitted); *see also Langford v. Warden*, 665 F. App'x 388, 389 (6th Cir. 2016) ("The crux of the Supreme Court's decision in *Ayala* is that courts on collateral review have to give a heightened degree of deference to the state court's review of a harmless error decision."). The TSC's decision is not contrary to or an unreasonable application of clearly established Supreme Court precedent and was not based on an unreasonable determination of facts in light of the evidence presented. Even on *de novo* review, the claim is without merit. Summary judgment is GRANTED, and Claim E is DENIED.

### F. Waiver of Mitigation Evidence

Hugueley alleges that the trial court erred by allowing him to waive the presentation of mitigation evidence. (ECF No. 58 at PageID 4665.) He asserts that this claim and the factual

allegations supporting it were not raised in the motion for new trial, on direct appeal, or during state post-conviction proceedings because: (1) his counsel was ineffective at trial, on appeal and during post-conviction proceedings; (2) Tennessee does not provide an adequate post-conviction remedy to raise these claims; and/or (3) the trial court denied post-conviction counsel adequate process, including but not limited to funding, resources, and time, to challenge Hugueley's competency to waive post-conviction. (*Id.* at PageID 4665-66.)

Respondent insists that this claim is procedurally defaulted and that Hugueley has conceded he did not raise it in state court. (ECF No. 112-1 at PageID 5466.) He contends that the ineffective-assistance claims on which Hugueley relies to excuse procedural default are also procedurally defaulted because the inmate waived state post-conviction review. (*Id.* at PageID 5467.) The Warden argues, based on *Edwards*, that an ineffective-assistance claim cannot serve as cause to excuse a procedural default if that claim is also procedurally defaulted. (*Id.*) *See Edwards*, 529 U.S. at 453. Respondent asserts that Hugueley's allegations of ineffective assistance do not provide a viable basis for excusing this or any other procedurally defaulted claim. (*Id.*) He also maintains that the Court must not enable Hugueley "to make good on his promise to throw a monkey wrench' into the process' by permitting review of this claim for the first time on federal habeas review via a manufactured ineffective-assistance claim that is also defaulted." (*Id.*)

Respondent asserts that this claim is inadequately pled under Habeas Rule 2(c) because Hugueley does not provide authority, argument or factual support for his conclusory assertions. (ECF No. 112-1 at PageID 5478.) The inmate has failed to plead facts supporting his claim under Habeas Rule 2(c). (*See* ECF No. 58 at PageID 4665.)

Petitioner argues that the trial court improperly allowed him to waive mitigation when it was on notice of his incompetence. (ECF No. 127 at PageID 5623.) He avers that a trial judge must conduct a competency determination where there is "a *bona fide* doubt as to a defendant's competence to stand trial." (*Id.*) Relying on *Filiaggi v. Bagley*, 445 F.3d 851, 858 (6th Cir. 2006), Hugueley claims that the test of whether a trial judge should have held a competency hearing is "whether a reasonable judge, situated as was the trial court judge whose failure to conduct an evidentiary hearing is being reviewed, should have experienced doubt with respect to competency to stand trial." (*Id.*) Hugueley argues that relevant factors to this determination include irrational behavior, demeanor in court, and medical opinions on competency. (*Id.*)

The inmate contends that the trial court had a bona fide doubt as to his competency based on his irrational behavior each time he was in court, including:

- announcing his intention to represent himself;

- attempting to plead guilty to capital murder;

- announcing "attorneys don't matter";

- accepting appointment of counsel "as long as he don't come see me. He ain't getting no help out of me";

- telling the trial court to "kiss my ass, that's all I've got to say";

- responding to his attorney's request for a psychological evaluation by erupting, "are you out of your fucking mind?";

- calling his attorney a "stupid son-of-a-bitch";

- announcing that he would not talk to his counsel, because they were "trying to drag out [his] future"; and

- stating that it was his "intention" to hamper his attorney's attempts to present a defense.

93

(*Id.* at PageID 5624; *see* ECF No. 131-20 at PageID 7509-11; *see also* ECF No. 132-1 at PageID at PageID 7522-23.)

The court approved funding for expert assistance for determining Petitioner's competency and brain scans, and Hugueley argues that the trial court's actions indicate that there was a genuine question about his competence. (ECF No. 127 at PageID 5624.) He points out that Tennessee Supreme Court Rule 13 requires a finding that there was a genuine issue necessitating an expert for the court to approve funding. (*Id.* at PageID 5625.) Hugueley argues that where there is a *bona fide* question about his competency, it violates his constitutional right to a fair trial for the trial court to fail to hold a competency hearing. (*Id.*)

Hugueley avers that the trial court's colloquy about the waiver of the presentation of mitigation evidence did nothing to determine he was competent to make such a waiver and consisted of the trial court asking him to affirm his "understanding" of legal concepts. (*Id.* at PageID 5625-26.) Petitioner contends that the colloquy did not check his capacity to assist in his defense and that the colloquy did not address his relationship with counsel, his understanding of counsel's role in the proceedings, his trust of counsel, or his ability and capacity to assist counsel. (*Id.* at PageID 5626-27.) Hugueley asserts that, "[w]here the trial court failed to make a competency determination but clearly had a *bona fide* question as to Mr. Hugueley's competency, the trial court erred in allowing Mr. Hugueley to waive presentation of mitigation evidence[,] and Mr. Hugueley was prejudiced by that error because he was not in fact competent to waive the post-conviction proceedings." (*Id.*)

The inmate relies on his argument that his ineffective assistance of counsel claims are properly before this Court to overcome the procedural default of the instant claim. (*Id.* at PageID

94

5627; *see id.* at PageID 5598-5622.)   The Warden argues that Hugueley offers nothing new to excuse the default of this claim other than a reference to the default of his ineffective assistance of counsel claims in Claims I and K.   (ECF No. 137 at PageID 7684.)   Respondent contends that Hugueley cannot establish cause to excuse the default of Claim F based on the ineffective assistance of counsel claims that are themselves procedurally defaulted.   (*Id.*)

Petitioner did not exhaust Claim F in state court.   He did not exhaust a related ineffective assistance of counsel claim and cannot rely on an ineffective assistance of counsel as cause to excuse the procedural default of Claim F.[27]

The Supreme Court in *Schriro v. Landrigan*, 550 U.S. 465, 479 (2007), stated that it had "never required a specific colloquy to ensure that a defendant knowingly and intelligently refused to present mitigating evidence."   The defendant in that case, much like Hugueley, expressed a desire to proceed with a death sentence stating, "I think if you want to give me the death penalty,

_____

[27] Hugueley's counsel put mitigation evidence on the record despite the trial court's acceptance of his client's waiver.   (*See* ECF No. 41-5 at PageID 730-37; *see* ECF No. 41-7.) Further, there is no indication that counsel was ineffective for following defendant's wishes in not presenting a mitigation case.   *See Tyler v. Mitchell*, 416 F.3d 500, 504 (6th Cir. 2005) ("[T]he Constitution does not prohibit a competent capital defendant from waiving the presentation of mitigation evidence."); *see also Ryder ex rel. Ryder v. Warrior*, 810 F.3d 724, 748 (10th Cir.), *cert. denied sub nom. Ryder v. Royal,* 137 S. Ct. 498 (2016) (finding that "counsel's decision not to investigate or present mitigating evidence was completely determined by petitioner and was within the realm of reasonable tactical decisions."); *Ramirez v. Stephens*, 641 F. App'x 312, 327 (5th Cir.), *cert. denied sub nom. Ramirez v. Davis*, 137 S. Ct. 279 (2016) (noting that "reasonable jurists would not find that trial counsel rendered ineffective assistance when counsel decided to stop their mitigation case at Ramirez's request.   Ramirez's 'directions were entitled to be followed'"); *Wood v. Quarterman*, 491 F.3d 196, 203-05 (5th Cir. 2007) (concluding there was no ineffective assistance where counsel did not request mid-trial competency determination based on defendant's decision to waive presentation of mitigation case); *Singleton v. Lockhart*, 962 F.2d 1315, 1321 (8th Cir. 1992) (ruling that in the face of a defendant's waiver of mitigating evidence, defense counsel "was under no duty" to present a mitigation case).

just bring it right on. I'm ready for it." *Id.* at 479-480. The fact that Landrigan failed to develop the claim in state court prevented the district court from granting an evidentiary hearing. *Id.* at 479. Much like Landrigan, Hugueley prevented the presentation of mitigation evidence at the trial court level and continued to thwart the presentation of that evidence on state post-conviction review, resulting in a failure to exhaust his claims.

To the extent the inmate may contend that ineffective assistance of post-conviction counsel establishes cause to excuse the procedural default, *Martinez* does not apply to this trial error claim. Hugueley has not otherwise established cause and prejudice or actual innocence to overcome the procedural default of his trial error claim. Summary judgment is GRANTED, and Claim F is DENIED based on procedural default.

Further, Hugueley has not shown that he was not competent at trial. The outbursts cited occurred at the arraignment on May 9, 2002, and a motion hearing on December 4, 2002. (*See* ECF No. 121-20 at PageID 7506; *see* ECF No. 132-1 at PageID 4509.) His trial was more than nine months later in September 2003, and he was determined to be competent to stand trial. (*See* ECF No. 41-4 at PageID 625.) Hugueley does not dispute his competence to testify or to stand trial, but only his competence to waive mitigation. He has not pointed to behavior, demeanor, or outbursts at trial that might have alerted the court about his competence. Further, Hugueley was determined to be competent in subsequent testing despite his unwillingness to participate in mental evaluations and pursue post-conviction and appellate relief from his death sentence.[28]

---

[28] The first expert report opining that Hugueley was incompetent to stand trial was written on September 17, 2014, by George Woods, M.D. based on his evaluations of Hugueley in 2001, 2011, 2013, and 2014. (*See* ECF No. 127-4 at PageID 5788.)

Courts have found that uncooperativeness and even outbursts from defendants do not equate to incompetence or concerns about mental capacity. In *Allen v. Sec'y, Florida Dep't of Corr.*, 611 F.3d 740, 765 (11th Cir. 2010), the Eleventh Circuit noted that the fact the defendant chose death was his right:

> Allen, a mentally competent, intelligent defendant, having been convicted of a brutal murder, faced life imprisonment or death. Insisting on doing things his way, he chose death and prevented his counsel from attempting to secure a life sentence through the development and presentation of mitigating circumstances evidence. That is not a choice that most people would have made, but it is one that he had the right to make, and he made it voluntarily and with full awareness of the consequences.

The Sixth Circuit in *Cowans v. Bagley*, 639 F.3d 241 (6th Cir. 2011), found it reasonable for the trial court not to order a competency exam based on the defendant's demeanor at trial,

> Also unavailing is Cowans' challenge to the district court's decision not to order him to undergo a competency examination. If before or during trial "sufficient doubt" arises about a defendant's competence—"the capacity to understand the nature and object of the proceedings against him, to consult with counsel, and to assist in preparing his defense"—the trial court should order a competency hearing. "There are, of course, no fixed or immutable signs" of incompetence, the standard is a high one, and the relevant factors—"evidence of a defendant's irrational behavior, his demeanor at trial, and any prior medical opinion on competence"—"are difficult to evaluate." These open-ended standards and the high threshold for establishing incompetence give state courts wide latitude in a habeas case. When virtually everything is potentially relevant and nothing is dispositive, reasonable minds occasionally may come to different conclusions about whether to hold a competency hearing.
>
> That at most is what happened here. Although Cowans' demeanor at trial and his decision not to present mitigating evidence raised concerns about his mental capacity, the state appellate courts determined that the trial court did not have to order a competency exam, a reasonable determination in view of the universe of relevant circumstances. None of Cowans' outbursts suggested he was "incompetent," meaning incapable of understanding the nature of the charges against him or assisting in his defense. Cowans has no significant mental history, whether before the trial or since. At the guilt phase of the trial, he showed himself capable of self control and did not have any outbursts. His outbursts before trial and

at the penalty phase also were not irrational, as they coincided with negative developments in the proceedings. His behavior—requesting new counsel and angry outbursts at the jury, judge and counsel—could be read in one of two ways: as evidence of mental incompetence or of an angry, hostile personality. The trial court, which had the benefit of interacting with Cowans, concluded that he acted out of pique, not out of mental incompetence. That was a reasonable determination on this record.

Nor does the evidence obtained since trial undermine the trial court's decision.

*Cowans*, 639 F.3d at 247-48 (citations omitted).

The record indicates that the psychologist found Hugueley competent although he may suffer some disorders. (*See* ECF No. 41-4 at PageID 625.) He always insisted that he was guilty and that he wanted the death penalty. (*Id.* at PageID 631.) There is no indication from the trial transcript that Hugueley was incompetent to waive the presentation of mitigation or that the trial court committed a constitutional error.

Claim F is procedurally defaulted, without merit, and DENIED.

## G.  Weighing of Aggravating & Mitigating Circumstances

Petitioner asserts that the proof presented for the aggravating circumstances was insufficient to outweigh the mitigating circumstances "presented in the guilt/innocence portion of the trial." (ECF No. 58 at PageID 4666.) The TSC addressed this claim on direct appeal. (*See id.*) The court opined:

### C. Aggravating Circumstances Outweigh Mitigating Circumstances

After the close of the State's proof during the sentencing phase of Defendant's trial, and while the jury was out, the trial court questioned Defendant about his decision regarding the presentation of proof of mitigating circumstances. Defendant stated that he did not want his lawyers to present any proof of mitigating circumstances. Furthermore, Defendant chose not to testify on his own behalf during the sentencing phase. Accordingly, the defense presented no proof during

the sentencing phase of Defendant's trial of any mitigating circumstances that might counteract the State's proof of aggravating circumstances. The only proof in the nature of mitigating circumstances presented during the guilt phase of Defendant's trial was Defendant's testimony about how the victim had treated him.

We conclude that the State's proof of aggravating circumstances outweighs any mitigating circumstances beyond a reasonable doubt.

*See Hugueley*, 185 S.W.3d at 383.

The Warden argues that the TSC's determination was not contrary to or an unreasonable application of clearly established federal law and was based on a reasonable determination of facts and that Hugueley's claim is inadequately pled and should be dismissed under Habeas Rule 2(c). (ECF No. 112-1 at PageID 5458, 5478.)   Respondent asserts that Hugueley offers no argument or factual basis to support his claim and has not disclosed what mitigation facts or evidence stack against or outweigh the applicable aggravating circumstances.   (*Id.*)   Without any explanation of his objection to the state court's decision, the Warden insists that Hugueley has not shown that the decision was unreasonable.   (*Id.* at PageID 5458.)

The inmate has failed to plead facts supporting his claim under Habeas Rule 2(c).   (*See* ECF No. 58 at PageID 4666.)   Further, he has not presented an argument for Claim G in opposition to the motion for summary judgment.

Like for Claim D, *Jackson v. Virginia*, is the relevant Supreme Court precedent to analyze the sufficiency of the evidence related to the weighing of aggravating and mitigating circumstances.   There was sufficient proof of the four aggravating circumstances, *see* supra pp. 74-80, and the only potentially mitigating evidence presented to the jury was Hugueley's statements about his conflicts with Steed.   *Hugueley*, 185 S.W.3d at 383.   The evidence was more than sufficient to permit a rational trier of fact to find that the aggravating circumstances

outweighed the mitigating circumstances beyond a reasonable doubt. The TSC's decision is not contrary to or an unreasonable application of clearly established Supreme Court precedent and is based on a reasonable determination of facts in light of the evidence presented. Summary judgment is GRANTED, and Claim G is DENIED.

## H.      Death is a Disproportionate Penalty

Hugueley asserts that the death sentence is disproportionate to the penalty imposed in similar cases and incorporates by reference the TSC's decision on direct appeal without further explanation. (ECF No. 58 at PageID 4666.) The TSC conducted a proportionality review to identify "aberrant, arbitrary, or capricious sentencing by determining whether the death sentence is 'disproportionate to the punishment imposed on others convicted of the same crime.'" *Hugueley*, 185 S.W.3d at 384 (citing *State v. Bland*, 958 S.W.2d 651, 662 (Tenn. 1997)). The court noted the relevant factors,[29] considered other cases, and stated that it had upheld the death penalty in numerous cases where the sole aggravating circumstance was the defendant's prior conviction of a

---

[29] The TSC defined the factors to be consider in the proportionality review of Hugueley's sentence,

> In reviewing the applicable pool of cases, we consider numerous factors regarding the offense: 1) the means of death; (2) the manner of death; (3) the motivation for the killing; (4) the place of death; (5) the victim's age, physical condition, and psychological condition; (6) the absence or presence of premeditation; (7) the absence or presence of provocation; (8) the absence or presence of justification; and (9) the injury to and effect upon non-decedent victims. In addition, we consider numerous factors about the defendant: (1) prior criminal record or activity; (2) age, race, and gender; (3) mental, emotional, and physical condition; (4) role in the murder; (5) cooperation with authorities; (6) level of remorse; (7) knowledge of the victim's helplessness; and (8) potential for rehabilitation.

*Hugueley*, 185 S.W.3d at 384 (citation omitted).

violent felony offense and also where the jury applied the heinous, atrocious, and cruel aggravating circumstance for the stabbing death of a victim. *Id*. at 384-87. The TSC determined that Hugueley's sentence was "not excessive or disproportionate." *Id.* at 387.

The Warden argues that comparative proportionality review is not constitutionally mandated. (ECF No. 112-1 at PageID 5458.) He insists that the TSC's comparative proportionality review was not contrary to or an unreasonable application of clearly established federal law or based on an unreasonable determination of facts. (*Id.*) Respondent contends that the court reasonably applied *Pulley v. Harris*, 465 U.S. 37 (1984), to conclude that the capital sentence was not arbitrary where Hugueley:

> (1) armed himself with a weapon he had created specifically to use against another human being; (2) walked up behind the seated and unarmed victim, a corrections counselor, and began repeatedly stabbing him, aiming initially for the victim's vital organs; (3) stabbed the victim thirty-six times; (4) committed the killing intentionally and with premeditation; (5) expressed no remorse for the killing; (6) made clear that he would commit the killing again if given the opportunity; and (7) had killed two other persons and attempted to kill a third person.

(*Id.* at PageID 5459.) Respondent notes that Hugueley has offered no argument or factual basis to support this claim and has not shown that the TSC's decision was unreasonable. (*Id.*)

Respondent further maintains that the claim is not cognizable because proportionality review is not constitutionally required under *Pulley* and that the argument pertains solely to the state court's application of Tennessee's capital sentencing statute. (*Id.* at PageID 5474-76.) The Warden avers that the claim is inadequately pled under Habeas Rule 2(c) because Hugueley provides no authority, argument, or factual support that his sentence is disproportionate to the penalty in similar cases. (*Id*. at PageID 5479.)

In response to the motion for summary judgment, Petitioner states that he is entitled to habeas relief on this claim because the Tennessee court considered race in making the determination. (ECF No. 127 at PageID 5660.) He observes that clear Supreme Court precedent forbids the consideration of race in sentencing decisions. (*Id.* at PageID 5660-61.) The inmate cites *Rose v. Mitchell*, 443 U.S. 545, 555 (1979), to assert that "[d]iscrimination on the basis of race, odious in all aspects, is especially pernicious in the administration of justice." (*Id.* at PageID 5661.) He references *Batson* to argue that the United States Supreme Court has "committed itself to 'unceasing efforts' seeking to eradicate from the criminal justice process any consideration of race." (*Id.* at PageID 5660.) Relying on *Zant v. Stephens*, 462 U.S. 862 (1983), Petitioner maintains that the United States Supreme Court explicitly prohibits consideration of race during a sentencing decision. (*Id.* at PageID 5661.) Hugueley contends that the TSC disregarded the Supreme Court's admonition on eradicating racial prejudice in the criminal justice process when performing proportionality review in a capital case and "includ[ing] in its calculus intuitive feelings its members harbor respecting the defendant's race." (*Id.*)

Hugueley claims that Tennessee's proportionality review is contrary to clearly established federal law. (*Id.*) He notes that Tennessee Code Annotated § 39-13-206(c)(1)(D) requires a direct review of a capital case to determine whether a death sentence is excessive or disproportionate to the sentence imposed in similar cases considering the nature of the crime and the defendant. (*Id.* at PageID 5662.) The inmate argues that the TSC considered the defendant's race in its review, admitted that the review was not an "objective test," and that it did not employ "mathematical or scientific techniques." (*Id.*) According to Petitioner, to assist the appellate court with review, the trial court provided a form that specifically asked his race, and in

102

performing the review, the TSC stated that it would consider various factors including Hugueley's race.   (*Id.* at PageID 5663.)   The inmate contends that it cannot be disputed that race entered into the decision that his death sentence was proportionate to sentences given others in Tennessee. (*Id.*)   He asserts that "[w]hile injecting racial predilections into any capital sentencing decision offends the Federal Constitution, incorporating such biases in proportionality review unequivocally violates clearly established federal law."   (*Id.*)

To bolster his argument that his sentence was disproportionate to the penalty in similar cases, he cites three cases in which the defendant was given a life sentence where a prison guard or correctional officer was killed.   (*Id.* at PageID 5663-64.)

The Warden asserts that Hugueley fails to respond to the argument that this claim does not present a cognizable basis for federal habeas review because comparative proportionality is not required by the Constitution.   (ECF No. 137 at PageID 7685.)   Respondent contends that without such a response, he is entitled to summary judgment on this claim.   (*Id.* at PageID 7686.)   He maintains that the egregious nature of Hugueley's crime and the aggravating factors is evident, that "[h]e has killed twice before and finally received a capital sentence after repeatedly stabbing a prison counselor with a homemade weapon."   (*Id.*)

The comparative proportionality review that the TSC conducted to determine whether the death sentence was imposed in an arbitrary fashion is not constitutionally mandated.   The United States Supreme Court has held that the Constitution does not require proportionality review, but only requires proportionality between the punishment and the crime, not between the punishment in this instance and that exacted in other cases.   *Pulley*, 465 U.S. at 50.   "There is no federal constitutional requirement that a state appellate court conduct a comparative proportionality

103

review." *McQueen v. Scroggy*, 99 F.3d 1302, 1333-34 (6th Cir. 1996)*, overruled on other grounds by In re Abdur'Rahman*, 392 F.3d 174 (6th Cir. 2004); *see Hall v. Bell*, No. 2:06-CV-56, 2010 WL 908933, at *44-45 (E.D. Tenn. Mar. 12, 2010) (noting that a comparative proportionality review by state appeals courts is not dictated by the Constitution). The Supreme Court has generally rejected claims that a petitioner's death sentence is disproportionate to the sentences received by individuals convicted of similar crimes. *See, e.g., McCleskey v. Kemp*, 481 U.S. 279, 306 (1987) ("[W]here the statutory procedures adequately channel the sentencer's discretion [in imposing the death penalty], such proportionality review [of a death sentence to sentences imposed in similar cases] is not constitutionally required."); *Proffitt v. Florida*, 428 U.S. 242, 254 (1976) (rejecting challenge based on prosecutor's discretion); *Gregg v. Georgia*, 428 U.S. 153, 199 (1976) (rejecting claim that discretionary decision making with respect to the imposition of capital punishment, including the fact that "the state prosecutor has unfettered authority to select those persons whom he wishes to prosecute for a capital offense and to plea bargain with them," violates the Eighth Amendment). "Since proportionality review is not required by the Constitution, states have great latitude in defining the pool of cases used for comparison"; therefore, "limiting proportionality review to other cases already decided by the reviewing court in which the death penalty has been imposed" falls within this wide latitude. *Williams v. Bagley*, 380 F.3d 932, 962-63 (6th Cir. 2004) (citing seven prior Sixth Circuit cases that have upheld Ohio's limited proportionality review against constitutional challenges); *see Smith v. Mitchell*, 567 F.3d 246, 261 (6th Cir. 2009) (finding that the Sixth Circuit has rejected habeas challenges to Ohio's system of proportionality review); *see also Coe*, 161 F.3d at 351-52 (explaining that the

Tennessee mandatory death-penalty review statute did not create a liberty interest or a due process right in proportionality review).

Hugueley failed to plead race as an impermissible factor or make an equal protection claim in his Second Amended Petition. This aspect of his proportionality review claim is inadequately pled under Habeas Rule 2(c).

Further, the mere consideration of race as a factor to determine the proportionality of Hugueley's sentence to sentences in similar case is not discriminatory. Comparative proportionality review is considered "an additional safeguard against arbitrary or capricious sentencing" and used to prevent the consideration of impermissible factors in sentencing. *See Pulley*, 465 U.S. at 45. Race was not an issue in the comparison cases used by the TSC for proportionality review. *See Hugueley*, 185 S.W.3d at 384-87. The TSC focused on cases were the death sentence was imposed for the murder of a corrections officer or employee, a deputy, and a fellow inmate; where the sole aggravating circumstance was the defendant's prior conviction of a violent felony offense; and where the victim was stabbed to death and the jury applied the heinous, atrocious, or cruel aggravating circumstance. *Id.* Based on these legitimate factors, the TSC found that Hugueley's death sentence was proportionate. There has been no constitutional violation.

Summary judgment is GRANTED, and Claim H is DENIED.

## I.      Ineffective Assistance of Counsel – Investigation, Preparation & Penalty Phase Defense (Claims I & K)

In response to the motion for summary judgment, Petitioner argues Claims I and K jointly asserted that his trial counsel were ineffective for failing to investigate and present proof that he

was incompetent to stand trial and to waive the presentation of mitigation evidence.  (ECF No. 127 at PageID 5551.)

In Claim I, Hugueley alleges that his counsel rendered ineffective assistance in their investigation of and preparation for his capital case.  (ECF No. 58 at PageID 4666.)  He claims that his trial attorneys Michie Gibson and T.J. Jones failed to:

1. fully investigate, raise, and litigate his competency to waive the presentation of mitigating evidence;

2. investigate and discover the issues that were crucial to determining whether Hugueley was competent to stand trial, assist in his defense, and waive mitigation;

3. fully investigate his social history in compliance with the American Bar Association Guidelines for the Appointment and Performance of Defense Counsel in Death Penalty Cases;

4. retain the proper experts for pre-trial consultation; and

5. investigate the circumstances surrounding Hugueley's prior violent convictions which were used to support the statutory aggravating circumstances, including the investigation of the deaths of his mother and James Shelton and the circumstances surrounding the attempted murder of Timerall Nelson.

(*Id.* at PageID 4666-72.)  The inmate contends that his counsel would have discovered that he was incompetent to waive mitigation and that there was a reasonable probability that the jury would not have convicted him of first-degree murder and/or sentenced him to death had his counsel performed the tasks described above.  (*See id.* at PageID 4666-72.)

In Claim K, Hugueley alleges that his counsel rendered ineffective assistance in their defense at the penalty phase by failing to:

1. fully investigate his social history in compliance with the American Bar Association Guidelines for the Appointment and Performance of Defense Counsel in Death Penalty Cases;

2. investigate and challenge the validity of any of Hugueley's convictions for prior violent crimes which were used as aggravating circumstances during the penalty phase;

3. move for a hearing and establish that Hugueley was incompetent to waive the presentation of mitigation evidence; and

4. object to the trial court's confusing and unconstitutional instruction to the jury regarding the aggravating circumstance where a correction employee is a victim.

(*Id.* at PageID 4673-76.)

Petitioner claims that had his counsel investigated, they would have discovered:

- he was incompetent to waive the presentation of mitigating evidence;
- he used PCP, marijuana and alcohol, severely impacting his cognitive processing on the day that he shot his mother;
- He was unable to form the necessary mental state required for first degree murder;
- He was insane at the time of these incidents;
- He was not competent to stand trial;
- He was not competent to enter a plea;
- He was misinformed that his brain tumor was fatal and pled guilty only because he believed death was imminent;
- With Nelson, he was acting in self-defense; and
- The grand juries that indicted Hugueley were improperly constituted because blacks and women had been systematically excluded as grand jury forepersons.

(*Id.* at PageID 4674-76.)

## 1. The *Strickland* Standard

A claim that ineffective assistance of counsel has deprived a habeas petitioner of his Sixth Amendment right to counsel is controlled by the standard stated in *Strickland v. Washington*, 466 U.S. 668 (1984). To demonstrate deficient performance by counsel, a petitioner must demonstrate that "counsel's representation fell below an objective standard of reasonableness." *Strickland*, 466 U.S. at 687–88. "A court considering a claim of ineffective assistance must apply a 'strong presumption' that counsel's representation was within the 'wide range' of reasonable

professional assistance." *Richter*, 562 U.S. at 104 (citing *Strickland*, 466 U.S. at 689). "The challenger's burden is to show 'that counsel made errors so serious that counsel was not functioning as the "counsel" guaranteed the defendant by the Sixth Amendment.'" *Id.* (quoting *Strickland*, 466 U.S. at 687). To demonstrate prejudice, a prisoner must establish "a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." *Strickland*, 466 U.S. at 694.[30] "A reasonable probability is a probability sufficient to undermine confidence in the outcome." *Id.* "It is not enough 'to show that the errors had some conceivable effect on the outcome of the proceeding.'" *Richter*, 562 U.S. at 104 (quoting *Strickland*, 466 U.S. at 693). "Counsel's errors must be 'so serious as to deprive the defendant of a fair trial, a trial whose result is reliable.'" *Id.* (quoting *Strickland*, 466 U.S. at 687). "Surmounting *Strickland*'s high bar is never an easy task." *Padilla v. Kentucky*, 559 U.S. 356, 371 (2010).

### 2. Procedural Default

Hugueley states that Claims I and K were not raised in the state court proceedings because: (1) his post-conviction counsel were ineffective; (2) Tennessee does not provide an adequate post-conviction remedy; and (3) the trial court denied him adequate process to challenge his competence to waive post-conviction, including funding resources and time to assert the challenge. (ECF No. 58 at PageID 4672, 4677.)

------

[30] "[A] court need not first determine whether counsel's performance was deficient before examining the prejudice suffered by the defendant." *Strickland*, 466 U.S. at 697. If a reviewing court finds a lack of prejudice, it need not determine whether, in fact, counsel's performance was deficient. *Id.*

The Warden argues that Hugueley cannot be permitted to manufacture a winning ineffective assistance claim by sabotaging his defense and that the Court should not enable him to "throw a 'monkey wrench' into the process if his request was not honored."  (ECF No. 112-1 at PageID 5468, 5471.)  *See Hugueley*, 2011 WL 2361824, at *17.  Respondent submits that the Court should deny these claims as procedurally defaulted if it declines to find them time barred or subject to dismissal based on the Warden's motion to dismiss.  (ECF No. 112-1 at PageID 5468, 5471.)

The Warden asserts that Claims I(1 & 2) and K(3) related to Hugueley's competence and the waiver of mitigation are procedurally defaulted.  (ECF No. 137 at PageID 7669.)  He contends that the inmate had no right to post-conviction review, to post-conviction counsel, or to dictate the manner in which he would be allowed to waive post-conviction proceedings.  (*Id.* at PageID 7669-70.)  Respondent argues that Hugueley's arguments to overcome the procedural default address "the adequacy and reliability of the resources and process afforded to determine his competency" and that a state court's determination of competence is a factual finding owed deference.  (*Id.*)

Respondent insists that the state court's findings must be upheld unless there is clear and convincing evidence to the contrary.  (*Id.*)  This Court's review of Hugueley's competence to waive post-conviction review, says the Warden, is confined to the state court record.  (*Id.*)

Relying on *Richter*, Respondent asserts that habeas relief is precluded so long as fair-minded jurists could disagree on the correctness of the state court decision.  (*Id.*)  He states that the TCCA offered an in-depth discussion on its finding that Hugueley was competent to waive post-conviction review, reasonably deemed him competent to waive post-conviction

109

review, and determined that his waiver was knowing, voluntary, and intelligent. (*Id.* at PageID 7671-79.) *See Hugueley*, 2011 WL 2361824, at *36-43.

Respondent notes that Hugueley's challenge to the state court's competency determination is not a claim in the federal habeas petition. (*Id.* at PageID 7679.) He claims that the inmate's challenge to the competency determination as it relates to the adequacy of state post-conviction proceedings is not an issue that is cognizable on federal habeas review. (*Id.* at PageID 7679-80.)

With regard to the ineffective assistance allegations in Claims I(4) and K(2) about his prior violent convictions, the Warden maintains that the new evidence Hugueley offers to excuse the procedural default does not establish the merits of these ineffective assistance claims. (ECF No. 127 at PageID 7684.) Respondent relies on the state court's competency determination and contends that Hugueley's default "is solely a product of his decision to forego asserting these claims in state court." (*Id.*)

### a. The State Court Claims

The Warden contends that Claims I and K were not raised in the motion for new trial, on direct appeal, or during the state post-conviction proceedings. (ECF No. 58 at PageID 4672, 4677.) He asserts that Claims I and K first "appeared under Claims 7 through 10 of the amended post-conviction petition." (ECF No. 137 at PageID 7682; *see* ECF No. 42-1 at PageID 1643-47.)

Hugueley's counsel filed an Amended Petition for Post-Conviction Relief on January 3, 2007, which raised several ineffective assistance claims. (*See* ECF No. 42-1 at PageID 1622-82.) Claims 7 through 10 addressed ineffective assistance related to the guilt phase defense including counsel's failure to present evidence of the inmate's diminished capacity, brain damage, mental illness, and lifelong trauma (social history). (*Id.* at PageID 1641-42.)

110

In Claim 14 of that petition, Hugueley alleged that his counsel were ineffective for failing to move for a hearing on his competency to stand trial and to waive presentation of mitigation evidence. (*Id.* at PageID 1643.) The claim asserts that he suffered brain damage and mental illness, which "affect his capacity to make knowing, intelligent, voluntary, and competent decisions regarding his legal affairs." (*Id.* at PageID 1644.) The petition notes Hugueley's head injuries, brain surgery, CT scan, threats to harm himself, behaviors and psychological problems, and psychiatric treatment. (*Id.* at PageID 1644-47.) He argued that

> [c]ounsel were aware that Mr. Hugueley is prone to paranoid ideation and transient psychotic symptoms when under stress. He has a history of impulsivity which is likely biologically based; he suffers a severe mental disease as well. Mr. Hugueley's judgment and impulse control are severely impaired on a continuing basis.

> Nonetheless, counsel did not move for a competency hearing prior to trial or before Mr. Hugueley was permitted to waive presentation of mitigating circumstances. Counsel did not inform Mr. Hugueley of the full results of the limited mitigation investigation performed before the trial, thus precluding him from making a knowing, intelligent, and voluntary waiver of his right to present mitigating evidence. It has only been since he was sentenced to death that Mr. Hugueley has been provided with the results of that investigation.

> Mr. Hugueley was in fact incompetent to stand trial and to waive mitigation, which would have been discovered had appropriate measures been taken.

(*Id.* at PageID 1647.)

This claim is essentially the same as Claim I(1 & 2), and Claim K(3) also addresses the social history aspects raised in Claims I(3) and K(1). Hugueley waived these claims in the state post-conviction proceedings. Evidence was developed in the post-conviction proceedings about his competence, and his refusal to cooperate with experts prevented the further development of evidence. The reason for the state court's failure to hear these claims was Hugueley's desire to

withdraw them, and his subsequent failure to exhaust the claims at the appellate level. (*See* ECF Nos. 43-7 & 43-12.) *See Hugueley*, 2011 WL 2361824, at *3-26.

When he attempted to revoke his waiver of the post-conviction proceedings after the time period had expired, the TCCA found that Hugueley's "decision to resume post-conviction proceedings may be understood as a part of the Petitioner's continuing course of conduct of attempting to manipulate the system and protest the conditions of his incarceration." *Id.* at *20. The court noted that he sought post-conviction relief to continue visitation with his girlfriend and spread feces on the walls to protest jail conditions. *Id.* The TCCA said Hugueley "now seeks to protest the limitation placed by the prison on his telephone use by seeking to resume post-conviction proceedings." *Id.*

Additionally, the TCCA addressed the denial of the funding for experts stating:

> The post-conviction court found that the Petitioner had no constitutional right to expert assistance in preparing for his competency hearing and that he was not entitled to funding for his requested experts pursuant to Tennessee Supreme Court Rules. Under Rule 15, section 5(b)(1), counsel must make "every effort" to locate and retain experts within 150 miles of the court. The post-conviction court denied funding for a neuropsychologist, neuropsychiatrist, and pharmacologist because counsel failed to sufficiently set forth their efforts to locate experts within 150 miles of the court. With respect to the Petitioner's request for a pharmacologist, the court also determined that a psychiatrist or neuropsychologist should have sufficient expertise to address any issues that might arise regarding psychiatric drugs. The court denied the request for brain-imaging because current brain imaging technology would not have been available to the Petitioner's trial counsel. The court further found that any evidence that might be gleaned from the use of such imaging would not be relevant to an ineffective assistance of counsel claim. However, the court did not address the need for neurological imaging with regard to ascertaining the Petitioner's competency.

*Id.* at *22.

The TCCA noted the post-conviction court's efforts to evaluate Hugueley's competency by initially choosing two experts, the situation with Hutson being mistakenly compensated by the State, Brown's inability to complete the evaluation in a timely manner, and the subsequent appointment of Seidner as an expert. *Id.* The TCCA acknowledged that *Ake v. Oklahoma*, 470 U.S. 68, 77 (1985), established a right to access to a "competent psychiatrist who will conduct an appropriate examination and assist in evaluation, preparation, and presentation of the defense." *Hugueley*, 2011 WL 2361824, at *23 (citing *Ake*, 470 U.S. at 83). The court recognized that *Panetti* establishes a "defendant's right to be heard and presented rebuttal evidence with respect to a[] court-appointed expert's competency determination," but found that it did not "create a constitutional guarantee of funding for a rebuttal expert of the Petitioner's choosing." *Id.* at *23-24. The court also noted that Hugueley had no constitutional right to the appointment or the effective assistance of post-conviction counsel and declined "the Petitioner's invitation to overlook the express absence of each of these rights to suddenly create an ancillary constitutional right at a competency hearing to the mental health experts and testing of his choosing." *Id.* at *24.

### b. *Martinez*

Hugueley failed to exhaust any ineffective assistance claims in the state courts and relies on *Martinez v. Ryan*, 566 U.S. 1, 17 (2012), in part, to overcome the procedural default. Specifically, he asserts that ineffective assistance of post-conviction counsel caused the procedural default of the following substantial claims of ineffective assistance of trial counsel related to his competence and the waiver of the presentation of mitigation evidence: Claims I(1), I(2), and K(1)(a), related to proof of Hugueley's incompetence and waiver of the presentation of mitigation evidence. (ECF No. 127 at PageID 5616-17.)

113

In 2012, the Supreme Court rendered its decision in *Martinez*, which recognized a narrow exception to the rule stated in *Coleman*, "[w]here, under state law, claims of ineffective assistance of trial counsel must be raised in an initial-review collateral proceeding . . . ." *Martinez*, 566 U.S. at 17. In such cases, "a procedural default will not bar a federal habeas court from hearing a substantial claim of ineffective assistance of counsel if, in the initial-review collateral proceeding, there was no counsel or counsel in that proceeding was ineffective." *Id.* The Supreme Court emphasized that "[t]he rule of *Coleman* governs in all but the limited circumstances recognized here. . . . It does not extend to attorney errors in any proceeding beyond the first occasion the State allows a prisoner to raise a claim of ineffective assistance at trial . . . ." *Id.* at 16. The requirements that must be satisfied to excuse a procedural default under *Martinez* are:

> (1) the claim of "ineffective assistance of trial counsel" was a "substantial" claim[31]; (2) the "cause" consisted of there being "no counsel" or only "ineffective" counsel during the state collateral review proceeding; (3) the state collateral review proceeding was the "initial" review proceeding in respect to the "ineffective-assistance-of-trial-counsel claim"; and (4) state law requires that an "ineffective assistance of trial counsel [claim] . . . be raised in an initial-review collateral proceeding."

*Trevino v. Thaler*, 133 S. Ct. 1911, 1918 (2013) (quoting *Martinez*, 566 U.S. at 12-18)) (emphasis and revisions in the original).

In *Trevino*, 133 S. Ct. at 1921, the Supreme Court extended its holding in *Martinez* to states in which a "state procedural framework, by reason of its design and operation, makes it highly

---

[31] To be "substantial" under *Martinez*, a claim must have "some merit" based on the controlling standard for ineffective assistance of counsel stated in *Strickland*. *Martinez*, 566 U.S. at 14; *see Miller-El v. Cockrell*, 537 U.S. 322, 336 (2003) ("[R]easonable jurists could debate whether (or, for that matter, agree that) the petition should have been resolved in a different manner or that the issues presented were adequate to deserve encouragement to proceed further.")

unlikely in a typical case that a defendant will have a meaningful opportunity to raise a claim of ineffective assistance of trial counsel on direct appeal . . . ." Thus, the decision in *Trevino* modified the fourth requirement under *Martinez* for overcoming a procedural default. In *Sutton v. Carpenter*, 745 F.3d 787 (6th Cir. 2014), the Sixth Circuit held that ineffective assistance of state post-conviction counsel can establish cause to excuse a Tennessee prisoner's procedural default of a substantial federal habeas claim that his trial counsel was constitutionally ineffective.

The Warden asserts that *Martinez* does not apply to these defaulted ineffective assistance claims because the default is not attributable to post-conviction counsel. (ECF No. 137 at PageID 7682.) He argues that Hugueley's desire to waive collateral review proceedings is documented in the state court record. (*Id.*) Thus, Respondent contends that Hugueley's claims fall outside the purview of *Martinez*. (*Id.* at PageID 7682-83.)

Further, Respondent insists that Hugueley cannot establish that these claims are substantial under *Martinez*. (*Id.* at PageID 7683.) He contends that counsel investigated Hugueley's competency and deemed him competent to stand trial. (*Id.*) Trial counsel filed a substantial mitigation report including copious details about Hugueley's social, criminal, and psychological history. (*Id.*) Respondent notes that the only apparent impediment to Hugueley's trial and appellate counsel's investigation was his refusal to communicate or cooperate with counsel or experts. (*Id.*) Consequently, Hugueley's counsel cannot be faulted for relying on the experts who they consulted, and Hugueley should not be allowed to benefit from his decision to waive the presentation of claims or evidence in state court. (*Id.*) Respondent further argues that the inmate has failed to timely disclose any evidence now offered in support of his defaulted ineffective assistance claims. (*Id.*)

115

Hugueley maintains that his post-conviction counsel were ineffective in developing these claims. He contends that his post-conviction counsel's constitutionally inadequate representation prevented him from having the necessary evidence and expert assistance, including brain scans, to prove these ineffective assistance of trial counsel claims. (*Id.* at PageID 5615.) He asserts that because his post-conviction counsel failed to adhere to the state rules for funding experts, the state court denied the requests for brain scans and expert assistance. (*Id.*) Hugueley focuses on the post-conviction court's denial of funding for a neuropsychologist, neuropsychiatrist, and pharmacologist because counsel failed to set forth their efforts to locate experts within 150 miles of the court. (*Id.*) *See Hugueley*, 2011 WL 2361824, at *21. He claims that his post-conviction counsel's failures to located qualified experts within the geographic region specified by the Tennessee rules and provide documentation of those efforts constitute deficient performance, and counsel did not have any strategic reason for failing to comply with the Tennessee rules. (*Id.* at PageID 5615-16; *see* ECF No. 130-20 at PageID 7413-15.)

Petitioner contends that the post-conviction court denied brain imaging based on the erroneous belief that brain imaging technology would not have been available to him at the time of his trial. (ECF No. 127 at PageID 5616.) He notes that, in 2003, the trial court signed an order allowing MRI scans, and he faults his post-conviction counsel for failing to correct the trial court's misinformation about the relevance of scans in the post-conviction proceedings. (*Id.*) He cites the report of Siddhartha Nadkarni showing, with medical certainty,that congenital or developmental malformations existed in Hugueley's brain before his trial. (*Id.*; ECF No. 127-5 at PageID 5836 ("This brain abnormality is likely is developmental in nature - having affected his behavior since early in life—if not since birth.").)

The inmate claims that *Martinez* applies where post-conviction counsel failed to develop the evidentiary basis of a claim of ineffective assistance of trial counsel. (ECF No. 127 at PageID 5617.) He maintains that the brain scans would have allowed him to show that he was incompetent to stand trial, that his ineffective assistance of trial counsel claims were substantial, and also that he was irreparably prejudiced by post-conviction counsel's deficient performance. (*Id*. at PageID 5618.)

Hugueley's post-conviction counsel clearly raised claims that his trial counsel were ineffective for failing to move for a hearing about his competence to stand trial and waive the presentation of mitigation evidence (Claim 14). (*See* ECF No. 42-1 at PageID 1643.) The petition raised issues about brain damage, head injuries, brain surgery for a tumor, psychological problems, evaluations, and treatment. (*Id.* at PageID 1644-47.) As stated supra, multiple attempts were made to evaluate Hugueley's competence in the post-conviction proceedings resulting ultimately in a determination that he was competent to waive post-conviction proceedings and ending consideration of his ineffective assistance of trial counsel claims. *See Hugueley*, 2011 WL 2361824, at *3-20.

Although Petitioner's post-conviction counsel raised the ineffective assistance of trial counsel claims, his waiver prevented the development of those claims despite counsel's efforts to establish that he was incompetent to waive post-conviction review. Hugueley was determined to be competent at the time of trial and in the post-conviction proceedings. The only available evidence that is contrary to those determinations is George Woods' report in 2014, after the post-conviction trial and appellate proceedings concluded. (*See* ECF No. 127-4 at PageID 5788-89.) Deference is owed the state courts on the TCCA's finding that Hugueley was

117

competent to waive post-conviction review.   *See id.* at *41 ("Petitioner is competent to withdraw his petition for post-conviction relief.")   Hugueley has not presented clear and convincing evidence to rebut the presumption of correctness of the TCCA's factual finding.   Based on the validity of the post-conviction waiver, he cannot demonstrate prejudice associated with his post-conviction counsel's performance.   Therefore, he could not meet his burden under *Martinez* to overcome procedural default.

After Hugueley waived his claims, the ineffective assistance of trial counsel claims were not exhausted on post-conviction appeal.   (*See* ECF No. 43-7.)   *Martinez* does not extend to errors of counsel beyond the first opportunity to present the claim on collateral review.   *Martinez*, 566 U.S. at 16.

Further, Hugueley would have difficulty demonstrating that his trial counsel's performance was deficient where there is a detailed history of his mental health issues, evaluations, treatment, and refusal to cooperate with counsel over the course of his life resulting in multiple and varying diagnoses.   The TCCA referred to Pamela Auble's neuropsychological evaluation of Hugueley in 2007.   The court noted that "[c]ompetency is not static, but rather a function of the individual's present state" and that Auble was unable to "venture an opinion on [Hugueley's] present competency" because she had not seen him in four years.   *See Hugueley*, 2011 WL 2361824, at *13.   (ECF No. 130-11 at PageID 7365 (competency changes over time).) The TCCA also referenced Caruso's evaluation of Hugueley and that Caruso "could not offer an opinion as to [Hugueley's] present competency because he has not seen him in more than four years."   The TCCA stated "[t]he competency of individuals such as this can wax and wane depending upon the circumstances."   *Id.*   There is not a reasonable probability that the outcome

at trial would have been different because: (1) approximately fifteen years has passed since the crime; (2) the trial court and Hugueley's counsel noted no apparent issue with his demeanor and competence (*see* ECF No. 41-5 at PageID 755; *see* ECF No. 130-8 at PageID 7293 ("I thought Mr. Hugueley was competent.  He seemed like a smart guy. . . .   When I say Mr. Hugueley was competent, I mean he knew what was going on."); and (3) the only concurrent evaluation of Hugueley's competence at trial indicated that he was competent to stand trial.  *See Harries v. Bell*, 417 F.3d 631, 635-37 (6th Cir. 2005) (denying habeas claims about the defendant's competence to stand trial and ineffective assistance for counsel's failure to challenge the defendant's competence where two doctors found the defendant competent to stand trial, trial counsel bolstered the competency determination, and the evidence of incompetence was submitted nineteen years post-trial)[32]; *see also Sully v. Ayers*, 725 F.3d 1057, 1070-72 (9th Cir. 2013) (denying habeas relief based on retrospective determination of incompetence)[33]; *Johnson v. United States*, 860 F. Supp. 2d 663, 809-810 (N.D. Iowa 2012) (finding that "[t]he fact that Johnson was later able to find a mental health expert, Dr. [George] Woods, to opine that she was not competent to stand trial does not make trial counsel's conduct at the time of trial unreasonable" where trial counsel had not received any indication from the mental health experts or observations of Johnson's demeanor and behavior to indicate that she was incompetent).

---

[32] The *Harries* case is similar to Hugueley's because, like Hugueley, Harries demanded the death penalty *at times*, talked with press, and attempted to manipulate the system through his jailhouse behavior, while also engaging in coherent discussion during the trial proceedings. *Harries*, 417 F.3d at 636.

[33] In *Sully*, the court stated that it generally disfavored "retrospective determinations of incompetence like that of Dr. Woods" where there was "strong evidence that Sully was competent to stand trial" based on his testimony and discussion of the charges.  *Sully*, 725 F.3d at 1071-72.

To the extent that Petitioner argues that trial counsel was ineffective for failing to develop and present evidence of his social history as mitigation, his counsel did develop his social history and put that evidence in the record despite Hugueley's waiver. His counsel's performance appears reasonable under the circumstances. *See Ryder ex rel. Ryder*, 810 F.3d at 748–50 (denying ineffective assistance claim for failure to present mitigation evidence where legally competent defendant waived mitigation); *Ramirez*, 641 F. App'x at 327 (denying claim of ineffective assistance where counsel stopped mitigation case at defendant's request where defendant was competent "and wanted to avoid spending the rest of his life in jail").

Further, the Court acknowledges that Hugueley has presented evidence in these proceedings of a personal and family history of mental illness, sexual abuse, and brain damage. That evidence is juxtaposed against a violent criminal history with the inmate as a young adult murdering his mother, killing two individuals in prison, and attempting the murder of a third individual while in custody. Hugueley's testimony about the manner in which he murdered Steed was grotesque and showed no empathy or remorse. Woods' conclusions about Hugueley's mental disorders do not humanize him and make no attempt to explain how they relate to his violent nature other than stating that his disorders created "a depth of impaired functioning and disruptive behavior." (*See* ECF No. 127-4 at PageID 5805.) This evidence does not establish a reasonable probability that the outcome at sentencing would have been different had the jury heard the evidence now presented.

Claims I(1-3) and K(1 & 3) are procedurally defaulted, without merit, and DENIED.

With regard to the sub-claims I(5) and K(2) related to the investigation and presentation of evidence about Hugueley's prior violent convictions, he asserts that his ability to reasonably assist

counsel was compromised by his developmental, if not congenital, brain defects and resulting mental illness. (ECF No. 127 at PageID 5636.) He contends that these conditions vitiated his competency to plead guilty to the three prior crimes used to support the aggravating circumstance of prior violent felony convictions under Tenn. Code Ann. § 39-13-204(i)(2). (*Id.*) Hugueley contends that his trial counsel's failure to collaterally attack these convictions prejudiced him. (*Id.*)

Petitioner argues that these claims were not raised in the state courts due to the ineffective assistance of post-conviction counsel. (ECF No. 127 at PageID 5636.) He provides Gleason's declaration that the claims were not made because of "the time constraints and my focus on other cases, coupled with lack of resources to begin investigation on Mr. Hugueley's social history." (*Id.* at PageID 5636-37; *see* ECF No. 130-20 at PageID 7406-07.) Hugueley contends that this failure to investigate and collaterally attack these prior convictions, along with investigating his social history and mental health is constitutionally inadequate for both trial and post-conviction counsel. (ECF No. 127 at PageID 5637.) He asserts that, under *Martinez*, he has cause for the procedural default of his ineffective assistance of trial counsel claims. (*Id.* at PageID 5638-39.) He also argues that his incompetency at the time of the prior convictions renders those convictions unconstitutional and overcomes procedural default and that he has suffered prejudice. (*Id.* at PageID 5639.)

The inmate relies on Nadkarni's letter that he was incompetent at the time of his prior convictions. (*See* ECF No. 127 at PageID 5636.) However, Nadkarni does not come to that conclusion. Nadkarni opined that Hugueley suffered "a virtually global neurocognitive syndrome, with marked dysexecutive features" and that Hugueley had severe brain abnormality

that "impairs his judgments, tending toward explosive behavior, with an organically based lack of empathy" which is likely developmental in nature. (ECF No. 127-5 at PageID 5836.) [34] Nadkarni further concluded that "Hugueley's thinking *may be* irrational and not based in reality." (*Id.* (emphasis added).) However, Nadkarni never examined or interviewed Hugueley or reviewed his records and admitted that his opinions might be modified based on that information. (*Id.*)

Nadkarni makes no assertions about Hugueley's competence. Woods' report is also silent about Hugueley's competence at the time of the prior convictions. Without some showing that Petitioner was actually incompetent at the time of those convictions, his prejudice argument fails. Hugueley has not demonstrated ineffective assistance of post-conviction counsel. *Martinez* does not assist Hugueley in overcoming the procedural default of his claims of ineffective assistance of trial counsel related to his prior convictions in Claims I(5) and K(2).

### c. *Panetti*

The inmate asserts that the state court's adjudication of his waiver of the post-conviction process under Tennessee Supreme Court Rule 28 did not comport with due process and resulted in an erroneous determination that he was competent. (ECF No. 127 at PageID 5598.) He argues that, as a result, there is not an adequate state procedural ground for the default of his claims for which he is entitled to *de novo* review. (*Id.*)

Tennessee Supreme Court Rule 28, § 11(B)(2) provides the state procedure required when a defendant seeks to withdraw a post-conviction petition:

---

[34] Nadkarni made no reference to Hugueley's brain tumor or how the removal of that tumor related to the abnormalities referenced in the report.

A petitioner is presumed competent to withdraw a post-conviction petition and waive post-conviction relief; however, if a genuine issue regarding the petitioner's present competency arises during the hearing provided for in (A), supra, the trial court shall enter an order appointing at least one, but no more than two, mental health professionals from lists submitted by the State and counsel for the petitioner. The order shall direct that the petitioner be evaluated by the appointed mental health professionals to determine the petitioner's competency and that the appointed mental health professionals file written evaluations with the trial court within ten days of the appointment unless good cause is shown for later filing. Upon filing, the trial court clerk shall forward a copy of the written evaluations to counsel for the petitioner and to the State.

Hugueley outlines the proceedings in the state post-conviction courts (*see* supra pp. 4-12) to assert that he was denied due process when the state post-conviction court allowed him to withdraw his ineffective assistance claims. (*Id.* at PageID 5599-5608.) He claims that the state court unconstitutionally precluded consideration of evidence of his incompetence in contravention of *Panetti v. Quarterman*, 551 U.S. 930 (2007), because he was not afforded a fair hearing in accord with fundamental due process. (*Id.* at PageID 5608-12.) Hugueley contends that, in violation of *Panetti,* the Tennessee courts denied funding for brain scans or expert assistance to challenge the state's competency determination. (*Id.* at PageID 5610.) He maintains that he was entitled to the assistance of his own expert. (*Id.*)

Although post-conviction counsel repeatedly asked for brain scans and expert assistance for the competency hearing, Hugueley asserts that the post-conviction appellate court refused. (*Id.* at PageID 5611.) He cites the TCCA's determination that Hugueley has no constitutional right to expert assistance at all stages of competency proceedings and no constitutional right to the funding or appointment of experts. (*Id.* at PageID 5612.) *See Hugueley*, 2011 WL 2361824, at *24 ("Absent the creation of a new constitutional right, due process merely requires the postconviction court to follow the procedures established by state rules."). He argues that,

"[h]eedless of *Panetti*," the Tennessee court decided his competency only based on the examination performed by the court-appointed expert and contravened his due process rights. (*Id.* at PageID 5612.)

The Warden counters that, as the TCCA noted, neither *Ake*, 470 U.S. 68, nor *Panetti*, 551 U.S. 930, established a constitutional right to funding for experts of a petitioner's choosing in a collateral review proceeding. (ECF No. 137 at PageID 7680.) *Hugueley*, 2011 WL 2361824, at *23. He argues that these cases do not support Hugueley's argument that due process required funding of an expert of his selection to litigate his competency to waive state post-conviction proceedings. (*Id.* at PageID 7680-81.)

*Panetti* specifically addresses the competency of a prisoner to be executed. *Panetti* is not directly applicable to Hugueley's claim because competence to stand trial and waive mitigation is not the equivalent to competence to be executed, and the timelines for these determinations are different. The Supreme Court in *Panetti* held that "no deference [was] due" to a state court's adjudication of a prisoner's claim that he was not competent to be executed because "[t]he state court's failure to provide the procedures mandated by *Ford* [*v. Wainwright*, 477 U.S. 399 (1986),] constituted an unreasonable application of clearly established federal law as determined by this Court." *Panetti*, 551 U.S. at 948. In *Panetti,* the court stated that, once a prisoner seeking a stay of execution makes a "substantial threshold showing of insanity," procedural due process affords him a "fair hearing" or an "opportunity to be heard." *Id.* at 949. The Court noted that the state procedures in *Ford* were deficient because the determination of sanity was "made *solely* on the basis of the examinations performed by state-appointed psychiatrists." *Id.* The basic requirements of due process were described as "an opportunity to submit 'evidence and argument

from the prisoner's counsel, including expert psychiatric evidence that may differ from the State's own psychiatric examination.'" *Id.* at 950.

The Sixth Circuit has addressed the process required for a determination of an inmate's competence to be executed. Due process requires more than a determination based "*solely* on the examinations performed by state-appointed psychiatrists." *Ford*, 477 U.S. at 424; *see also Bedford v. Bobby*, 645 F.3d 372, 380 (6th Cir. 2011). However, a full hearing is not mandated as a part of a threshold determination of competency. *Bedford*, 645 F.3d at 379. So long as the inmate is afforded "the opportunity to be heard," there is no due process violation. *Id.* at 380.

Although Hugueley contends that he was not provided resources to respond to the state's evidence, he ignores the fact that he was granted the opportunity to select an expert of his own choosing and that Peter Brown could not complete the evaluation in a timely manner, in part because of Hugueley's refusal to cooperate. His post-conviction proceedings began in 2006, and continued until 2011. *See Hugueley*, 2011 WL 2361824, at *3. Seidner was ultimately appointed and evaluated Hugueley in 2008. *Id.* at *11. The inmate provided the affidavits of Auble and Caruso in the post-conviction proceedings in contrast to Seidner's opinion. *Id.* at *13. The TCCA also reviewed TDOC records about Hugueley's previous psychiatric diagnoses of intermittent explosive, antisocial, narcissistic personality, borderline personality, and delusional disorder, the brain tumor that was removed in 1986, and his IQ. *Id.* at *16.

Hugueley's case differs from a situation involving the competency to be executed. Still, he was provided an opportunity to be heard and due process with regard to the competency

determination for his waiver of post-conviction review.[35]  He has not demonstrated cause and prejudice to overcome the procedural default of his ineffective assistance claims in Claims I and K based on constitutionally inadequate post-conviction proceedings.

### d.  Adequate State Procedural Ground

Hugueley contends that, given the fundamental unfairness of the state post-conviction proceedings, there is not an adequate state ground precluding federal review of his claim.  (ECF No. 127 at PageID 5612.)  He asserts that the adequacy of his waiver is dependent on the adequacy of Tennessee Supreme Court Rule 28.    (*Id.* at PageID 5613.)  Hugueley submits that because the competency determination did not comport with basic due process, federal review is not barred.

Petitioner insists that, without the brain scans, the state court had no proof of the congenital, physical abnormalities that were the basis of his irrational and self-destructive decisions.  (*Id.* at PageID 5614.)  He argues the state court's erroneous determination that he was competent to waive post-conviction proceedings is the direct result of the denial of resources and establishes cause for the procedural default of Hugueley's claims.  (*Id.* at PageID 5614.)

Respondent counters that the relevant question is whether Hugueley's waiver of post-conviction review and the one-year limitation on post-conviction petitions are independent and adequate grounds to support the default.  (ECF No. 37 at PageID 7681.)  He notes that Hugueley's ineffective assistance claims are defaulted due to improper exhaustion, rather than

---

[35] The TCCA noted that Hugueley had no constitutional right to post-conviction review or to post-conviction counsel and declined "to suddenly create an ancillary constitutional right at a competency hearing to the mental health experts and testing of his choosing."  *Hugueley*, 2011 WL 2361824, at *24.

the express enforcement of an applicable state procedural bar. (*Id.*) The Warden observes that under *Coleman*, the claims are defaulted notwithstanding the lack of a state court decision enforcing a procedural bar. (*Id.*) These well-established and regularly applied procedural bars, argues Respondent, are adequate to support a finding of procedural default.

As stated herein, Hugueley has not demonstrated that the state court proceedings denied him due process as it relates to the competency determination. Tennessee Rule 28 did not act as a procedural bar to the exhaustion of Hugueley's claims. He made a valid waiver of those claims and subsequently failed to exhaust them in the state courts.

Hugueley has not demonstrated that his failure to exhaust the allegations in Claims I and K are based on the ineffective assistance of post-conviction counsel, nor has he established cause and prejudice to excuse procedural default based on a denial of funding and due process in the post-conviction proceedings. *See Hugueley*, 2011 WL 2361824, at *25 ("The record reflects that the court provided the defense team with every reasonable opportunity to have a report prepared by the expert of their choosing."). The allegations in Claim I and K are procedurally defaulted.

3. **Merits**

Alternatively, the Warden submits that Hugueley's claims that his trial counsel failed to investigate or consult with experts about his competency, social history, and prior convictions (Claim I and K) are belied by the state-court record and without merit. (ECF No. 112-1 at PageID 5468-69, 5471-72.) Respondent contends that the record reflects trial counsel's extensive consultation with experts and those experts' exhaustive investigation into Hugueley's social, criminal, and psychological history. (*Id*.) Hugueley's counsel investigated his

competency, and the expert deemed him competent to stand trial.   (*Id.* at PageID 5469, 5471-72.)

Respondent points out that Hugueley's trial counsel filed "a several-hundred-page report" prepared by a mitigation expert and that document includes details about Hugueley's social, criminal, and psychological history.   (*Id*. at PageID 5469, 5472; *see* ECF No. 41-7.)

Petitioner asserts that he is brain-damaged, traumatized, and mentally ill and that he was incompetent to stand trial and waive mitigation.   (ECF No. 127 at PageID 5551-5570.)   He believes that his trial counsel were ineffective for failing to investigate the brain damage and incompetence issues and that his counsel ignored their own experts' requests for additional information.   (*Id.* at PageID 5570-85.)   Hugueley contends that his counsel's inactions undermined their experts' ability to make an accurate assessment and did not understand the law of competency.   (*Id.* at PageID 5586-89.)   As a result of his counsel's failures to conduct an adequate social history and appropriate legal research, he asserts that they failed to investigate brain dysfunction and did not present significant evidence of his incompetence.   (*Id.* at PageID 5589-94.)   The inmate avers that, had his counsel investigated and developed "the clear proof that Mr. Hugueley's behaviors and decisions are not merely 'unconventional' but rather the irrational product of his organic brain malformation and resulting serious mental illness," he never would have been convicted or sentenced to death.   (*Id.* at PageID 5597.)   He contends that, had his counsel investigated and prepared a social history that comported with professional norms, they would have realized the critical need for MRI scans and understood that his history of suicide attempts and self-injurious behavior was an irrational product of mental illness.   (*Id.*)   At least one juror, claims Hugueley, would have voted for life had his trial counsel presented the mitigation proof documented and illustrated in the biopsychosocial evaluation.   (*Id.* at PageID 5597-98.)

128

The Court further notes that Hugueley has not clearly demonstrated deficient performance or prejudice as it relates to Claims I and K. The record indicates that Petitioner's trial counsel attempted to litigate his mental health issues without much cooperation from Hugueley. With a mitigation investigator, counsel developed themes of early childhood trauma, inadequate community response, institutional failure, cognitive and emotional disorder, and cultural distortion of perception. (*See* ECF No. 41-7 at PageID 908.) The mitigation investigation included Hugueley's social history including his mother's background, his childhood, problems setting fires, the Faith Tabernacle Baptist Church and assertions that he had been sexually assaulted by the preacher, behavior problems, his father's suicide, Hugueley's belief that his father was killed by his mother's family to prevent him from gaining custody, juvenile delinquency, incidents of self-mutilation and psychiatric treatment while in state custody as a juvenile, his multiple suicide attempts, hearing voices to "kill mama and take the car," his mother's fear of him, and Hugueley's murder of his mother in 1986. (*Id.* at PageID 909-17, 923-27, 930-31.) The records address his mental health evaluations, surgery for a brain tumor, treatment with various psychiatric medications, and varied psychiatric diagnoses including, but not limited to intermittent explosive disorder, bi-polar disorder, paranoid schizophrenia, delusion disorder (persecutory type), and alcohol and cannabis abuse. (*Id.* at PageID 916-18.) Hugueley was classified as "a maximum security offender" and described as "the most dangerous prisoner they have ever had" and "a hopeless and dangerous case." (*Id.* at PageID 918.) The mitigation history addresses Hugueley's murder of James Shelton in 1991, the attempted murder of Timmerall Nelson in 1997, and his psychiatric treatment and medications while incarcerated, his relationship with Robin Thomas, and his conflict with Delbert Steed. (*Id.* at PageID 919-22, 931-32.) The mitigation

history also addresses Hugueley's belief that he should have received the death penalty for the murders of his mother and James Shelton.   (*Id.* at PageID 933-34.)

Although Hugueley has a substantial record of mental health issues, the record before this Court demonstrates that trial counsel investigated his mental health and developed mitigation theories but were unable to present those theories because of Hugueley's refusal to cooperate. The record indicates that Petitioner was deemed competent at the time of trial and knowingly, voluntarily, and intelligently waived his mitigation case.   Further, given that he admitted to the crime before internal affairs and the jury and had a violent history, having, at age 18, murdered his mother, murdered another inmate during his incarceration, and attempted to murder a third inmate, there is not a reasonable probability that the outcome of Hugueley's conviction or sentence would have been different.

With regard to Claims I(5) and K(2), Hugueley contends that, in 2003, it was standard capital litigation practice for counsel to investigate, develop, and present evidence to collaterally attack prior convictions that the State intended to use as basis for the prior crime of violence aggravating circumstance.   (ECF No. 127 at PageID 5627.)   He contends that his trial counsel failed to investigate his prior convictions and that, if they had investigated and developed proof of his developmental brain malformation, they would have realized that he was incompetent to enter pleas to the three prior crimes of violence.   (*Id.* at PageID 5628.)   Hugueley argues that he was insane when he killed his mother.     (*Id.* at PageID 5628-36.)   He asserts, based on declarations, that his mother physically, emotionally, and sexually abused him.   (*Id.* at PageID 5629-31; *see* ECF No. 130-2 at PageID 7270 (Mary Carter states "he confided in me that his mama, Rachel, was sexually abusing him.   Steve told me Rachel made him sleep with her.   It was clear that he meant

that she made him have sex with her."); *see* ECF No. 132-4 at PageID 7543 (Marcella Laster states, "After Steve killed her, I wondered if Rachel might have been sexually inappropriate with him.  I just can't think of anything else that would cause a child to kill their mother."); *see* ECF No. 130-6 at PageID 7284 (Freddie Chears states, "One day Stephen told me that his mother coerced him into having sex with her."); *see* ECF No. 132-5 at PageID 7545 (Anthony Brandon states, "When we were in school, people used to say that his mother was sexually abusing him."); *see also* ECF No. 132-6 at PageID 7548 (Danny Walden states, "[a]fter he killed his mother, I wondered whether she had abused him.  It would seem like it would take something deep-seated like chronic sexual abuse to make a kid do something like that").  Hugueley provides declarations from people who claim that his relationship with his mother had "a strange and inappropriate sexual overtone," that they acted "more like husband and wife," and that she told her son, "[i]f I can't have you, no one can!"  (ECF No. 127 at PageID 5631; *see* ECF No. 132-7 at PageID 7551; *see also* ECF No. 132-15 at PageID 7648.)[36]

The inmate relies on the report of David Lisak, Ph.D., a clinical psychologist and international expert in child sexual abuse, to support his claim.  (ECF No. 127 at PageID 5632; *see* ECF No. 130-1 at PageID 7205.)  Lisak was asked to provide an opinion on the long term impact on a child of incestuous sexual abuse by his mother and to provide "a general opinion

_____

[36] Despite the assertions of incest, the declarations state that "I never saw Rachel hug Steve.  She was not affectionate toward him."  (*See* ECF No. 132-15 at PageID 7648.) Petitioner also cited Lucille Permenter's comments about Hugueley not letting his mother hug him.  (ECF No. 127 at PageID 5631.)  The comments were not related to incest but to Hugueley's resentment of his mother and "the way he treated her.  Although he was physically affectionate and would give me and other people hugs, he never let Rachel hug him."  (ECF No. 130-12 at PageID 7372.)

regarding the likelihood that Mr. Hugueley was capable of conforming his conduct to the law when he killed his mother." (*Id.* at PageID 7207.) Lisak summarily concludes based on a document review that Petitioner was "subjected to the most severe form of sexual abuse possible – maternal incest" and that "[t]he most catastrophic of the traumas that befell Steve Hugueley was the long term incestuous abuse perpetrated by his mother." (*Id.* at PageID 7208.) The psychologist relied on the declarations of Carter and Chears and stated "Mr. Hugueley disclosed that the incest had been ongoing at least twice, both times during his adolescence within two years of when he fatally shot his mother." (*Id.* at PageID 7208-10.) Lisak contends that the incestuous abuse is "indirectly corroborated by the very severe mental disturbance that characterized Mr. Hugueley's childhood and adolescence." (*Id.* at PageID 7210.)

Hugueley's trial counsel stated, "[t]hough I suspected that Mr. Hugueley was a victim of maternal incest, Ms. Charvat did not locate any information or witnesses to substantiate that suspicion." (ECF No. 130-18 at PageID 7396.) The declarations cited do not provide any first-hand knowledge of sexual abuse. They are based on purported reports from Hugueley, hearsay, or speculation. No evidence of this type has been presented previously despite years of mental health evaluations and treatment. The inmate has not made any statement in these proceedings about the incest allegations.

Nearly thirty years after Rachael Hugueley's murder, Lisak, having never met Stephen Hugueley or his mother and based solely on a document review, concluded that Hugueley had been sexually abused by his mother and that "it is quite plausible that during the fatal encounter with his mother Steve Hugueley was incapable of conforming his conduct to the law." (*Id.* at PageID 7212; *see* ECF No. 127 at PageID 5633.) Petitioner has not shown either that he was

132

sexually abused by his mother or that he was incapable of conforming his conduct to the law, and therefore has not demonstrated that the conviction for the murder of his mother should not be considered as a violent felony conviction in support of the aggravating circumstance. To the extent this evidence could be used for purposes of mitigation, its reliability is questionable.

Hugueley cites to *Johnson v. Mississippi*, 486 U.S. 578 (1988), to support his argument that defense counsel have understood the professional obligation to collaterally challenge a capital defendant's prior convictions. (ECF No. 127 at PageID 5635.) *Johnson*, however, did not involve a claim of ineffective assistance.

In *Rompilla v. Beard*, 545 U.S. 374, 384-86 (2005), the Supreme Court found counsel's performance to be deficient where counsel failed to view the file on a prior rape conviction and a transcript from the rape victim which counsel knew the prosecution intended to use to support an aggravating circumstance. The Court, however, noted that its analysis does not create "a 'rigid, *per se*' rule that requires defense counsel to do a complete review of the file on any prior conviction introduced." *Id.* at 389. In *Rompilla*, the Court found prejudice because the file contained a range of mitigation leads that was otherwise unavailable, as well as prison files and information about the victims' juvenile history and background. *Id.* at 390-91. *Rompilla* states that a "lawyer is bound to make reasonable effort to obtain and review material that counsel knows the prosecution will probably rely on as evidence of aggravation at the sentencing phase of trial." *Id.* at 377.

In the instant case, unlike *Rompilla*, there was no evidence related to the prior violent felony conviction that was being presented which was detrimental to Hugueley other than the fact of the conviction and the violent nature of the crime. *See Hamm v. Comm'r, Alabama Dep't of*

*Corr.*, 620 F. App'x 752, 773 (11th Cir. 2015), *cert. denied sub nom. Hamm v. Allen*, 137 S. Ct. 39 (2016), *reh'g denied*, 137 S. Ct. 584 (2016) (distinguishing the case from *Rompilla* because counsel had no notice that any underlying facts from the Tennessee convictions other than the convictions themselves would be used in the penalty phase).   The purported failure was not the failure to discover the evidence of incest that Hugueley now claims predicated his mother's murder.   As stated earlier, trial counsel suspected but had no proof from his investigation to corroborate the suspicion of incest.   Further, the evidence of incest presented in these habeas proceedings is not reliable.   There is not a reasonable probability that the outcome at trial would have changed for this three-time murderer who had admitted his responsibility for the crime had his trial counsel investigated further and presented the evidence now available to this habeas court.

With regard to the other two convictions, Hugueley asserts that his counsel were ineffective for failure to challenge these convictions as voidable due to his incompetence.   (ECF No. 127 at PageID 5636.)   He relies on Nadkarni's report, developmental brain defects, and mental illness to argue that he was incompetent to plead guilty to those crimes and maintains that his trial counsel's failure to attack those convictions was deficient performance prejudicial to him. (*Id.*)   Nadkarni notes "significant deficits resulting in a virtually global neurocognitive syndrome" and that the "striking abnormalities" found in Hugueley would likely be exhibited as "poor judgment, apathy, outbursts, and difficulty organizing and planning."   (ECF No. 127-5 at PageID 5836.)   He highlighted the developmental nature of these abnormalities and opined that Hugueley's behavior has been affected "since early in his life – if not since birth."   (*Id.*) Nadkarni does not make a finding as to Hugueley's competence at present or at the time of these

prior convictions. As stated supra, without some evidence that Petitioner was not competent to stand trial for those prior convictions, he cannot demonstrate prejudice for Claims I(5) and K(2).

Hugueley does not develop an argument for Claim I(4)—counsel's failure to retain the proper experts for pre-trial consultation—and fails to plead this claim with specificity under Habeas Rule 2.

With regard to Claim K(4), that the inmate's counsel rendered ineffective assistance in their defense at the penalty phase by failing to object to the jury instruction on the aggravating circumstance related to the murder of a correctional employee, this Court has determined that Hugueley is not entitled to habeas relief for that jury instruction (Claim E) as it did not affect the fairness of his trial. Similarly, he cannot demonstrate prejudice. Claim K(4) is not substantial, and therefore procedurally defaulted, without merit, and DENIED.

Claims I and K are procedurally defaulted, without merit, and DENIED.

### J.   Ineffective Assistance of Counsel – Jury Selection (Claim J)

In Claim J, Hugueley alleges that his trial counsel was ineffective during the jury selection process. (ECF No. 58 at PageID 4672.) He argues that his counsel failed to object to the State's race and gender biased exercise of peremptory challenges for potential jurors Johnny Hudson, Gertrude Gibbs, and Linda Pirtle. (*Id.*) He contends that his counsel failed to perfect a *Batson* claim by neglecting to obtain specific findings by the trial court about the State's proffered reasons for striking African-American jurors. (*Id.* at PageID 4673.) Hugueley also insists that his trial counsel failed to elicit all available facts to demonstrate bias in support of the motion to strike potential juror Barry Watkins for cause and for failing to object to the denial of the motion to strike in the motion for a new trial. (*Id.*)

Hugueley asserts that the claims were not raised in the state court proceedings because of the ineffectiveness of post-conviction counsel, that Tennessee does not provide an adequate prost-conviction remedy, and/or because the trial court denied Hugueley adequate process to challenge his competence to waive post-conviction.   (*Id.*)

The Warden responds that these claims were waived on post-conviction review and are now procedurally defaulted.   (ECF No. 112-1 at PageID 5469.)   He asserts that the TSC correctly rejected Hugueley's *Batson* claims, and Hugueley cannot establish that the unpreserved *Batson* claims would have been different than those rejected.   (*Id*.)   Respondent contends that these claims are also meritless because Petitioner has failed to demonstrate that he was convicted or sentenced by an impartial jury.   (*Id.*)

Hugueley does not address this claim in response to the motion for summary judgment. The claim was not exhausted in the state court and Hugueley has not argued cause and prejudice or actual innocence to overcome the procedural default.   The allegations in Claim J are procedurally defaulted.   Summary judgment is GRANTED, and Claim J is DENIED.

### K.    Ineffective Assistance of Counsel - Direct Appeal (Claim L)

Hugueley asserts that his appellate counsel was ineffective for failing to raise and litigate his incompetence to waive the presentation of mitigating evidence (Claim L(1)) and to challenge Hugueley's prior violent convictions, which were used as aggravating factors (Claim L(2)).   (ECF No. 58 at PageID 4677.)   The inmate argues that these claims were not raised in the state proceedings because of the ineffectiveness of post-conviction counsel, that Tennessee does not provide an adequate post-conviction remedy, and that the trial court denied Hugueley adequate process to challenge his competency to waive post-conviction.   (*Id*. at PageID 4677-78.)

The Warden counters that Hugueley failed to present Claim L in state court because he waived post-conviction review and the claims are procedurally defaulted. (*Id.* at PageID 5472.) Respondent contends that the claim is also time-barred. (*Id.* at PageID 5473.) He asserts that the claims are meritless because Hugueley had the same counsel for trial and direct appeal, and state-court record demonstrates trial counsel's extensive consultation with experts, exhaustive investigation into Hugueley's social, criminal, and psychological history, and a determination of his competence. (*Id.*) Further, Respondent maintains that the claim is inadequately pled under Habeas Rule 2(c) because Hugueley provides no argument or factual support. (*Id.* at PageID 5479.)

Petitioner does not directly address Claim L in response to the motion for summary judgment. The claim was not exhausted in the state court, and he has not demonstrated cause and prejudice or actual innocence to overcome the procedural default. Although Hugueley submits that he has cause for any procedural default under *Martinez*, the Sixth Circuit does not apply *Martinez* to overcome the procedural default of ineffective assistance of appellate counsel claims. (*See* ECF No. 127 at PageID 5615.) *See Hodges v. Colson*, 727 F.3d 517, 531 (6th Cir. 2013); *see also Porter v. Genovese*, 676 F. App'x 428, 434 (6th Cir. 2017) (recognizing circuit split in application of *Martinez* to ineffective assistance of appellate counsel claims). The allegations in Claim L are procedurally defaulted. Summary judgment is GRANTED, and Claim L is DENIED.

## IX.     CONCLUSION

Claims A in part, B, C, D, E, F, G, H, I, K are without merit.

Claims F, I, J, K, L and A, as it relates to prospective jurors Hudson, Gibbs, and Pirtle, are procedurally defaulted.

Respondent's motion for summary judgment is GRANTED.

All claims in the petition have been determined to be procedurally defaulted and/or without merit, and therefore, the petition is DENIED in its entirety.

## X.    APPEAL ISSUES

There is no absolute entitlement to appeal a district court's denial of a § 2254 petition. *Miller-El*, 537 U.S. at 335; *Bradley v. Birkett*, 156 F. App'x 771, 772 (6th Cir. 2005).   The Court must issue or deny a certificate of appealability ("COA") when it enters a final order adverse to a § 2254 petitioner.   Rule 11, § 2254 Rules.   A petitioner may not take an appeal unless a circuit or district judge issues a COA.   28 U.S.C. § 2253(c)(1); Fed. R. App. P. 22(b)(1).

A COA may issue only if the petitioner has made a substantial showing of the denial of a constitutional right, and the COA must indicate the specific issue or issues that satisfy the required showing.   28 U.S.C. §§ 2253(c)(2) & (3).   A "substantial showing" is made when the petitioner demonstrates that "reasonable jurists could debate whether (or, for that matter, agree that) the petition should have been resolved in a different manner or that the issues presented were adequate to deserve encouragement to proceed further."   *Miller-El*, 537 U.S. at 336; *see also Henley v. Bell*, 308 F. App'x 989, 990 (6th Cir. 2009) (unpublished table decision).   A COA does not require a showing that the appeal will succeed, *Miller-El*, 537 U.S. at 337; *Caldwell v. Lewis*, 414 F. App'x 809, 814-15 (6th Cir. 2011), however, courts should not issue a COA as a matter of course. *Bradley*, 156 F. App'x at 773.

In this case, Hugueley has asserted that *Martinez* applies to overcome the procedural default of his ineffective assistance of appellate counsel claims (Claim L). Reasonable jurists could disagree about the resolution of Claim L. *See Davila v. Davis*, 137 S. Ct. 810 (U.S. Jan. 13, 2017) (cert. granted). Because reasonable jurists could not disagree about the remaining claims, the Court DENIES a COA on Claims A through K.

Rule 24(a)(1) of the Federal Rules of Appellate Procedure provides that a party seeking pauper status on appeal must first file a motion in the district court, along with a supporting affidavit. If the district court certifies that an appeal would not be taken in good faith, or otherwise denies leave to appeal *in forma pauperis*, the prisoner must file his motion to proceed *in forma pauperis* in the appellate court. *See* Fed. R. App. P. 24(a) (4)-(5).

The Court CERTIFIES, pursuant to Federal Rule of Appellate Procedure 24(a), that an appeal in this matter would be taken in good faith to the extent it addresses Claim L for which the Court has granted a COA. An appeal that does not address that issue would not be taken in good faith, and the petitioner should follow the procedures of Rule 24 to obtain *in forma pauperis* status.[37]

IT IS SO ORDERED this 3rd day of August 2017.

s/ J. DANIEL BREEN
UNITED STATES DISTRICT JUDGE

---

[37] If Petitioner files a notice of appeal that does not address Claim L, he must pay the full $505 appellate filing fee or file a motion to proceed *in forma pauperis* and supporting affidavit in the Sixth Circuit Court of Appeals within 30 days of the date of entry of this order. *See* Fed. R. App. P. 24(a)(5).